UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NEW YORK

_____

QUENTIN SUTTLES,

      Plaintiff,

   v.                          Civil No.

CITY OF BUFFALO; OFFICER JOHN    24-cv-00098 (LJV)(J

DAVIDSON; OFFICER RUSSELL        JM)

SULLIVAN; and OFFICER JOHN/JANE

DOE(S), ET AL,

      Defendants.

_____

DEPOSITION OF JOHN DAVIDSON

DATE:          Wednesday, July 2, 2025

TIME:          12:25 p.m.

LOCATION:      Remote Proceeding

              City of Buffalo Law Department

              Office of the Corporation Counsel

              65 Niagara Square, 11th Floor

              Buffalo, NY 14202

REPORTED BY:   Talya Brott

JOB NO.:       7458284

Page 2

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF QUENTIN SUTTLES:

PRATHIMA REDDY, ESQUIRE (by videoconference)

The Reddy Law Firm

455 Linwood Avenue

Buffalo, NY 14209

preddy@thereddylaw.com

(716) 725-0139


ON BEHALF OF DEFENDANTS CITY OF BUFFALO, OFFICER

JOHN DAVIDSON, AND OFFICER RUSSELL SULLIVAN:

ANTHONY C. DUDDY, ESQUIRE (by videoconference)

City of Buffalo Law Department

65 Niagara Square, 11th Floor

Buffalo, NY 14202

aduddy@buffalony.gov

(716) 851-4203


ALSO PRESENT:

Rajitha Nair, Assistant at The Reddy Law Firm

(by videoconference)

I N D E X

EXAMINATION:                                             PAGE

By Ms. Reddy                                6

By Mr. Duddy                              174


E X H I B I T S

NO.                DESCRIPTION                          PAGE

Exhibit 6      Judge Boller Hearing

Transcript, 9/1/2020          101

Page 4

J. DAVIDSON

THE REPORTER:  Good afternoon.  My name is Talya Brott.  I'm the reporter assigned by Veritext to take the record of this proceeding.  We are now on the record at 12:25 p.m.

This is the deposition of John Davidson taken in the matter of Quentin Suttles vs. City of Buffalo, et al., on Wednesday, July 2, 2025, in Buffalo, New York.

I am a notary authorized to take acknowledgements and administer oaths in New York State.  Parties agree that I will swear in this witness remotely.

Additionally, absent an objection on the record before the witness is sworn, all parties and the witness understand and agree that any certified transcript produced from the record of this proceeding:

- is intended for all uses permitted under applicable procedural and evidentiary rules and laws in the same manner as a deposition recorded by

Page 5

J. DAVIDSON

stenographic means; and

- shall constitute written stipulation of such.

At this time, will everyone in attendance please identify themselves for the record, beginning with Ms. Reddy?

MS. REDDY:  Sure.  Good afternoon. Prathima Reddy, attorney for the plaintiff.

THE REPORTER:  Mr. Duddy?

MR. DUDDY:  Good afternoon.  Yeah, good afternoon.  Anthony Duddy, attorney for the City of Buffalo and for police officer John Davidson.

THE REPORTER:  Mr. Davidson, will you state your name for the record?

MR. DAVIDSON:  John Davidson.

THE REPORTER:  Thank you.

MR. DAVIDSON:  You're welcome.

THE REPORTER:  Hearing no objection, I will swear in the witness.

Please raise your right hand.

//

//

Page 6

J. DAVIDSON

WHEREUPON,

JOHN DAVIDSON,

called as a witness and having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

THE REPORTER:  Thank you.

You may proceed.

MS. REDDY:  Great.  Thank you.

EXAMINATION

BY MS. REDDY:

Q    Good morning, Officer Davidson.

A    Good morning.

Q    Good morning, or good afternoon for you.

A    Yeah.

Q    I'm here to ask you some questions about a case that's currently before the federal court involving Mr. Quentin Suttles.  Are you familiar with this matter?

A    I -- I believe I'm familiar with -- I'm not familiar with this specific one.  I know he has a couple of

Page 7

J. DAVIDSON

different -- he's had a bunch of different cases, so I'm not certain specific to this one.  But I'm aware of Quentin Suttles.

Q    Okay.  How are you aware of him?

A    I believe he's -- like, in general, I guess, he's a gentleman that I arrested who had a 9 millimeter handgun. That's, to my knowledge, my only interaction with him.

Q    Okay.  And when was that?

A    I don't know the date.

Q    Okay.  Have you ever participated in a deposition before?

A    I have, yes.

Q    Okay.  In what capacity?

A    I don't know, like, the wording. I -- I've been involved in them -- in the same -- like, kind of what we're doing now so far.  I don't know what the wording would be, though.

Q    Okay.  So you were deposed similar to today?

A    So far it's been similar, yes, ma'am.

Page 8

J. DAVIDSON

Q    Okay.  Okay.  So in that case, obviously you have some experience.  We have a court reporter here today recording my questions and your answers.  So it's important that I get my question out, and I'll give you some time to make sure you understand the question and provide an answer.  So we'll try not to speak over each other.

I do need you to answer verbally so that she can record your statement as opposed to head nods or hand gestures, which she can't record.

A    Clear.

Q    Great.  What is your current place of employment?

A    The Buffalo Police Department for the City of Buffalo.

Q    Okay.  And what is your job title?

A    Police officer.

Q    And how long have you been employed with the Buffalo Police Department?

Page 9

J. DAVIDSON

A    I'm in my ninth year.

Q    And what district are you currently employed in?

A    I'm assigned to the A District.

Q    Is that where you typically work?

A    When I work patrol, I work in the A district.  Yes, ma'am.

Q    Okay.  And when you don't work patrol?

A    Like, for instance, today I'm -- like, I'm on a court detail.  Like -- it's court.  It's called court.  Any time that you're basically testifying or having a conference for testifying or deposition, it's court.

Q    Okay.  And is that just for today?

A    It's any day that you have court, any time that you have court.  But you're still assigned to your home district.

Q    Right.  Okay.  And how long have you been with the A district?

Page 10

J. DAVIDSON

A    I'm not certain.  Between two and three years.

Q    Okay.  It's fine if you don't know an answer.  I would ask you not to guess, but approximations are okay.  So something like two to three years would be appropriate.  But moving forward, if you don't know or you need me to clarify my question, I'm happy to do so.

A    Okay.

Q    -- have to guess.  So nine years.  So what year did you start?

A    Started in January of 2017.

Q    And what district were you in at that time?

A    I was assigned to the academy.

Q    How long were you in the academy?

A    I was actually in the Erie County Law Enforcement Academy for, I believe, five and a half months.  And then I was still assigned to the academy for another -- I'd have to give you an estimated guess.

Page 11

J. DAVIDSON

Q    Yeah, estimation is fine.

THE REPORTER:  Did you say Erie?  I'm sorry, did you say Erie County?

THE WITNESS:  Yes, ma'am.  Erie County Law Enforcement Academy.  So the academy itself was five and a half months, I mean, roughly.  I don't know the exact date count, but very close to five and a half months.  And then I could give you an estimate on how much longer I was assigned to the academy.

BY MS. REDDY:

Q    Sure.  I'm just trying to get some background here.

A    Yeah, I just -- I didn't want -- I know you gave me the --the rule on the estimation and I -- I just didn't want to -- I didn't want to mess up, so --

Q    No, that's fine.  Yeah, Approximations are good.

A    A ballpark.  Yeah, I can ballpark it another six months.  So I was assigned to the academy unit for roughly a year.  I would say just shy of a year.

Page 12

J. DAVIDSON

Q    Okay.  And how long was the actual training for the academy?

A    Approximately five and a half months.  And then there was also a field training officer portion of it.  So that is a part of the -- that's why you're still assigned to the academy, but you're not sitting down and doing day-to-day instruction like you are while you're a recruit.

So once you're a probationary police officer with a field training officer, you're still assigned to the academy, but you are working in a district.  So all in all, I -- I would have been assigned to the academy for roughly a year, just shy of a year.  And the time that I would have spent in the Erie County Law Enforcement Academy classrooms would have been about five and a half months.

Q    Okay.  So what did the field training portion entail?

A    A lot.  The -- the general

Page 13

J. DAVIDSON

overview would be that you spend each day your entire shift with a seasoned officer who's been trained to be a field training officer, and you are essentially doing the job of a police officer, but you are always with that officer.

Q    Okay.  And who was your assigned officer?

A    Roberto Becerril.

MS. REDDY:  And also, just speaking generally and maybe right now, if there's a name that pops up, would you like us to spell it as we go or do it all at the end,, Talya?

THE REPORTER:  You can spell it as -- you can spell it as you go.  That'd be great.

THE WITNESS:  I do not know how to spell his name.

BY MS. REDDY:

Q    Okay.  Could you repeat that name for me?

A    Roberto Becerril.

Q    Becerril, okay.

J. DAVIDSON

A    I could give you my best guess, but I don't know how to spell it certainly.

Q    Yeah, I think your best guess, and then we can fine tune it later if we need to.

A    Sure.  R-O-B-E-R-T-O.  And this one's going to be more of a guess. B-E-C-C-E-R-R-I-L [sic].

Q    Okay.  So how long did you attend field training with Roberto Becerril?

A    Sixteen weeks, I believe, is the timeframe.

Q    And what did he train you on?

A    It's hard to, like, give a succinct answer to that.  He trained me on all -- on -- as best he could based on the calls we received on how to handle calls as a Buffalo police officer.

But you really are just doing the job, so you go to the calls you're dispatched to, so you don't necessarily see every call in those 16 weeks because

Page 15

J. DAVIDSON

you can't really force it.  You've just got to kind of go to the calls as you're dispatched.

Q    Okay.  And what happens after the 16-week season training?

A    I was assigned to, like, a walking detail through the academy for another couple of months.

Q    Okay.  Can you explain what a walking detail is?

A    Sure.  You would have your morning briefing, and then you'd be told what neighborhood to walk foot patrol in. If it were too far away to walk, you'd be dropped off.  And at the end of the shift, you'd return for a debriefing, and that would be your shift.

Q    Okay.  And where did you do this?

A    Throughout the entire city of Buffalo.  Every day was a new assignment.

Q    Oh, to a new district, or just a new call?

A    So we were not assigned a

Page 16

J. DAVIDSON

specific district.  You would be assigned to the academy still at this point.  And then each day, you'd -- you'd show up for a roll call or a briefing.  And then the lieutenant or captain, or even higher than that, depending on who was available in the academy, would give you your assignment for the day.

So for each day you'd have a new assignment.  It -- it wouldn't be specific to any sector or district.  It would be more of a neighborhood, or if there was an event going on that day, it'd be a officer presence in the area.

Q    Okay.  And how long did you do this?

A    A couple of months.  I don't know.  Between two and three months, I'd say.

Q    Okay.  So now we're in early 2018; is that correct?

A    Either late 2017 or early 2018, but I'm not certain.  Because I was -- I was hired early into the year, so January

Page 17

J. DAVIDSON

of '17, so all that would have taken roughly a year.  So I'm not quite certain if I would have been placed in the new year finally at, like, a home district, or if I was still walking into the -- into the new year.  It would have been close, though.

Q    Okay.  So what did you do after your walking detail completed?

A    I was assigned to the C District, Charlie, C District.

Q    Okay.  And what shift?

A    Initially, I was assigned to the day shift.  We call it MP 2.

Q    And how long were you on the day shift?

A    Not long.  Couple of weeks.  No more than a couple of months.

Q    Okay.  And what happened after that?

THE WITNESS:  Do I let John Heffron [ph] in?

MR. DUDDY:  No.

THE WITNESS:  Sorry to interrupt.

Page 18

J. DAVIDSON

Okay.  I just got a message on my screen.

MR. DUDDY:  No.

THE WITNESS:  Okay.  I'm sorry, what was the last question?

BY MS. REDDY:

Q    That's okay.  I was just asking you what happened after you did a couple of weeks on the day shift in C District in 2018.

A    Yeah, I'm not sure if it was a couple weeks or a couple months.  It was a brief period of time in the scheme of years.  I was there very briefly, and then I went to midnights in the C District, which is called MP 5, and it's an overnight shift.

Q    And how long were you on MP 5?

A    I don't know.  I don't have a very strong answer for you.  It was more than a year, less than five.  I don't -- I -- I kind of bounced between an afternoons and a midnight shift while I was in C district.  So I don't -- I don't have a concrete understanding right at

Page 19

J. DAVIDSON
this moment of which shift I was on at what time.

Q    Okay.  And how long did you stay in the C district?

A    I'd say approximately five years after the one year of the academy.  Five years in -- in the C district, roughly.

Q    Did you move to A after that?

A    Yes, ma'am.

Q    What made you move to the A District?

A    I don't have, like, a great answer.  I mean, that's the district I lived in, so at some point, it was nice just to kind of go be in the neighborhood where I knew all the pizzerias.

Q    Okay.  I am just going to go back a little bit.  Where did you go to high school?

A    I went to two different high schools.

Q    Where's that?

A    My first high school was West Seneca West High School.  And then the

Page 20

J. DAVIDSON

second high school which I graduated from was Bishop Timon St. Jude.

Q    And where's that?

A    The first one is in West Seneca, New York, and the -- the one I graduated from is in Buffalo, New York, 601 McKinley Parkway.

Q    Okay.  And what year did you graduate Bishop St. Jude?

A    Bishop Timon St. Jude, 2002.

Q    Oh, what's that second word you're saying?  Bishop what?

A    Bishop Timon, T-I-M-O-N.  It's named after Bishop John Timon, the first bishop of Buffalo.

Q    Okay.  And I'm sorry, I didn't catch what year you said you graduated.

A    I graduated from high school in 2002.

Q    And what did you do after high school?

A    I went to college.

Q    Where did you go to college?

A    I received my undergrad from

Page 21

J. DAVIDSON

St. Bonaventure University.  But I did spend a summer semester at Oxford University and transfer in some credits so I could have an easier senior year.  So I could transfer in a few credits from Erie Community College and Herkimer Community College, so I would take those classes at the community colleges on breaks and transfer them into Bonaventure.

Q    Okay.  And what year did you receive your degree?

A    2006.

Q    And what was your degree in?

A    Elementary education.

Q    And what did you do after 2006?

A    I worked on my master's degree while teaching in a public school in Charlotte, North Carolina.

Q    So did you move to Charlotte?

A    I did.  I moved to Charlotte while working on my master's and gaining experience in the field of education.

Q    This is in 2006?

A    From 2006 to 2011, I was a

Page 22

J. DAVIDSON

public school teacher in Charlotte-Mecklenburg School District and received a master's degree from Queens University of Charlotte.

Q    And what year did you receive your master's?

A    I'm fairly certain it was 2010. But from when I finished until when they had the graduation ceremony was some time. So I may have graduated in 2009 and received the diploma in '10, or graduated in '10 and received the diploma in '11.

I -- like I said, I finished in a -- I did it early.  I tried to get through it as quickly as possible.  So I finished mid school year, and I just don't remember when I actually walked and received my diploma.

Q    Okay.  And what did you do after 2011?

A    I moved back to Buffalo, New York, and I worked as a banker for approximately two years.

Q    A banker where?

Page 23

J. DAVIDSON

A    At First Niagara.  I worked in the post-closing mortgage department.  And then after that I worked, at M&T Bank in the assignment and notes of mortgages.

Q    How long were you at M&T?

A    I was at each bank -- I was at -- I don't know.  I worked in banking for roughly two years.  I don't know the division of how long I was at each bank.

Q    Why did you leave First Niagara?

A    To go to M&T.

Q    Okay.  And what did you do after M&T?

A    I was a public school teacher in Buffalo, New York.

Q    What made you go back to teaching?

A    I wanted to be a teacher the whole time.  I just couldn't get a job.

Q    Got it.  Where did you teach in Buffalo?

A    Buffalo Public School District.

Q    What school?

A    I was at many schools. I don't

J. DAVIDSON

even know off the top of my head.  It -- the -- every -- several schools each year. They just moved me around quite a bit.

Q    Okay.  And how long did you do that?

A    About five years.  I don't know the exact dates.  I received tenure, so all totaled up.  I had at least three years of time accumulated.  But like I said, I would -- I would be laid off in the summers, and then placed at new schools.  And I'm not quite sure.  I don't understand the Buffalo Public Schools retention policies.

Q    Right.  So that brings you to two thousand --

A    That would bring me up -- I -- I left in the middle of the school year to be a police officer.

Q    So sometime in 2016?

A    It would have been January of '17.

Q    Okay.  You started the academy in 2017, January?

Page 25

J. DAVIDSON

A     Yes.  Yes, ma'am.

Q     Okay.  But sometime in 2016, you left your position at the Buffalo Public School District?

A     No, it would have been seamless. On January 20th of 2017, I was a police officer.  On January 19th of 2017, I was a Buffalo School teacher.  Now, that may -- now, hold on.  January 19th may be a weekend.

So I don't -- I wasn't, like, working that day.  I just -- to be clear, I was working as a teacher up until I became a police officer.  So I don't know if it was actually the 19th, but right up until I was sworn in, I was teaching still.

And as soon as I found out that I'd gotten the job, I let the principal of the school I was working at know, and I also kept them updated throughout the process so that if I left quickly, which was likely, the way that they hire, they'd have a contingency plan, so to speak.

Page 26

J. DAVIDSON

Q    Did you have to take a written test to apply to the Buffalo Police Department?

A    Several tests.  One of them was a written test.  Yes, ma'am.

Q    Okay.  So you did that sometime in '16 while you were still a Buffalo police teacher -- I'm sorry, Buffalo School District teacher?

A    I don't know if it was 2016 or '15 or '14.  The -- the hiring process takes some time.  I don't know when I took the written test.

Q    And what made you decide to transition from teaching to police work?

A    If I would have been placed into a teaching job full-time somewhere, I probably would have been a teacher to this day.  I love teaching.  I love coaching sports.  I still coach youth sports.  Last night, I coached two lacrosse games.  I'd probably still be a teacher if I could have found a permanent position.

And right now, it's funny,

Page 27

J. DAVIDSON

because -- I don't know about where you are, but here in New York, like, they're hurting for teachers, and people are graduating and getting full-time jobs immediately.  Where, in 2002, when I graduated college, everybody I graduated with moved to the southern portion of the United States just to try and get some experience.  It was just very difficult to get a job at the time.

Q    Yeah.  It's all about timing.

A    I know.  I even -- I added to my certifications, I'm actually certified K through 12 in reading literacy as well.  I just couldn't -- I'm actually -- and I went back here and there, added some credits.  I'm -- I'm either three or six credits shy of a special education certification as well in New York State.

It just -- I -- and the irony of the whole thing is, I received a letter from the Buffalo School Board like three months into the academy that I accrued enough time and I was finally tenured.  So

Page 28

J. DAVIDSON

I got tenured as a New York State teacher after I'd already spent three months in the Buffalo Police Academy.

Q    Oh, wow.

A    Yeah.

THE REPORTER:  And just try to slow down just a little bit, Mr. Davidson.

THE WITNESS:  Yes, ma'am.

THE REPORTER:  Thank you.

BY MS. REDDY:

Q    Well, I guess it's good to have choices.

A    Absolutely, yes.

Q    So at some point you decided to start taking the written exams for the Buffalo Police Department to start the academy?

A    For all -- for all.  While I was in the Buffalo Police Academy, I received an invitation to the Buffalo Fire Academy and the -- I can't remember.  There was another one.  It might have been the NFTA Police Department, which would stand for, I believe, Niagara Frontier Transportation

Page 29

J. DAVIDSON

Authority.  But I'm not certain.

So it kind of all came at once. Once I'd finally gotten a job, it was -- then I had too many offers, which is, again, you know, a good problem to have, I suppose.

Q    Right.  Not a bad problem.

A    Yeah.

Q    So what exactly did you have to do to get into the academy?

A    It's hard to say exactly what I had to do.  I had to take a -- from my recollection, I had to take a written test, a physical agility test, a psychological evaluation, a drug test, a polygraph, and proof of residency were like the big things.

Also had to provide proof of, like, good credit.  I don't know how to word that.  Basically that you weren't super in debt to anyone, because that would make you liable to be beholden, I suppose, to someone.  That's kind of my interpretation of it.  And I don't know

Page 30

J. DAVIDSON

exactly why, but you did have to provide good credit, proof of.

Q    Okay.  So you did all of that and somehow -- I'm sorry, not somehow. You did all of that at some point.

A    It's fine.  It's -- Freudian.

Q    And you became --

THE REPORTER:  I'm sorry?

BY MS. REDDY:

Q    Not somehow.  At some point, you -- I'm just trying to get a chronology honestly.

A    I'm totally joking around.  I'm totally joking around.

Q    Just a sequence of events.  So just at some point, you were able to get that official acceptance into the academy to start in January of 2017 --

A    Yes.

Q    -- written tests and all of --

THE REPORTER:  Wait, I'm sorry.  Just overlapping.  "To get official acceptance into the academy," and then I didn't hear what you said, Ms. Reddy.

Page 31

J. DAVIDSON

MS. REDDY:  I think I said I'm just trying to get a basic chronology.

THE WITNESS:  So I'm not sure if it came in writing.  But I know for sure I received a phone call from an inspector with the Buffalo Police Department letting me know that I was accepted into the Buffalo Police Department, that I'd be sworn in on the 20th.

There may have been, like, an official letter that came after the fact, but I don't recall.  I just know that I received a phone call while I was actually in my classroom with my students, and they knew.  They were keeping up with everything.  They were pretty pumped for me.  So it was a pretty cool moment.

BY MS. REDDY:

Q    Oh, nice.  Okay.

A    Yeah.

Q    And so now you are in the A District, transferred from C after five years?

A    Roughly five years to the C

Page 32

J. DAVIDSON

District.  Yes, ma'am.

Q    Okay.  And who was your supervisor in the C District?

A    I had several.

Q    Okay.  Can you name just in order of who you remember as your supervisor?

A    During my entire time at C District?

Q    Yes.

A    I don't know.  It would be dozens of lieutenants, and several captains, and multiple chiefs as well. I -- I don't -- I don't know.  I mean, do you want me to start naming as many as I can recall type thing?

Q    Not if you can't tether it to some timeframe.

A    No.

Q    Like, if you remember your first supervisor, or if you remember --

A    My first ever supervisor that I can recall would have been -- at the academy, it would have been Lieutenant

Page 33

J. DAVIDSON

James Curtin.

Q    Okay.  And after the academy?

A    At that same time, he would have had a supervisor that technically would still be my supervisor of the academy, Captain Mann.  I don't recall his first name.

THE REPORTER:  And I'm just going to ask that you slow down a little slower than you would in normal conversation. Just I have to get every word; okay?

THE WITNESS:  I will do my best. Yes.

THE REPORTER:  Thank you.

THE WITNESS:  I apologize.  Did you ask me a question?  Are you waiting on me?

THE REPORTER:  No, there's no --

THE WITNESS:  Okay.

BY MS. REDDY:

Q    There's no question pending.  I think you said Captain Mann last in terms of who you recall as your supervisor during academy?

A    During the academy, yes.  Those

Page 34

J. DAVIDSON

are the two supervisors I recall.  Captain
Mann may have retired, though, during my
time at the academy, and I may have had a
second captain at the academy.  But then I
would have been into more of the field
training and not on a day-to-day basis.
So I don't know who that would have been
or if that even occurred.  I just know he
retired very close to the end of my
academy time.

Q    Okay.  Have you reviewed any
documents in preparation for appearing
today?

A    Not -- not very recently, but
over the course of this case I have, yes.

Q    What have you reviewed?

A    I'm not certain.  Going all the
way back to when this was, like, a
criminal trial, I'd gone over a ton of
stuff then.  And then since it's moved
into this deposition, I believe I've
watched portions of my body camera.  I
think that's all I've done in preparation
for this.

Page 35

J. DAVIDSON

But just due to conflicting schedules on all of our ends, it's been moved a few times, so I don't even know the last time that I've met with anyone regarding this.

Q    Okay.  And outside of counsel, have you discussed this case with anyone?

A    Not outside -- I mean outside of this counsel, yes.  With other lawyers for the criminal proceedings.

Q    Okay.  And yes, outside of attorneys, have you had any discussions with anyone else regarding this case?

A    Not -- no, not outside of, like, the scope of the job.

Q    Okay.  Even within the scope of your job, have you discussed this case with anyone besides your attorneys?

A    I would think so.

Q    With whom?

A    I don't know, but I'm sure I've talked about this case with other officers just throughout the process, doing paperwork and court proceedings.  But I

J. DAVIDSON

don't -- I don't have any specific times that I could point to.  I would just know, over the course of doing this job, you speak with other officers about cases you're on.

Q    Okay.  Do you take any medication?

A    I do.

Q    What type of medication?

A    Is that something I have to answer?

Q    You have to answer all my questions today.

A    On what --

MR. DUDDY:  Just hang on.  Just -- I'm going to put an objection.  But go ahead and answer.

THE WITNESS:  I take Prilosec over the counter.  Occasionally I take ibuprofen or Motrin.  Men's multivitamin, multivitamin.  I've taken prescribed antibiotics.  I'm sure -- I've had a few surgeries, so I'm sure whatever anesthesia I've been given.

Page 37

J. DAVIDSON

MR. DUDDY:  Sorry, are we talking about current medications, or are you listing everything you've ever taken?

THE WITNESS:  Yeah, that's what I asked if I had to answer that.  I'm just trying to think --

BY MS. REDDY:

Q    Hold on a second.  Hold on, Officer Davidson.

A    Yep.

Q    Your attorney can lodge an objection for the record, but these are not speaking objections and not we're going to have a dialogue or a discussion.

MR. DUDDY:  Yeah, objection.  But he's not listing than everything he's ever taken.  I think that you have to qualify your question.

MS. REDDY:  Generally speaking, I'm sure you're aware we do this every time. I'm not going to entertain your speaking objections.  If you want to object --

MR. DUDDY:  I'm just --

MS. REDDY:  Please let me finish my

Page 38

J. DAVIDSON
sentences for the court reporter.

MR. DUDDY:  You already said it.

MS. REDDY:  I didn't hear what you just said.

THE WITNESS:  Me?

MS. REDDY:  No.  Mr. Duddy said something.  I don't know if he was lodging an objection, but no one caught what he said.

MR. DUDDY:  Yeah.

MS. REDDY:  Sorry, Talya, what did he say?

THE REPORTER:  I didn't hear him.

MR. DUDDY:  Objection.

BY MS. REDDY:

Q    Okay.  So just to be clear, your attorney may say, "Objection," and place -- objection on the record, and you can --

MR. DUDDY:  I will tell my client that.

MS. REDDY:  But you haven't.

MR. DUDDY:  I know, but I will tell him that.

//

J. DAVIDSON

BY MS. REDDY:

Q    I'm putting it on the record -- Officer Davidson, don't respond directly to your attorney and have a discussion. He may interrupt me and put an objection in the record, and then thereafter you'll still need to answer my question.

MR. DUDDY:  Objection.

BY MS. REDDY:

Q    We'll try our best not to speak over each other.  So now he's put his objection in the record.  If you don't understand my question or you have a question, you're welcome to direct that towards me.

MR. DUDDY:  Objection.

BY MS. REDDY:

Q    -- rephrase my question.

A    Okay.

Q    Have you taken any medication that would impair your ability to answer truthfully today?

A    No.

Q    Is there any other reason you

Page 40

J. DAVIDSON

may not be able to answer my questions honestly today?

A    No.

Q    So going back to what we're trying to attempt to create, some kind of context for you, in 2018, you were on the day shift for a couple of months.  What did you do after that?

A    I don't know the exact timeframe.  I know that I was on the day shift at C District for what I would consider a brief amount of time.  I then went to -- I stayed in the C District, and for the next four and a half to five and a half years, I was just between midnights and afternoons -- shifts, kind of back and forth, moving around.

Q    Okay.  In the C District?

A    That entire -- for -- for that question, yes.  In the C District.

Q    Right.  And I will represent to you that the subject matter of this case involves a timeframe in the fall of 2019.  Is that your --

Page 41

J. DAVIDSON

A    So the fall of 2019, I would have still certainly been in the C District.  I don't know what shift I would have been working.

Q    Okay.  So just for reference --

A    It would have been a -- it would have been a night shift, though.  I just don't know if it would have been afternoons into the early morning or nights from late night into the later morning.

Q    Okay.  And did you have an assigned partner in 2019?

A    It's hard to answer that question the way it's asked.  We don't have assigned partners.  It -- well, when you're a PPO during the FTO process, you have an assigned partner.  And then once you graduate from that and you're no longer a probationary police officer, you no longer have an assigned partner.  I hope that helped.

Q    I didn't understand that, so --

A    Yes.  Yeah, sorry.

Page 42

J. DAVIDSON

Q    When did you first meet Officer Russell Sullivan?

A    The first time I ever met Officer Sullivan, we were at Cazenovia Park.  I don't know the year or date or anything like that.  It was at, like, a farmer's market of some sort of sort.

Q    Oh, okay.  This is outside of work?

A    Oh, yeah.  I think he was maybe in the Navy or armed forces of some kind.

Q    Okay.  So you -- okay.  What year was that?

A    No idea.

Q    So you knew Officer Russell Sullivan before he joined the Buffalo Police Department?

A    I met him one time prior to joining the Buffalo Police Department.

Q    Okay.  And in his capacity within the Buffalo Police Department, when did you first meet Officer Russell Sullivan?

A    I don't know.

Page 43

J. DAVIDSON

Q    And was there a time where you came to be his partner?

A    No.

Q    Was there a time where you came to work with him on any shift together?

A    Yes.

Q    When did that happen?

A    I don't know the date.  It was while at the C District.

Q    Okay.  Did you and him work on the same shift in the C District?

A    For a time period, yes.

Q    And how often did your shifts overlap in the C District?

A    For a time period, we were on the exact same shift.  Couple of years, maybe two-ish.  And then there was probably another two-ish where our shifts overlapped.  And then there was probably another year where we were on different shifts, but still in the C District.  So would, you know, cross paths, whether it be on like overtime assignments or trainings.  So in some capacity, I suppose

Page 44

J. DAVIDSON

we worked overlapping roughly five years.

Q    During your time in the C District?

A    Yep.  And some of that was more than overlapping.  Some of that was the exact same shift.

Q    Okay.  And did you ride in patrol cars together?

A    Occasionally.  We were never car partners.  If -- we get along, so if my partner were out and his partner were out, and we -- and we felt like having a partner for the day, we would jump in together occasionally.

Q    Did you take calls together?

A    So --

Q    And partner -- maybe this isn't the right language.

THE REPORTER:  Okay.  I'm sorry.  I just didn't hear the end of that question.  I think it was interrupted.  "Did you take calls" --

BY MS. REDDY:

Q    I was going to say together.

Page 45

J. DAVIDSON

A    I can't really answer that.

Q    Yeah.  And I'm sorry, I was going to say, I don't know if that's the right language.  But did you --

A    Yeah.

Q    You can interpret that and explain it.  But did you take -- did you respond to any calls together?

A    So if you mean by -- if by together, like, were we ever dispatched to the same call, then, yes, often.  If you mean were we, like, hip to hip with one another when we answered calls, very rarely.

His car partner and him were a steady car partner all the way until a promotion.  So they -- him and his car partner were the same two for probably close to eight years.  So he didn't ride with too many other people during that timeframe.

Q    Okay.  And who was his car partner?

A    Nick -- it's a Polish name that

Page 46

J. DAVIDSON

I can't really pronounce or spell.  It begins with a K and ends with a "ski."

Q    Okay.  And who was your car partner?

A    I've had a few.  The -- the three partners that I've had for long term would be -- in order, would be -- my first partner was Patrick Garry.  And then the next partner that I rode for a long term period would be Andrew Moffett.  And then the -- the most recent car partner that I had for a longer period of time would be Robert Grandy.

Q    Okay.  And going back, you mentioned your time at the academy, the written test that you took, the written, psychological, drug, et cetera test that you took prior to entering the academy.  And then you were assigned to the C District.  What was your title at that time?

A    My first few months in the C District, I would have been technically titled a probationary police officer.

Page 47

J. DAVIDSON

Q     Okay.  And then after that?

A     Police officer.

Q     How long were you a probationary police officer?

A     From the time you are hired until you're off probationary status is 18 months.

Q     Okay.  So do you recall when your title changed from probationary police officer to police officer?

A     I don't know the exact date. I'm sure there's record of it, and I could try and do the math in my head right now, 18 months from January 20th.  But I don't know exactly when.

Q     So sometime towards the middle or end of 2018?

A     It would have been mid '18.  I assume it would have been July 20th based just on the math.  But I don't know for certain if it was 0001 on the 18th, or the 19th at, you know, 2359.  I don't know the exact -- for, like, transfer purposes and things, the new -- the new day begins at

Page 48

J. DAVIDSON

0600.  So I don't know at what time it would have went into effect, but it would have been -- based on 18 months from January, I believe, July of 2018.

Q    Okay.  And what does it require to be retitled as a police officer from a probationary police officer?

A    I think the academy unit would maybe be able to best answer that.  I'm not quite sure what the specific criteria is.

Q    And how were you made aware that you were no longer a probationary police officer with the Buffalo Police Department?

A    To my knowledge, no one made me aware.  Just on all the paperwork you sign, anything you need to sign in our department, you sign it your title.  So just -- around that timeframe, I just stopped putting the probationary part.  So I would just sign things PO John Davidson. And prior to that, I signed them PPO John Davidson.

Page 49

J. DAVIDSON

Q    So were you aware of any requirements that you had to meet in order to remove your probationary status?

A    I'm sure that there's more in depth.  I just -- what we are aware of is, you know, graduate the academy and then not get fired until you've made it to 18 months.  I don't know -- you have to finish the FTO process, field training officer training.  But I don't know -- I'm -- like I said, I'm certain that there's records in the academy, but I don't know what they are.

We have a whole unit, it's called the Academy Unit and there's POs, lieutenants, captains.  So they keep files and records.  But I -- I don't know the specific criteria.

Q    And outside of field training, what other training did you have to undergo to become a police officer?

A    Again, it's the same thing.  The academy would have records of all that training.  I don't -- I don't recall the

Page 50

J. DAVIDSON

specifics.  I know it's ongoing.  I mean, we still have training several times a year.  I -- I don't know specifically, though.

There's some big ones.  You know, you have EVOC, which is learning how to drive a patrol vehicle and do all the functions of patrol vehicle while also -- you know, it's a difficult job having all those distractions in a car.  Firearms was a big one.

It's hard to remember.  Like I said, the entire -- there were tests often in the academy.  I mean, I wouldn't say daily, but at least weekly, you had to complete a test and pass it.  And then since that time, there's still ongoing trainings that you have to participate in.

Q     You said EVOC?

A     Mm-hmm.

Q     What does that stand for?

A     I do not know.  I did know at one time, but I don't recall anymore.

Q     Okay.  And are you saying

Page 51

J. DAVIDSON

E-V-O-C, EVOC?

A    Yes, ma'am.  Yeah.  It's an acronym.  It's an acronym.  I bet you the V is vehicle, but I can't recall.  Evasive vehicle.  I'm not certain.

Q    Okay.  And outside of those trainings, do you recall any other required trainings as a Buffalo Police Officer?

A    Firearms training was an intensive multi-week training.  CIT training, which I believe stands for crisis intervention techniques for dealing with people having various stages of mental health episodes.  Bloodborne pathogens.  Article 35 was a very big training.

Q    What's Article 35?

A    It is the justification of use of force in New York State.

Q    And how often -- I'm so sorry.  How often do you do that training?

A    In the academy, it was an extensive training.  But I don't know how

Page 52

J. DAVIDSON

often since.  The academy keeps the records of everything.  But I don't -- I don't know.  I'm trying to think some of the other ones that jump out at me that we do often and -- and you know, a little more intensive.

We have use of force training extensively in the academy and throughout our careers.  Taser training.  We have that one at least annually, if not more often.  I've sought extra training, but I don't -- again, I don't know the -- like, what the titles of them were.

When I was in the emergency response team, we had trainings once a month.  Kept records of them, but I don't have them in front of me.  And our ERT team was disbanded a few years ago, so I don't even really --it's been a while since I even thought of that.  It just came to me just now while I was trying to rack my brain thinking of trainings.

So I'm sure there's a lot of trainings I'm forgetting, but those are

Page 53

J. DAVIDSON

the ones that kind of jump out as ones that were still in my forefront of my brain.

Q    Okay.  And as you sit here today as a Buffalo Police officer, what are your required trainings, or yearly trainings that you're required to complete?

A    I don't know.  The -- the academy would know which ones are yearly and which ones are bi-annually or bimonthly or -- I don't -- I don't know what the -- the standards are to keep our accreditation with New York State.  We're an accredited department, so I'm sure that they have pretty specific guidelines on their trainings, but I don't know what they are.

Oh, pepper spray, OC.  It's called OC spray.  That was another one that was like a long training, very in depth and we receive annual trainings on, or I believe they're annual.  I don't know that.  They're -- they're more than -- I've been trained on it several times

Page 54

J. DAVIDSON

since the academy.

Q    So have you done any trainings in 2025?

A    In 2025?

Q    That would be this year.  So up until July 2, 2025, have you done any trainings in your capacity as a Buffalo police officer?

A    No.  I mean, yes, I just can't recall them.  I think this year -- I'm certain that I've had bloodborne pathogens training this year.  I've qualified with my firearm.  The brunt of the training is in the academy.  Like, that's -- that's where, like, that's all you do is training.

And that's where -- like I said, the big ones, the EVOC that I can't recall the acronym for, the firearms.  And each of these trainings have like little subset trainings in them.  So like, when you do firearms, you also learn about firearm safety, and when you do EVOC, you learn about, like -- it's not just about, like,

Page 55

J. DAVIDSON

driving and having your radio in the car.

You learn how to -- little things, like you beep your horn if you're going to go in reverse just so people know that. You learn how to gauge other cars' speeds. You learn how to -- you learn how to actually -- like, little things. Like, your radio has a slight delay, so when you queue it up you've got to wait a brief second or your first word will get cut off.

So I don't know, like, exactly if all these trainings have their own specific name or they just fall under training within training. It's hard for me to answer 'cause I'm not -- that's not the field I work in. We have an academy unit, and I'm sure that they would have more details. I'm sorry, I'm kind of fumbling through this answer.

Q    That's okay. I appreciate it. I understand the sequence of the academy.

A    Okay.

Q    I was trying to understand what

Page 56

J. DAVIDSON

updated trainings you undergo as a police officer.

A    Sure.  So we have trainings that are actually -- you have to be physically present, and then we also have trainings all the time where they're through like a -- it's called DMS, and I don't know what that acronym is, and they're like online trainings that you have to sit through and then sign that you sat through them.

Or it'll be a bulletin that you need to read and then sign that you've read it.  So I've done those -- a lot more of those this year than I've done physical be present trainings.  I know I did have a TraCS training, which is T-R-A-C -- I believe there's an S on it -- and that's on how to, like, use the in-car system to do paperwork.  We're trying to cut down on the amount of physical paper.

I also -- due to budgetary reasons, sometimes you get turned down for training.  So there's definitely a

Page 57

J. DAVIDSON

distinction on what training's mandatory and what training is not mandatory.

Q    Okay.  Thank you.

A    Sure.

MS. REDDY:  So just going off the record, Talya.

THE REPORTER:  Sure.  It's 1:16. We're off the record.

(Off the record.)

THE REPORTER:  It is 1:51.  We're on the record.

MS. REDDY:  Okay, thank you.

BY MS. REDDY:

Q    Okay.  Back on the record, Officer Davidson.  I'm going to continue answering -- asking you questions this morning.

A    Okay.

Q    I just want to remind you that you're still under oath.

A    All right.

MS. REDDY:  So during the break, we attempted to find exhibits that had been previously entered in the course of the

Page 58

J. DAVIDSON

depositions involving this case.

Mr. Duddy, just so -- on the record, they are not in the exhibit share folder, but I have access to them in my system. They've been previously marked and submitted in prior depositions. I will screen share and show them to you now. Would that be okay with you?

MR. DUDDY:  Yeah, that's fine.

BY MS. REDDY:

Q    Okay.  Officer Davidson, I want to discuss the incident that brings us here today involving Mr. Quentin Suttles. Was there a time sometime in September of 2019 where you came to meet Mr. Suttles?

A    I don't know the date.  I have no reason to think you're lying, though. So I do -- there -- that's the ballpark timeframe, but I don't know the date.

Q    Okay.  And how did you come to be in contact with Mr. Suttles, the plaintiff?

THE REPORTER:  I'm sorry, what was the last couple words of that question?

Page 59

J. DAVIDSON

BY MS. REDDY:

Q    Being specific, Mr. Suttles, the plaintiff in this matter.

A    Well, I've only, to my knowledge, dealt with Mr. Suttles in person one time, and that was when he was in possession of a loaded 9 millimeter firearm.

Q    Okay.  And how did you come to be involved with him?

A    I pulled over a vehicle in the city of Buffalo for traveling at an imprudent speed.  Subsequent to the stop, I did see that there was an obstruction in the view of the windshield.  The driver was exhibiting signs of intoxication and dishonesty.

And when trying to have the occupants of the vehicle exit the vehicle, Mr. Suttles did refuse to get out of the vehicle, fight with officers, while in possession of a 9 millimeter handgun -- loaded handgun.

Q    Okay.  So going back to your

J. DAVIDSON

statement, you pulled over a vehicle traveling at an imprudent speed.  What vehicle are you referring to?

A    I don't recall the specific vehicle.

Q    Who was driving the vehicle?

A    A female.  I don't recall her name.

Q    And what do you mean by "imprudent speed"?

A    So to my estimation, the speed was going too fast -- traveling too fast in the city of Buffalo for a city roadway.

Q    How did you determine that the vehicle was traveling too fast?

A    I paced the vehicle.

Q    How did you pace the vehicle?

A    So I was in my patrol vehicle, traveling the speed limit, and the vehicle in question was going further away from me, indicating that it was traveling beyond the speed limit.

Q    Where was that vehicle when you began pacing the vehicle?

Page 61

J. DAVIDSON

A     On the -- on Broadway, in the city of Buffalo.  It's a street in the city of Buffalo, Broadway.

Q     When did you first see the vehicle?

A     I don't know what time.

Q     Where did you first see the vehicle?

A     On Broadway.

Q     Where were you located at the time?

A     I was on a side street.  I don't know the name of it.

Q     Were you driving?

A     I was stationary at the time.

Q     Were you in the driver's seat?

A     Yes, ma'am.

Q     Were you in a patrol car?

A     Marked patrol unit, yes.

Q     Who was with you?

A     Officer Russell Sullivan.

Q     And why were you on this -- why were you stationary on the side street?

A     Officer Sullivan and I had to go

Page 62

J. DAVIDSON

do the same training, so we drove to the training together.  So we were both on the way back from the training in the same vehicle.

Q    What training?

A    I believe it was use of force, but I'm not certain.

Q    So you carpooled together to attend the training in a marked patrol unit?

A    Correct.  We were on duty, so yes.

Q    On duty.  Okay.

A    Yes, ma'am.

Q    And why were you stationary on the side street off Broadway?

A    We were on a side street that had a stop -- I'm sorry, a stop light, traffic light.  We were facing north, I don't know the name of the street we were on, watching for vehicles that were traveling through the red light, traveling -- they would be traveling east or west.

Page 63

J. DAVIDSON

Q    And this is after your training as part of your duties on shift that day?

A    Correct.

Q    Okay.  And so while you were stationary -- and I'm going to represent to you that this is -- the incident that we're discussing is September 19, 2019.

A    All right.

Q    So while you were parked stationary on a side street off Broadway in the city of Buffalo on September 19, 2019, you saw a vehicle pass -- you observed a vehicle pass you; is that correct?

A    We observed several vehicles passed through the intersection.

Q    Okay.  And why is that relevant?

A    Only one vehicle appeared to be traveling too fast.

Q    Which vehicle was that?

A    The one that we pulled over.

Q    The one that Mr. Suttles, the plaintiff in this matter, was a passenger; is that correct?

Page 64

J. DAVIDSON

A    A rear -- a rear seat passenger. Yes, ma'am.

Q    So you observed -- so just to clarify your testimony this afternoon, you observed several vehicles pass through that intersection on Broadway where you were stationary on a side street; is that correct?

A    Correct, yes.

Q    And you determined that one of those vehicles that went through the light was speeding; is that correct?

A    One vehicle was traveling significantly higher to my eye speed than any of the other vehicles, at a high rate of speed.

Q    And how did you determine that?

A    For that portion, it was just by the eye test based on the totality of the circumstances and my experience as a police officer.  One vehicle out of all the other vehicles went through at a much higher speed than any of the other vehicles.

Page 65

J. DAVIDSON

Q    How much higher?

A    I don't know.  I didn't have a radar or anything like that.

Q    No radar in your vehicle?

A    No, I'm not radar trained, so that I don't have a radar.  I guess it'd be called radar gun or radar.  I'm not sure the actual name of the -- I don't have one, so I don't even know what it's called.

Q    Okay.  And when you say, "I don't have one," are you referring to that particular patrol unit from September 19th, 2019?

A    To my knowledge, and I'm not certain of this, I don't believe any of our patrol vehicles have it equipped in the vehicle.

Q    Okay.  And then you mentioned something about a gun.  Can you explain that?  A radar --

A    -- radar gun.  Some officers are trained in that.  I am not one of them. So I've been taught to pace for speed

Page 66

J. DAVIDSON

while in the Erie County --

THE REPORTER:  I'm sorry?

THE WITNESS:  I'm sorry?  I just said I -- I learned that while in the Erie County Law Enforcement Academy.

BY MS. REDDY:

Q    In the academy, okay.  So how were you taught to pace for speed?

A    So if you're pacing a vehicle for speed, if you want to know the speed of that vehicle, you would travel the same speed of that vehicle.

If you wanted to know if they were speeding or going above the legal speed limit, you would drive the speed limit.  And if it is pulling away from you, it is an indication that that vehicle is going faster than you.  And you are traveling the speed limit, therefore, that vehicle is traveling above the posted speed limit.

Q    Okay.  And you're referring to your training from January 2017?

A    I don't know what month it would

Page 67

J. DAVIDSON

have been.

Q    But you are referring to your initial academy training?

A    That would have been academy training, yes.

Q    So what happened when you saw the vehicle that Mr. Suttles was traveling in pass you on Broadway?

A    I -- that's when I paced.  Then I put the car in drive and I turned eastbound onto Broadway.  I paced the vehicle, determined that it was over the -- it was exceeding the posted speed limit in the city of Buffalo, and initiated a traffic stop.

Q    How far from the intersection where you parked?

A    I do not recall.

Q    But you pulled off from being stationary, and did you make a left or right turn to follow the vehicle that Mr. Suttles was a passenger in?

A    I would have made an eastbound turn.  So from where I was, that would

J. DAVIDSON

have been a right-hand turn.

Q     So you began to follow the vehicle?

A     I began to pace the vehicle at that point.

Q     How did you pace the vehicle?

A     By reaching the posted speed limit in the city of Buffalo, and then staying at that speed limit and seeing that that vehicle was pulling away from me.

Q     What do you mean by "pulling away"?

A     Going faster than the posted speed limit.

Q     What was the speed limit?

A     Thirty miles per hour.

Q     And how long did you follow this vehicle?

A     I do not recall.  The traffic stop would be documented.  So wherever the traffic stop was, it'd be that far.  But I don't know.

Q     Okay.  What happened next?

Page 69

J. DAVIDSON

A    The vehicle pulled over, and then we pulled behind the vehicle, slightly off center, so that there was a space to create safety for approaching vehicles.

Q    Sorry, could you repeat that?

A    Sure.  So they pulled over, and then -- they pulled over to the right of the road, and we pulled over behind them, slightly back from them and slightly off center.  So our car would have been out to the left a bit to create a safety buffer from approaching vehicles on the road.

Q    Okay.  And how did you initiate the traffic stop?

A    Overhead lights.  I'm not sure if I had to use any sirens or not, but overhead lights for certain.

Q    And at that time, you intended to give them a ticket for speeding?

A    Not necessarily was going to give a ticket.  I don't always give tickets.  At that time, I just intended to investigate the speeding.

Page 70

J. DAVIDSON

Q    But the basis of stopping that vehicle was that they had been pulling away from your vehicle; is that correct?

A    That they were exceeding the posted speed limit in the city of Buffalo.

Q    Which was what?

A    Thirty miles per hour.

Q    What was the vehicle traveling?

A    I do not know.

Q    Okay.  What happened next?

A    Next from which portion?

Q    After you pulled over the vehicle.

A    I exited the patrol vehicle from the driver's side and approached the driver's side of the vehicle that was exceeding the speed limit.

Q    Okay.  And what did you do next?

A    Engaged in a conversation with the driver of the vehicle.

Q    And what was the nature of that nature of that discussion?

A    I'm sorry, what was the question?

Page 71

J. DAVIDSON

Q    What was the nature of that discussion?

A    So the discussion -- I don't remember the -- like, I don't want to be quoted.  I don't remember every word of the discussion.  But the gist of it was that she admitted that she was driving too fast.  She didn't quite want to tell me or didn't quite know where she was going to or coming from.

The vehicle smelled of alcohol.  And that she said that they were just out.  I believe she said at one point they were partying.  But she didn't want to tell me where they were coming from or where they were going to.

Q    Okay.  And what happened next?

A    I don't recall if I received her license and registration, proof of insurance next, to be honest.  I would have asked, but I don't recall.  I don't recall the exact sequence of where the conversations happened and when I asked for documentation.

Page 72

J. DAVIDSON

Q    Okay.  And who else was in the vehicle?

A    There was a female passenger in the front passenger seat.  I do not know her name.  And then Mr. Suttles was in the rear on the passenger side of the vehicle.

Q    So in your earlier testimony, you mentioned that you were trained in pacing a vehicle in the academy; is that correct?

A    That is correct.

Q    Okay.  And to your understanding, the method that you were taught to pace for speed allows you to initiate a traffic stop; is that correct?

A    Correct.

Q    And what other methods are allowable to initiate a traffic stop in relation to the speed of a vehicle?

A    I'm not prepared to speak on all the reasons or anything like that.  I -- I don't have the vehicle traffic law in front of me.

Q    Well, to the best of your

Page 73

J. DAVIDSON

recollection, as you sit here today as a Buffalo police officer?

A    Sure.  You can pull a vehicle over in New York State if it's traveling in excess of the speed limit.

Q    I understand that.  I'm asking you, in addition to pacing, what other allowable methods have you been trained in to allow for a traffic stop in relation to the speed of a vehicle?

A    If a vehicle is on a roadway in New York State and traveling beyond the posted speed limit, you can pull it over.

Q    Again, besides that statement, you testified earlier that you were trained in pacing a vehicle.

A    Yes.

Q    Which in this instance was the basis of your stop of the vehicle that Mr. Suttles was traveling in.

A    Yes, ma'am.

Q    My question to you is, besides pacing, what other allowable method have you been trained in that would allow for a

Page 74

J. DAVIDSON

traffic stop of a vehicle in relation to its speed?

MR. DUDDY:  Objection.

THE WITNESS:  So what I was trained on would be for pacing.

BY MS. REDDY:

Q     Pacing only?

A     That's the one I recall.

Q     Did you give the driver of that vehicle a speeding ticket on that day?

A     I believe I did, but I don't remember.

Q     Okay.  So what happened after you had a discussion with the driver of the vehicle?

A     She appeared to be intoxicated. I was hoping to run some SFSTs.  To do that, you need to remove everyone from the vehicle and place them somewhere for your safety so you can perform the SFSTs without a divided focus.

During the course of removing people from the -- occupants from the vehicle, Mr. Suttles refuse to step out of

J. DAVIDSON

the vehicle, wrapped his arms around the front seat, told the driver to pull away, and then did struggle with officers.  And it was found that he was in possession of a loaded 9 millimeter handgun.

Q    How was he in possession of a 9 millimeter?

A    I do not know.  It was on the other side of the vehicle at the time.

Q    Where were you?

A    I was on the driver's side of the vehicle.

Q    Is that where you remained during the entire duration of the traffic stop?

A    No.  I moved around the vehicle several times throughout the process.

Q    How was it determined that that 9 millimeter belong to Mr. Suttles?

A    DNA testing through the crime lab of Erie County.

Q    What type of DNA testing?

A    I do not know.

MR. DUDDY:  Objection.

Page 76

J. DAVIDSON

BY MS. REDDY:

Q    Okay.  And my question was actually relative to the day in question. On this particular day, how was it determined that that 9 millimeter belonged to Mr. Suttles?

A    He was in possession of it.

Q    How was he in possession of it?

A    I wasn't on that side of the vehicle.  I believe it was in his, like, front pouch of a hoodie, but I -- I don't know for certain where it was on him.  I just know that it was, from what the officers told me on that side of the vehicle.

Q    Okay.  And when you mean hoodie, are you referring to clothing?

A    Like I said, I'm not certain.  I wasn't on that side of the vehicle, so that's just what I was under the impression of.  But I don't know for certain where the gun was on his possession.

Q    Okay.

Page 77

J. DAVIDSON

MR. DUDDY:  Is there a question pending?

MS. REDDY:  No, I just said, "Okay."

Hold on one second.  I think there's a -- one of these exhibits is playing. Give me one second.

THE REPORTER:  Do you want to stay on the record?

MS. REDDY:  Yeah, I'm sorry.  There's no question pending.  I just was told that there's some background noise.  I don't know if you can hear a video playing.  I don't hear it, but I just thought I would --

THE REPORTER:  I don't --

MS. REDDY:  You don't hear --

THE REPORTER:  I don't hear anything.

MS. REDDY:  Oh, okay.  Sorry about that.

BY MS. REDDY:

Q    Okay.  So going back to my questioning, did you arrest Mr. Suttles on that night?

A    So we did arrest Mr. Suttles.  I

Page 78

J. DAVIDSON

don't know if it was technically I that arrested him or I just helped process the arrest.  But he was arrested, yes.

Q    Okay.  I'm going to start sharing my screen, so I'm just getting ready for that.  Okay.  Are you able to see my screen, Officer?

A    Yes.

Q    Okay.  I'm sharing my screen. And this is Exhibit 1 that was previously marked in the course of our depositions and was produced by defense.  So I'm going to refer to this document as Exhibit 1.

A    Okay.

Q    Have you seen this document before?

A    I don't recall ever seeing it, but I've seen several documents that look like it, so very likely I've seen it before.

Q    And can you describe what this document is?

A    That would be, like, an arrest report or a booking report from the city

Page 79

J. DAVIDSON

of Buffalo.

Q    Okay.  And referring specifically to this document, do you recognize what this is?  And I can scroll up or down if you want to review it.

A    It looks like an arrest report or a booking report, they're kind of synonymous, for Quentin Suttles.

Q    Okay.  And does this document have a date?

A    I'm sure it does.  I don't know where, though.  Yeah, okay.  Yep.

Q    What's the date of the document?

A    September 9, 2019.

Q    Is there a time reflected?

A    It looks as if there are two times reflected.

Q    What would that be?

A    0304 and 0318.

Q    Okay.  And what do those dates and times signify to you?

A    It's what is listed as the booking start time and the booking end time.

Page 80

J. DAVIDSON

Q    And what does that mean?

A    I don't know.  I think that would be something that our cell block would know.  I would -- I would guess that the -- by the way I would consider booking, it would have taken longer than 14 minutes.  But internally, they may only count that as a certain portion of booking.

From the time we arrived to cell block until the time we left, it was longer than 14 minutes.  So I think you'd have to ask cell block.

Q    Okay.  I'm going to direct your attention to this specific date and time here, which says arrest date and time.

A    Okay.

Q    September 8, 2019, at 2357.

A    I do see that.

Q    What does that signify to you?

A    That would be the time that we placed the defendant officially under arrest.

Q    Okay.  So the discussions that

Page 81

J. DAVIDSON

we've had to date refer actually to the night of September 8, 2019; is that correct?

A   I don't know for certain.  I don't -- I mean, this -- this document shows that it would be September 8, 2019.

Q   Okay.  And the incidents that we just discussed, your testimony about pacing the vehicle that Mr. Suttles was a rear passenger in, would reflect this date; is that correct?

A   That is correct.

Q   And I'm also attempting to highlight to you that this was close to midnight, so September 8th, 2357.  So the discussion that we're having about the incident would reflect in part September 8, 2019, as we're near nearing midnight and September 9, 2019; is that accurate?

A   The incident may have happened earlier than that specific time.  That's the time he was placed under arrest.  But the incident would span the evening

Page 82

J. DAVIDSON

portion of the 8th into the morning portion of the 9th.

Q    Okay.  Thank you for clarifying.

A    You are welcome.

Q    Do you see your name reflected in this document?

A    I do.

Q    Where do you see that?

A    Arresting Officer Davidson, John M.

Q    And what does that signify?

A    Matthew.

Q    Oh, okay.  But as the arresting -- as you being designated an arresting officer, what does that indicate?

A    That I would sign on the charges.

Q    Okay.  And what were the charges?

A    I don't remember all of the charges.  I know that it was possession of a weapon, a firearm.  I believe it's 2 -- Penal Law 265.03 sub 3 -- oh, it's right

Page 83

J. DAVIDSON

there.  Yeah, 265.03 sub 3, loaded firearm.

Q    Okay.  And earlier your testimony was that Mr. Suttles was in a vehicle traveling on Broadway and that you were on a side street.  Does this exhibit reflect that side street?

A    So I will say that I -- without looking at a map right now, I don't know if Moore would have been the side street I was on or the side street where the traffic stop occurred, where he actually pulled over -- well, not he.  The female driver.

So I -- I'm not sure -- Moore was involved.  I mean, whether or not that was where we were stationary and saw this -- the vehicle traveling in excessive speed, or if that's where the vehicle came to stop during the traffic stop.

Q    Okay.  And is more a street that is perpendicular to Broadway?

A    I would assume so based on the -- the arrest paperwork, but I'm not

Page 84

J. DAVIDSON

certain.  Because I don't know how we'd contract a traffic stop on parallel streets.  So there's some more -- where you just scrolled to, there's some additional charges as well.  So it'd be obstruction, resisting arrest, and unlawful possession of marijuana as well.

Q    What does that refer to?

A    Obstruction would be that he was obstructing.  I would think, without looking at the paperwork, that would be when he wrapped his arms around the front passenger vehicle and told the driver to pull off during the traffic stop.  Resisting would be while he was actively resisting his -- being handcuffed.

And unlawful possession of marijuana at the time would have been a crime, or at least a violation in New York State.  Marijuana has since been decriminalized, so I believe that law is no longer on the Penal Law in New York State.  But at the time it would have been at least a violation.  It may have been a

Page 85

J. DAVIDSON

B misdemeanor.  I'm not certain at this moment.

Q    But these were the four arrest charges against Mr. Suttles; is that correct?

A    According to this paperwork, at least those four charges, yes.

Q    And what is your understanding of what was the outcome of these arrest charges?

A    He pled guilty and was sentenced to some time, incarceration.

Q    And what's your understanding of what happened after that?

A    I -- my understanding of that is he was then released from -- I'm not sure if it'd be prison or jail or what -- what word or sentiment you want to use, because he was an informant to some other crimes. But that's just my interpretation of what -- I don't know why he was out.

I don't know what he specifically pled to or how he got out.  I just know that he -- he didn't serve the

Page 86

J. DAVIDSON

time that he pled guilty to.

Q    Because he was an informant?

A    That -- that's what I'd heard, yes.  To a female who was running -- like, sex trafficking girls back and forth between PA and New York.  Jamestown, and -- I can't remember the name of the town in Pennsylvania.

Q    Okay.  And did he appeal his conviction in relation to the incident of September 9, 2019?

A    I --

MR. DUDDY:  Objection.

You can answer.

THE WITNESS:  I -- yeah.  I don't know.  I am under the impression that when you plead guilty, you forego the ability to appeal.  But I don't -- I don't know how he was released or -- or what reasons.  Just what I heard.

BY MS. REDDY:

Q    Okay.  I'm just going to stop sharing for a minute while I pull up something else.  Bear with me.

Page 87

J. DAVIDSON

A    Okay.

Q    Thanks.  Okay.  I am actually just going to show you page 2 of Exhibit 1.

A    Yes, ma'am.

Q    -- your name reflected in this document?

A    I see two -- I see two names.

Q    Oh, okay.  I was asking if your name is reflected in this document?

A    Yes, it is.

Q    Okay.  And in what capacity are you in this document?

A    I believe this is part of the booking process for a weapons possession.  This is, to my knowledge, the first time I've -- I've seen this document.  Maybe I've seen it in a different format or -- that may be like specific to maybe city court, the way they use paperwork.  I'm -- I'm not familiar with seeing this in this format before.

Looks like it might be an instrument.  I'm not -- like I said, I'm

Page 88

J. DAVIDSON

not quite sure.  I've not seen this document in this format previous to today that I'm aware of.

Q    Okay.  But here, as you review this document, it indicates that -- what is the capacity of your involvement in this felony complaint that's page 2 of Exhibit 1?

A    Yes.  I -- I'm not sure if that's a question, or are you just asking me to say that that's what that is?

Q    Well, I'm asking you to just specify your involvement as reflected in this document.

A    It appears that my name is listed in the -- I guess below the heading in the first sentence.

Q    Is this --

A    And then at the bottom, of my signature.

Q    Got you.  Okay.  Exactly.  Okay. So the bottom of page --

A    If you zoom --

THE REPORTER:  I'm sorry?

Page 89

J. DAVIDSON

THE WITNESS:  Is it possible for you to zoom in so I can see the whole document at one time?

BY MS. REDDY:

Q     Or zoom out?

A     I apologize.  Yeah, zoom out. So --

Q     I just didn't want to make it too small.  But that's the whole page.

A     No, that's fine.  Yeah.  Okay. So now it does look familiar except for the heading.  The heading itself, everything above the double black line, that is probably the way that, like, city court booking uses their information.  But everything below that black line I would have done with a report technician in our cell block cubes.

Q     Okay.  And I'm going to represent to you that this is page 1 of 2, and I'm scrolling down so you can see page 2.

A     Okay.

Q     It says page 1 of 1.

Page 90

J. DAVIDSON

THE REPORTER:  And I'm sorry, I just want to make sure that I heard you.  You said cell block -- cell block cubes?

THE WITNESS:  Yeah, sorry.  I guess that's slang.  Like, their cubicles, the area where they work.

So this does look like the instrument that I would work on with the report technician, but it's just not in the format I'm used to seeing.

BY MS. REDDY:

Q    Okay.  Does page 2 of this exhibit accurately reflect your name and signatures?

A    If -- if what I'm looking at right now is page 2, that is my name and that is my signature.

Q    Okay.  And I'd like you to just take a minute to review the portion that's in capitals.

A    Aloud or to myself?

Q    To yourself is fine.

A    There's, like, a block on my screen where I can't read some of the

Page 91

J. DAVIDSON

words.

Q     All right.  There you go.

A     Okay.  Thank you.

Q     Okay.  And does that accurately reflect the incidents that occurred involving Mr. Suttles on September 8th and 9th of 2019?

A     It is a synopsis, yes.

Q     Okay.  And I'm going to represent to you that this narrative references a 2010 Chevy, gray in color, vehicle.  Was that the vehicle that Mr. Suttles was a passenger in on September 8, 2019?

A     To the best of my recollection, that vehicle would match, but I don't know the exact year or make, to be honest.

Q     And as you sit here today, do you have any reason to disbelieve that he was traveling in a 2010 Chevy gray on that night?

A     No, not right now.

Q     And who made the determination to pull over the vehicle -- the Chevy that

Page 92

J. DAVIDSON

Mr. Suttles was a passenger in on September 8, 2019?

A    I don't -- I mean, I would assume, as I was the driver I would have made that final decision, because I'm the one that could actually do it.  I'm sure my partner and I for the day discussed it before doing it.

Q    And who was your partner for the day

A    That day, like I said, it was the day that Russell Sullivan and I had gone to training, so we were together.

Q    Okay.  And was there ever a time where you testified before a court in relation to this incident involving the stopped Mr. Suttles vehicle on September 8, 2019?

A    I -- I don't remember specifically a felony hearing, but I assume, unless he waived, there would be testimony from a felony hearing.  And I do believe I testified during a suppression hearing as well.

Page 93

J. DAVIDSON

Q    Okay.  So I want to go back to your earlier testimony about the speed of the vehicle.  Here in this document, page 2 of Exhibit 1, it does indicate that the stop was for speed not reasonable and prudent.

A    Yes.

Q    Does that match your earlier --

A    Yes.

Q    And --

THE REPORTER:  Just try to slow down so you can not overlap; okay?

MS. REDDY:  Thank you.

MR. DUDDY:  I'm just going to object to that question.  But go ahead.

THE WITNESS:  I apologize.  Am I -- is there a question for me right now?

BY MS. REDDY:

Q    Well, I think your attorney wanted to object, but you answered.  But his objection will get lodged in the record.

A    Okay.

Q    And you did provide the answer,

Page 94

J. DAVIDSON

so thank you.  There's no question pending.  I was just trying to gather my thoughts and clear this box.  Okay.  So speed not reasonable and prudent, is that a determination that you made on that night of September 8, 2019, in relation to the vehicle Mr. Suttles was a passenger in?

A    Sure.  So because I don't have any kind of like a radar gun for a specific speed, that's the -- that's the way that we are told to use the -- when you're pacing, you use reasonable and prudent, so that it is -- it's unreasonable and not prudent to be speeding in the city of Buffalo.

And then I've written that ticket before for -- like, for instance, if someone maybe is going just 1 mile under the speed limit, but it's hail and sleet and ice, and they are going past a bus stop, and there's kids everywhere, and there's cars constantly sliding off the road, that could also be, like, another

Page 95

J. DAVIDSON

example of -- of that traffic infraction.

Q    Okay.  And is there a method to determine if a car is not traveling at a reasonable and prudent speed that involves just visual estimations?

A    I suppose you could use -- so when you -- when you write a ticket in New York State, you can write a ticket for direct observation or you can write a ticket for information and belief.  So I -- I suppose you could write an information and belief ticket in the manner that you just described.  I have not, but I suppose you could.

Q    And does that vary from pacing?

A    I don't understand the question.

Q    What you're testifying to, that visual estimation, is that something different from pacing, from the word pacing that you used earlier?

A    I apologize.  You asked that question and I just tried to answer using hypothetical.  I -- I don't know if I can answer your question the way you're asking

Page 96

J. DAVIDSON

it now.

Q    Okay.  Now, in -- I'm now scrolling to page 3 of Exhibit 1.  Does this document accurately reflect your name and signature?

A    So yes, that is my name at the top.  That is my signature at the bottom.  Again, this is going to be a form that -- it's not the way I'm used to seeing it, but I'm familiar with what it is.

Q    I'm going to ask you the same question in relation to page 4 of Exhibit 1.  Does this accurately reflect your name and signature?

A    And again, yes, same answer.

Q    Could you repeat that for the record, please?

A    Sure.  That is my name on the top half and that is my signature at the bottom half.  I'm familiar with what this document is now that we've been going over these, but this is not the format that I'm used to seeing the document in.

Q    Okay.  Moving to page 5 of

Page 97

J. DAVIDSON

Exhibit 1, does this document accurately reflect your name and signature?

A    It does, in the same manner.

Q    Thank you.  Moving to page 7 and 8 of this document, which is Exhibit 1, previously entered, submitted, and marked, does this accurately reflect your name and signature and the date of September 9, 2019?

A    It does.

Q    Okay.  I was just going to say, I'll scroll up to the beginning of the document, which is page 7 and page 8 with your name and signature.

A    Yes.

Q    Okay.  Moving to page 15 of this exhibit, do you recognize this document?

A    Yeah.  So this is what I'd be more familiar with.  This is the work that I would have done that then would have been typed up by a report technician and create the document that you showed me previously.

Q    Okay.  Is this your handwriting

Page 98

J. DAVIDSON

reflected on page 15 of Exhibit 1?

A    Most of it is.  It looks like the report technician does some writing as well, and signatures.

MS. REDDY:  Okay.  Sorry, was there something --

THE WITNESS:  I thought I answered.

MS. REDDY:  You did.  There's no question pending.  I just thought Mr. Duddy was saying something.

THE WITNESS:  I'm sorry.  Am I supposed to be answering something?

MR. DUDDY:  You're okay.  Don't worry.

THE WITNESS:  Okay.

MS. REDDY:  No, no, there's no question pending.  I'm sorry.  There was --

MR. DUDDY:  Just off the record.

(Off the record.)

THE REPORTER:  Back on?

MR. DUDDY:  Yeah.

MS. REDDY:  Okay.  I'm just going to take a break.  I'm going to stop screen

Page 99

J. DAVIDSON

sharing.  I'm going to take a break and ask you some more questions.  I just need to queue up those exhibits.

THE WITNESS:  Okay.

MS. REDDY:  So we're going to take a -- we'll take a five minute break.  If you need to use the restroom, feel free to do.

THE WITNESS:  Sure.

MS. REDDY:  Thank you.

THE REPORTER:  Okay.  It's 2:41. We're off the record.

(Off the record.)

THE REPORTER:  It is 2:54.  We're on the record.

MS. REDDY:  Okay, great.  Thank you.

BY MS. REDDY:

Q    Okay.  Officer Davidson, we're back on the record, and you're still under oath.

A    Sounds good.

Q    Thank you.  Just going back to some earlier testimony where we discussed the criminal matter involving Mr. Suttles

J. DAVIDSON

from the charges stemming from September 8, 2019.

A     Yes.

Q     Was there a time you testified at an Ingle hearing in relation to his arrest from that day?

THE REPORTER:  I'm sorry, a what hearing?

BY MS. REDDY:

Q     Well, let's just say any hearing.

A     There may have been a time where he testified in the felony hearing within -- I think the statute is five days of the arrest.  Things have changed with bail reform.  I'm not sure if he waived or not.  I don't recall.  I do recall testifying in a suppression hearing regarding this matter.

Q     Was that in court?

A     It would have been in court, yes.

Q     Okay.  Yeah.  I am going to screen share with you and direct your

J. DAVIDSON

attention to what will be marked and submitted as Exhibit 6.  This is a document that was produced in the normal course of discovery.  I will represent to you that this is a transcript from September 1, 2020 --

(Exhibit 6 was marked for identification.)

A    All right.

Q    -- at a hearing before Judge Boller.

A    All right.

Q    That date is reflected on page 53, which will be page 1 of the exhibit--

A    All right.

Q    -- in this deposition.  I'm going to scroll down to the beginning of testimony and indicate to you that the people called John Davidson.

A    All right.

Q    As you sit here today, is there any reason to believe that this document does not reflect your testimony from

Page 102

J. DAVIDSON

September 20th -- I'm sorry, September 1, 2020, in relation to Mr. Suttles?

A   I have no reason.

MS. REDDY:  Okay.  So Talya, at the conclusion of this deposition, I'm going to send this over to your office so you have it.  But this will be referred to as Exhibit 6 in the ongoing exhibits that we've marked and submitted.

THE REPORTER:  Okay, great.  And you can send it to -- to me directly.

MS. REDDY:  Okay.  We'll make sure to do that.

THE WITNESS:  All right.

BY MS. REDDY:

Q   I'm going to stop sharing that particular exhibit and move on to a previously marked exhibit, Exhibit 3. Now, on the date of September 8th, 2019, during the arrest of Mr. Suttles, were you wearing any body cam apparatus?

A   I believe I was.

Q   And did that generate any body cam video footage?

Page 103

J. DAVIDSON

A    I believe it did.

Q    Was your partner also wearing body cam apparatus that day?

A    I do believe so.

Q    Was it on?

MR. DUDDY:  Objection.

THE WITNESS:  I don't know.

BY MS. REDDY:

Q    To your knowledge -- body cam footage on?

A    I believe his was on, but I don't know.

Q    And was yours on?

A    Yes.

Q    Okay.  I'm going to represent to you that this was produced by your counsel in the normal course of discovery, and it was previously marked as Exhibit 3 in the course of the depositions in this case. Are you able to see this screenshot of the video?

A    Yes.

Q    Okay.  I'm going to play it and start asking you questions, then I'll

Page 104

J. DAVIDSON

pause it.

A    Okay.

Q    Let me know if you can't see or hear it.

A    I don't think we'll hear anything for the first few seconds.

Q    Yeah, I think 25, maybe.  Let's see.

A    Yeah, it buffers.

(Video played.)

THE REPORTER:  Can we turn it down? Can we turn it down a little?

MS. REDDY:  Yeah.  Sorry if that blasted your ears.

THE REPORTER:  It's okay.

(Video played.)

BY MS. REDDY:

Q    Okay.  Do you recognize this footage that I just --

A    I can barely hear you.

Q    Oh, you can barely hear me?

A    I think maybe when you turned the volume down -- I -- I can't hear you very well.

J. DAVIDSON

Q    Okay.  So I'm going to be really --

A    Yep.

Q    -- when I speak, I'll turn it up, and when I play the video I'll turn my volume down.

A    Yeah, sorry.

Q    Okay.  That's okay.  I was just asking, do you recognize what's reflected as Exhibit 3?

A    Yes.

Q    What do you recognize this to be?

A    It appears to be the body camera footage from my body camera.

Q    Okay.  And does this reflect the time that you turned on your body cam footage?

A    That I can't be certain of.  I'm not totally understanding of the way the technology works.  I know that when you turn it on, it's already been recording in silence for a period of time.  This appears to be when I would have turned it

J. DAVIDSON

on, but I don't -- I don't know for certain.

Q    Okay.  I'm going to continue playing the video.

A    All right.

(Video played.)

Q    Do you recognize that voice?

A    That is my voice.

Q    That's your voice, okay.  And what did you just say?

A    I don't remember.

MR. DUDDY:  Objection.

BY MS. REDDY:

Q    I'm going to go back and play it, and I'd like you to -- you've now identified your voice.

A    Okay.

Q    I'd like you to answer my question once I replay the video.

A    Yeah, sure.

Q    Pardon?

A    So I mean, the best I can -- I asked her for her license and she didn't want to give it to me.  I asked her to

Page 107

J. DAVIDSON

roll down her window.  She didn't want to do that either.  I asked for her registration.  She didn't want to give that to me.  That's kind of, I mean, the gist of what we just kind of saw.

Q    Right.  I was just asking you to reflect on what the last statement was and you said you weren't sure, so I was going to play it again for you.

A    Oh, okay.  Yeah, sure.

(Video played.)

Q    The last statement that was said, what was that statement and what was that in reaction to?

A    I said, "Okay," but I don't know exactly what I said it to.

Q    Okay.  Well, you said, "Okay, but I'm asking for the statement right before that.

A    I don't know.

Q    I'm going to play it again.

A    Okay.

(Video played.)

Q    Did you hear that?

Page 108

J. DAVIDSON

A    Yeah.  "You're driving too fast and you have obstructions hanging down from your rearview," I believe.

Q    Yeah.  Is that a statement that you made?

MR. DUDDY:  Objection.

BY MS. REDDY:

Q    Was that your voice that you recognized?

A    Yes.

Q    And what was that answer a response to?

A    I'm not following.  I apologize. You asked, and then I answered.  I don't --

Q    Right.  No, I'm sorry.  I mean, in the video, that statement that you made, please clarify what that statement was --

A    Oh, what was she asking me?

THE REPORTER:  Wait, wait, wait, wait.  Just one at a time.  I need to make sure I get what Ms. Reddy said.  "I mean, in that video, you" --

Page 109

J. DAVIDSON

BY MS. REDDY:

Q    Were responding to a question. I'm just asking you what that question in the video was, not --

A    Oh, I don't know.

Q    Okay.  Was the driver asking why you pulled her over?

A    At one point, she was, yes.

Q    And your statement just now, was that a response to that?

A    That would make sense.

Q    Okay.  I'm going to turn it down a little and keep playing the video.

A    So I have my volume all the way up, but I'm having trouble hearing it when you turn the volume down.  Can we just leave the volume up and possibly have the reporter turn her volume down?

THE REPORTER:  Sure.  I -- I will do that.  Just give me a heads up, maybe, before you're playing it.

(Video played.)

BY MS. REDDY:

Q    I'm going to pause this at the

Page 110

J. DAVIDSON

3:18 mark.  Who do you see in this footage now?

A    I can't see them in this footage.  It's too dark.  But I know who it is.

Q    Who is it?  Who do you recognize --

A    Captain Whitenight.  Captain Jason Whitenight.  He may have been a lieutenant at the time, though.

Q    Okay.  And why does he appear at the scene, to your knowledge?

A    I -- I don't know why he appears at the scene.

Q    Did you or your partner call for other officers to appear?

A    Not that I believe.  I don't think so, no.  There'd be radio transmissions, though.  But I -- my body camera's been on and I don't hear myself calling for cars, so I don't believe that we did.

Q    Okay.  I'm just going to go back maybe 30 seconds and ask you about your

J. DAVIDSON

discussion with the driver.

THE REPORTER:  And if you could just speak up for me, Ms. Reddy, I'm having a little trouble hearing you.

MS. REDDY:  Okay.  Sure.

(Video played.)

BY MS. REDDY:

Q    Is that your voice that we hear?

A    So you hear both of our voices. Mine's the one telling her that you can only go 30, hers is the voice saying that she was going 40.

Q    So the driver states that she's going 40 miles an hour?

A    Yes.

Q    And what did you say?

A    That the posted speed limit is 30.

Q    Okay.  I'm going to go back again.

A    Okay.

Q    Starting at the 2:41 mark.

(Video played.)

Was that your voice that

Page 112

J. DAVIDSON

indicated she was going too fast and her view was obstructed?

A     Yes.

Q     And what view obstruction are you referring to?

A     I can't say at this moment.  I believe they were -- from her rearview mirror, something was hanging.  I can't recall right now.  I want to say it was some air freshener, like trees, and a little bracelet.  But I -- I cannot remember for certain what was hanging.

Q     Is that allowed to be hanging in your vehicle?

A     No.

Q     And --

A     Not -- not from that spot, I suppose is the answer.  I mean, you can have it hanging, I guess, from somewhere that's not obstructing your view.

Q     Did you stop her for that reason?

A     That's not the reason I stopped her, no.

                              J. DAVIDSON

    Q    Okay.  And I know you testified earlier to your recollection.  Now I'm asking you questions about what is reflected in this video.

    A    Okay.

         THE REPORTER:  Ms. Reddy, if you could speak up or move closer to the mic.  I'm having trouble hearing you.

         MS. REDDY:  Okay.  Sorry.  I'm trying to turn it down for the video so it's not too loud for you, and I'll remember to try to turn it back up when I speak.

         THE REPORTER:  Thank you.

         THE WITNESS:  But when you turn it down for the video, I can't hear it very well.

         MS. REDDY:  Okay.  So Talya, let me know if it's just too loud in your ear or if you want to mute it when I'm playing the video.

         THE REPORTER:  Okay.  If you just give me a heads up before you hit play, I can turn down my audio, then turn it up when you're done.

Page 114

J. DAVIDSON

MS. REDDY:  Yeah.  I think yours is up really loud, even -- we can hear you very loudly, so maybe it's the volume on your end.  But --

THE WITNESS:  So just to be clear, on my end, the volume's perfect until you turn it down.  But up until we started playing videos and then the video volume was going down, I've heard everything perfectly on my end.

MS. REDDY:  Okay, good to know.  And I just think there might be parts of the video that get really loud, so if everyone can just --

THE WITNESS:  Sure.

MS. REDDY:  I really don't want to blast anybody's ears.  Okay.  I'm going to start playing the video again.

THE WITNESS:  All right.

(Video played.)

BY MS. REDDY:

Q    Is that your voice that says, "You're going too fast, that's the biggest problem"?

Page 115

J. DAVIDSON

A    Yes, I believe I said "ma'am" in there as well, but yes.

MS. REDDY:  Okay.  I just want the record to reflect that I paused at three minutes and one second to ask the witness that question.  I'm starting the video again.

(Video played.)

BY MS. REDDY:

Q    When you say, "40 miles an hour is above the speed limit," what are you referring to?

A    She says, "I was only going 40." So then I tell her that 40 miles per hour is above the speed limit in the city of Buffalo.

MS. REDDY:  Playing the video again.

(Video played.)

BY MS. REDDY:

Q    And was that your voice that indicated they're going to fast?

A    That was my voice, yes.  Well, hold on.  Her voice is the first one indicating that she was going too fast,

J. DAVIDSON

and then I also say that as well.

Q    Right.

A    Yes.

Q    And her going fast was the basis of your stop of that vehicle; is that correct?

A    That is correct.

Q    I'm going to scroll ahead to 3:32 and play the video.

A    All right.

(Video played.)

Q    Was that your voice asking Mr. Suttles to step out of the vehicle?

A    I did not hear my voice or any voices.

Q    Okay.  That part of the video is very low, so I'm going to play it again and turn it up.

(Video played.)

Okay.  At this point, are you -- is that you moving from one side of the vehicle to the other?

A    So on my body camera, you can see another officer.  So that's not me

Page 117

J. DAVIDSON

that you can see.  And then you can see, from my perspective, my body camera move from the driver's side to the rear of the vehicle.  And where it's paused, I'm getting ready to crest around to the passenger side.

Q    Where Mr. Suttles is; is that correct?

A    Mr. Suttles was on that side of the vehicle in the rear.

Q    So that's a yes?

A    I -- I don't know for certain where he was while I was transitioning.  I don't know if he slid over or back.  I'm just letting you know where he was when I saw him.

Q    Okay.  Got it.

(Video played.)

Is that your voice saying, "Quentin, step out"?

A    It is.

Q    And why are you asking Mr. Suttles to step out of the vehicle?

A    Well, it's twofold.  At this

Page 118

J. DAVIDSON

point, we found marijuana in the vehicle, which at the time was still a crime in New York State.  So everyone in the vehicle is going to be questioned and interviewed.

Also, if we're going to perform SFSTs on the driver for being intoxicated, that requires focus from the officer on that driver, very diligent focus on that driver.  So you don't want outside -- you want to be as far from as many distractions and unsafe scenarios as possible.

So you would get off the road. You'd get passengers situated in the rear patrol vehicles.  So those would be the two reasons at that time to step Mr. Suttles out of the vehicle.

Q    Okay.  I'm going to begin playing the video at three minutes, 47 seconds.

A    Okay.

(Video played.)

Q    And what's happening right there?  I just stopped at four minutes and

J. DAVIDSON

one second.

A    Sure.  So instead of stepping out of the vehicle as he was asked with a lawful order, Suttles -- Mr. Suttles wrapped himself around the passenger front seat, would not step out of the vehicle, and told the driver to pull off.  So I returned to the driver's side of the vehicle to remove the keys from the ignition so that she could not do so.

Q    And was she attempting to pull off?

A    I don't know.  I was -- it was a frantic moment.  So rather than give her the chance to and have us dragged down the street resulting in injury or death, I removed the vehicle's keys from the ignition.

Q    Was the driver's hands up in the air?

A    I don't know.  When he said, "Pull off, pull off, pull off," I ran around.  So I don't know where her hands were.

J. DAVIDSON

Q    I'm just going to go back five seconds so you can answer that question.

A    Sure.

(Video played.)

Q    Are the driver's hands in the air at that time?

A    At that moment, yes.

Q    Thank you.

A    You're welcome.

Q    I'm going to continue to play the video.

(Video played.)

Pausing the video at four minutes, 30 seconds.  Can you tell us what's happening here?

A    No, it seems like the audio is broken or distorted.  That's not generally how our body cameras sound.  So I don't know if it's something on your end or mine.

Q    But visually, can you tell us what's happening?

A    I see a hand with a handcuff in it.

Page 121

J. DAVIDSON

Q    Was Mr. -- vehicle?

THE REPORTER:  I'm sorry --

THE WITNESS:  I'm sorry?

THE REPORTER:  -- didn't hear that.

BY MS. REDDY:

Q    Was Mr. Suttles removed from the vehicle?

A    I can't tell in this picture if he was removed from the vehicle yet, but he was removed from the vehicle.

Q    I'm playing the video again at four minutes, 30 seconds.

(Video played.)

Can you tell us what's happening here?  Pausing the video at 5:13.

A    I can barely hear anything.

THE REPORTER:  Barely hear you, Ms. Reddy.

BY MS. REDDY:

Q    Oh, I'm sorry.  Pausing at 5:13. Can you tell us what's happening in this video?

A    Sure.  So an officer says that he has a gun.  We're pleading with him.

Page 122

J. DAVIDSON

You can actually hear my voice crack. We're pleading with him to put his hands behind his back, let go of the gun. He is refusing to do so, and we are using force to get the gun from him and place him into handcuffs.

Q    Where is the gun?

A    I do not know.

Q    Did you see the gun?

A    Eventually, but not at this moment, no.

Q    How did you determine that he had a gun?

A    An officer said that he had a gun.

Q    Did you strike Mr. Suttles with anything?

A    I struck him, yes.

Q    With what?

A    My fists.

Q    Why?

A    Because he was not complying and he had a firearm.

Q    But you didn't see the firearm,

Page 123

J. DAVIDSON

did you?

A     No, I didn't want anybody to shoot him.  I didn't want anyone to get shot.  So we were doing everything we can to apprehend him without using firearms, him or us.

Q     Does he have a handcuff on at this point in time?

A     I don't believe so.

Q     Where are his hands?

MR. DUDDY:  Objection.

THE WITNESS:  I'm not certain where his hands are at this moment.

BY MS. REDDY:

Q     How many times did you strike him?

A     I do not know.  Several.

Q     Did you hit him with something or just your fist?

A     No.  I pried his -- I took out my ASP and I was prying his arm out.  It was tucked under his chest.  His right arm, it would have been.  I was prying it out to get leverage with my collapsible

Page 124

J. DAVIDSON

baton.  And as I was pulling it out, there was something in his hand.  I don't know what it was.  And then he placed his hand back under him, and I struck him with my collapsible baton.

THE REPORTER:  And I'm sorry, did you say ASP?

THE WITNESS:  Yeah.  ASP, A-S-P.  I believe that's like a specific brand name of a baton, collapsible baton.  But I don't know if that is the name of ours.  It's kind of like calling all colas Coke, as an example.  It doesn't necessarily mean that it's Coca-Cola.  You're just having a cola.  I think that's kind of what this is.

I don't know the name brand of our collapsible baton, but they're generally called ASPs.  But I do believe that's more of a specific brand.

BY MS. REDDY:

Q    I'm going to continue to play the video.

A    Okay.

Page 125

J. DAVIDSON

(Video played.)

Q    Is that Mr. Suttle's voice indicating that he has no gun?

MR. DUDDY:  Objection.

THE WITNESS:  No.  I believe that was Officer Sullivan asking frantically for more cars.

BY MS. REDDY:

Q    No.  I mean, in the few seconds that we just heard, a voice say -- have no gun.

A    I did not hear that, no.

Q    I'm going to rewind it 15 seconds.

A    Okay.

Q    Playing from five minutes and nine seconds.

(Video played.)

Did you hear someone say, "I don't have no gun" at 5:21?

MR. DUDDY:  Objection.

THE WITNESS:  No, I hear, "It's over. Don't get shot over this."  And then I hear my voice say, "It's over."  Then I

Page 126

J. DAVIDSON

hear Russell -- Officer Sullivan frantically calling for additional cars over the air.  That's his radio on his shoulder.

BY MS. REDDY:

Q    Yeah.  I'm going to rewind it three seconds.

A    Okay.

(Video played.)

Q    What is the last statement you just heard?

A    I hear a muffled -- sounds like -- it sounds like the word "gum," like chewing gum, but I'm -- it would make more sense that it's the word "gun."  But I just hear the -- that word.  I don't hear any words other than that.  When you isolate that, I hear it, though.

Q    Okay.  Yeah, there were --

MR. DUDDY:  Objection --

THE REPORTER:  I'm sorry, I didn't hear Mr. Reddy -- Mr. Duddy.

MR. DUDDY:  I'm just -- I'm trying to get my objection in without talking over

Page 127

J. DAVIDSON

everybody.

MS. REDDY:  What's the basis of your objection?

MR. DUDDY:  Which one?  There's multiple.  The basis for this one?  Right -- okay.  Listen, you asked me for the basis for my objection.  That's what I'm going to give you.  You're testifying.  This is the third time now that you've mentioned what you want to hear.

MS. REDDY:  We're good.  We're good.  The basis is you claim I'm testifying?

MR. DUDDY:  I don't hear -- you asked me what my objection was and I'm telling you.

MS. REDDY:  -- playing the video now.  Thank you.  I heard it.

MR. DUDDY:  Stop, stop, stop, stop, stop, stop.  Off the record.  You're testifying --

MS. REDDY:  We're not off the record.  We're staying on --

MR. DUDDY:  -- off the record.

THE REPORTER:  Wait.  One at a time.

Page 128

J. DAVIDSON

One at a time.

MS. REDDY:  -- deposition.

MR. DUDDY:  -- the same question, hoping for the answer.

MS. REDDY:  On the record.

MR. DUDDY:  -- lady.  But you're not the one --

THE REPORTER:  I can't hear either of you.  I can't hear you, so you have to speak one at a time if you want this on the record,

MR. DUDDY:  Help yourself.

MS. REDDY:  We are on the record.  We do not go off the record when Mr. Duddy says so.  I'm in the middle of a question -- the witness.  I only asked Mr. Duddy to state his objection for the record and he's done so.  So we're moving on now.

MR. DUDDY:  So Talya, did you get the objection?

MS. REDDY:  I'll go off the record when there's a question pending.  I'm in the middle of questioning, Mr. Duddy.

Page 129

J. DAVIDSON

MR. DUDDY:  What was -- could you read back the question that's pending, Talya?

THE REPORTER:  Oh, yes.  One moment. Just give me a moment to get back.

(The reporter repeated the record as requested.)

MR. DUDDY:  And we objected, asked and answered.  Testifying.

MS. REDDY:  You did not make that objection.  You can make it now and you can --

MR. DUDDY:  I am making -- I am.

BY MS. REDDY:

Q    Officer Davidson, please answer my question.

MR. DUDDY:  Objection.

THE WITNESS:  At this point, I'm not certain what the question is.  Would you mind asking again?

MS. REDDY:  Talya will read it back to you.  Thank you.

THE REPORTER:  Okay, one moment.  Let me go back again.

Page 130

J. DAVIDSON

(The reporter repeated the record as requested.)

THE WITNESS: I heard an officer say, "Don't get shot over this, it's over," or maybe, "It's over, don't get shot over this." Then you hear my voice say, "It's over." And then you hear Officer Sullivan kind of frantically -- I don't want to say a panic, but definitely an elevated voice calling for more cars.

BY MS. REDDY:

Q    Right. And my question was not relevant to that. My question was, what was the last statement that you just heard? You attempted to answer? There was an objection. I would still ask that you answer. I'm asking you what is the last full statement that you just heard in the video? I just paused it at 5:23.

You said it was something something gum, but you assumed that the word was "gun." Is that --

A    Oh, that? Yah. I'm sorry. I -- I apologize. I feel like I've

Page 131

J. DAVIDSON

answered this question.  I'm just -- I'm
not sure if you're looking for more of an
answer or what.

Q    I'm just clarifying because you
keep going back to prior statements from
the officers, and that's not what I was
asking.  I was asking for this statement
just now, and I had asked earlier, do you
hear a individual say, "I don't have no
gun"?

MR. DUDDY:  Objection.  Objection.

MS. REDDY:  We got it.

THE WITNESS:  I do not -- I do not
hear someone say that, no.

BY MS. REDDY:

Q    Okay.  What do you hear?  I'm
going to play it again.

A    I hear the word --

Q    -- a second.

MR. DUDDY:  We're going to do this
hard way or the easy way.  It's up to
yourself.  Am I going to have to object to
everything that you're saying?

THE REPORTER:  I'm sorry.  I just

Page 132

J. DAVIDSON

didn't catch all of that, Mr. Duddy.

MS. REDDY:  -- talking.

THE REPORTER:  Can you repeat --

MR. DUDDY:  -- what I'm trying to do.

THE REPORTER:  Hust wait a minute.  I didn't hear what you said before --

MS. REDDY:  -- objection.

THE REPORTER:  Wait.  I need to hear what Mr. Duddy said so I can have that on the record.  Can you repeat it?

MR. DUDDY:  It was an objection to the fourth time this has been asked, and there was testifying because he didn't hear the statement.  He's already said he didn't hear the statement.  But he is been asked three times if he's heard a certain statement.

BY MS. REDDY:

Q    Moving on, I'm going to play the video at 5:17.  I'm going to turn up the volume, and I'd like you to testify when I pause it to what you can hear in the video.

(Video played.)

Page 133

J. DAVIDSON

What did you hear in this portion of the video that I just played?

A    I didn't -- I don't know if it's muted or what.  I did not hear a single word.

Q    Oh, you couldn't hear the video?

A    Nope.

Q    I'm going to try again.

A    Okay.

Q    Tell me if you hear --

(Video played.)

Can you hear anything in that video -- portion I just --

A    I hear -- yeah, I hear, "It's over."  Then I hear the radio chatter, and I don't know what the radio says.  And then I hear Officer Sullivan begin to ask for more cars.

Q    Okay.

(Video played.)

THE WITNESS:  Just so you know, there's no volume on my end.

MS. REDDY:  Okay.  Talya, can you hear the video?

Page 134

J. DAVIDSON

THE REPORTER:  I could up until the last portion where it seemed to go quiet.

THE WITNESS:  Yeah.

BY MS. REDDY:

Q   Okay.  Okay, that's fine.  I don't -- not sure what's going on with the video, but I'm done with this exhibit anyway.  I'm going to stop screen sharing for a second.

THE WITNESS:  I have to use the restroom.  I could wait like five, ten more.  But if it's going to be a while longer, I'm definitely going to have to take a bathroom break.

MS. REDDY:  Well, this is probably a good time when we're transitioning exhibits, so thank you.  Let's take five.

THE WITNESS:  Okay.

MS. REDDY:  Thank you.

THE REPORTER:  Okay, it's 3:33. We're off the record.

(Off the record.)

THE REPORTER:  It is 3:45.  We're on the record.

Page 135

J. DAVIDSON

BY MS. REDDY:

Q    Okay.  Back on the record.
Officer Davidson, I'm going to continue
asking you some questions, and you are
still under oath.

A    Okay.

Q    Okay, great.  I wanted to go
back to some of your earlier testimony and
clarify.

A    Sure.

Q    So perhaps I misunderstood, so I
have some follow-up questions.  Are there
two -- you've mentioned two words, that
you stopped the vehicle based on your
visual estimation, and you mentioned the
word "pacing."  Are those two distinct
methods, or is it one in the same when you
discussed that?

A    I don't know if I used the
phrase "visual" -- what was it?

Q    I heard you say something about
visual.  Maybe I didn't catch it.  So
let's just use this opportunity to clarify
your testimony.

J. DAVIDSON

A    Sure.  So I used pacing to determine that the vehicle was traveling in excess of the posted speed limit.

Q    Okay.  And is that a term for a method of determining if a vehicle is speeding or not?

A    Correct.

Q    And that's the method that you used on September 9, 2019?

A    Correct.

Q    -- vehicle in question, which we've seen in the video.  Does that reflect the vehicle, the Chevy, the gray Chevy?

A    So not just that night.  I've -- I have no -- no training on any other form of speeding.  So it's -- every car I've pulled over for speeding is going to be by pacing.

Q    Okay.  And is that different from an officer just visually determining that a vehicle is speeding?

A    I mean, that could go into the totality of your circumstances, and there

Page 137

J. DAVIDSON

are -- there's extensive training out there for different kinds of traffic infractions.  I have not been trained on how to tell how fast something's going to the naked eye.  But I can tell -- while looking at several vehicles going by, I can tell you if one's going much faster than the other ones.

Q    And what is that called?

A    I'm sorry?

Q    Is that called something.  Is that a certain method you're referring to?

A    I'm just looking.  I don't -- I don't know.

Q    Okay.  So visually looking?

A    So with my eyes -- I don't know -- I'm sorry if I'm not explaining it right.  So if -- let's just say three cars hypothetically drive by, and one is going much faster than the other two, I can tell you that.

Q    And what is that method called, if anything?

A    I don't believe it -- I mean,

J. DAVIDSON

I'm sure that there's a name for any kind of thing out there, but I don't have, like, a specific thing I call that.

Q    Okay.  And in your training, you were only taught a method called pacing; is that correct?

A    No, I don't know if that's correct.  Using the word "only," I'm not certain I would be able to testify to that.

Q    Okay.  I'm repeating what I thought I heard you say just a few minutes ago.

        MS. REDDY:  Talya, can you read back his answer about pacing?

        THE REPORTER:  Just now?  Just this previous answer?

        MS. REDDY:  Yeah.  It was something about training in the Buffalo Police Department.

        THE REPORTER:  One moment.

        MS. REDDY:  -- a minute ago.

        THE REPORTER:  There weren't many questions about that.  "What is the method

Page 139

J. DAVIDSON

called, if anything?"  You want the answer to that?  Or "In your training, you were only taught one method.  Is that called pacing?  Is that correct?"

MS. REDDY:  That was just now.  But right when we got back from the break, I thought I heard Officer Davidson reflect on his entire training with Buffalo Police Department, and I wanted to make sure we use the right language that he used.

THE REPORTER:  Okay, one moment.

(The reporter repeated the record as requested.)

BY MS. REDDY:

Q    Okay.  Well, that wasn't it, but I will follow up with that.  So just to be clear, Officer Davidson, you have not been trained in the Buffalo Police Department on determining if a car is speeding --

A    I would not say that, no.

Q    Oh, I didn't finish my question, Officer Davidson.

A    I'm sorry.  You stopped speaking, so I thought it was my turn.

Page 140

J. DAVIDSON

Q    No.  Have you been trained in the Buffalo Police Department on how to determine if a vehicle is speeding prior to a traffic stop by just visually seeing that vehicle on the road?

MR. DUDDY:  Objection.

THE WITNESS:  Not as the only basis for a traffic stop.

BY MS. REDDY:

Q    Okay.  What methods have you been trained to use and determine if a vehicle is speeding in a traffic stop by the Buffalo Police Department?

A    Answer it in a different way than I already have?

Q    Just to clarify, because there's been a lot of testimony and I thought I heard you say something differently, and Talya was looking in the record.

But instead of doing that, I'm asking you to itemize each and every method that you have been trained in in the Buffalo Police Department before effectuating a traffic stop on a vehicle

Page 141

J. DAVIDSON

that you suspect is speeding or driving imprudently or unreasonably safe only --

A    I'm not going to be able to do that.

MR. DUDDY:  Objection.

THE WITNESS:  I can't tell you everything I've learned as a police officer right now.  I just --

BY MS. REDDY:

Q    That's not what I asked you, Officer Davidson.  Please answer the question.

A    Can you please -- can you rephrase the question?  Because I'm having trouble understanding it.

Q    Sure.  First, let's name them.

A    Name --

Q    What are the names -- Officer Davidson, if you can just pause for one second.  Let me finish my sentence so that you have -- understanding of the --

A    Sure.  I'm not -- yeah, I'm not trying to be adversarial.  It's just you're pausing --

Page 142

J. DAVIDSON

Q    Hold on.  Just please stop --

A    -- something different than previously, so I'm just trying --

Q    Officer Davidson --

THE REPORTER:  Wait.

BY MS. REDDY:

Q    Please stop talking.

A    Yep.

Q    I need you to just pause for a second.  Take a minute.

A    Yes.

Q    I'm going to be -- very specific question.

A    Okay.

Q    Series of specific questions. Just let me get my question out, and you can take a second to think about it, and then answer.  These are not trick questions.  I'm just trying to get some clarity for the record.

A    Sure.  And just for clarity, I'm not trying -- I don't think they're trick questions.  It's just in the last few minutes your speaking cadence has changed,

J. DAVIDSON

so as you pause, I go to answer as I have been for the last four hours, and then you start speaking again because the question's not over.  So I'm just trying to --

Q    I understand -- okay.  I understand.  I need you to just answer the questions I'm asking you.  You don't have to explain.  I'm just trying to get a --

A    Okay.

Q    Okay.  During your tenure as a Buffalo police officer, whether on probation or in academy or as a police officer, what are the methods that you are trained in to determine if a vehicle is speeding in the city of Buffalo while you are in a patrol unit, whether stationary or moving?

MR. DUDDY:  Objection.

BY MS. REDDY:

Q    And you can answer.

A    Okay.  So pacing is the one that I used that day.

Q    Okay.  Hold on a second.

Page 144

J. DAVIDSON

A     Yes.

Q     Pacing -- what you used on the day of September 8, 2019, to pull over the vehicle that Mr. Suttles was traveling in; is that correct?

A     Yes, ma'am.

Q     That is a method that you were trained in in the Buffalo Police Department?

A     Correct.

Q     What other methods have you been trained in in the Buffalo Police Department, whether on probation, whether in the academy, or whether as a police officer, to determine that a vehicle was driving imprudently in relation to its speed that would allow for a traffic stop?

MR. DUDDY:  Objection.

BY MS. REDDY:

Q     And you can answer.

A     So I would have to say you'd have to check with, like, the academy on that.  I can't tell you every way that I've ever been trained to do a traffic

Page 145

J. DAVIDSON

stop.

Q    No.    That is not what I asked you, Officer Davidson, and please do not refer to the academy.

I'm asking you as you sit here today, based on your knowledge as a Buffalo police officer, can you name any other method that you have been trained in to effectuate a stop of a vehicle that you suspect is driving impudently based on its speed that you've been trained in, besides pacing -- you just testified to, that you've been trained on and used on September 8, 2019?

A    Not at this time.

MR. DUDDY:  Objection.

BY MS. REDDY:

Q    Thank you.

A    Have I done something to upset you at this point?

Q    Officer Davidson, this is a deposition.  I ask you questions and you answer them.

A    Oh, okay.  All right.  I'm just

Page 146

J. DAVIDSON

trying.  I just -- I don't know why you're so upset at me all of a sudden.

MS. REDDY:  Can we go off the record, Talya?

THE REPORTER:  Sure.  It's 3:56. We're off the record.

(Off the record.)

THE REPORTER:  It is 3:57.  We're on the record.

MS. REDDY:  Okay.  Thank you.

BY MS. REDDY:

Q    So I want to go back to your testimony that you were parked stationary in a patrol unit with Officer Sullivan on September 8, 2019, when a vehicle where Mr. Suttles, Quentin Suttles, the plaintiff in this case, was a rear passenger.  Your earlier testimony is that that vehicle passed you at the intersection -- passed at the intersection; is that correct?

A    Sure.  So it didn't -- didn't pass me.  I mean, technically, it did pass me, but not in a parallel fashion.

Page 147

J. DAVIDSON

Q    Right.  So at the intersection.  You are parked --

A    Yes.

Q    -- side street facing that intersection.

THE REPORTER:  Wait, wait, wait.  Just pause for a moment.  If you could repeat that question.

BY MS. REDDY:

Q    You were parked on a side street facing Broadway, and that vehicle crossed the light; is that correct?

A    Yes.  I was facing northbound on a side street facing Broadway, and the vehicle passed me going eastbound on Broadway.

Q    Okay.  And your earlier testimony was that when that car passed the intersection, you determined that it was traveling at a speed higher than allowable by the city limits of that area; is that correct?

MR. DUDDY:  Objection.

THE WITNESS:  At the moment, that

Page 148

J. DAVIDSON

wasn't my determination, no.

BY MS. REDDY:

Q    Okay.  What was your determination at that moment?

A    That it was going markedly faster than the other vehicles that had passed through that intersection.

Q    And how did you determine that?

A    With my eyes.

Q    Okay.  Is that called something?

A    Probably.  I don't know what it would be called.

Q    Okay.  And how long -- let's go back.  How many cars did you visually observe in that moment when you first saw Mr. Suttles' vehicle?

A    I do not recall.

Q    Okay.  And did you pull off from being stationary immediately after you saw the vehicle that Mr. Suttles was a passenger in pass you?

A    Yes.

Q    Okay.  And for how many seconds did you follow this vehicle?

Page 149

J. DAVIDSON

MR. DUDDY:  Objection.

THE WITNESS:  I don't recall.

BY MS. REDDY:

Q    Okay.  Your earlier testimony was that the vehicle went through the intersection, and you turned right and proceeded behind that vehicle; is that correct?

A    So I actually said that I turned eastbound, and then I believe you asked if it was right or left, and I said right.

Q    Okay.  So that's right. Eastbound was a right turn?

A    From -- from the direction I was facing, eastbound was right -- a right turn.

Q    Okay.  And for how long were you behind that vehicle before you turned on your lights --

A    I don't recall.

Q    Okay.  And is that when you began to pace the vehicle?

A    I began to pace the vehicle when I turned eastbound onto Broadway.

Page 150

J. DAVIDSON

Q    Okay.  And did you use any landmarks to pace the vehicle?

A    No landmarks.  Not, like, intentionally using landmarks, no.  It -- part of the totality of the situation, but no.  I was using the speedometer on my vehicle.

Q    Okay.  And what did your speedometer reflect?

A    Thirty miles per hour.

Q    Had you calibrated your speedometer?

A    I would not calibrate it.  Our garage -- we have a police garage where we take cars for regular maintenance, called PMI maintenance, so they would be the ones that calibrate a vehicle.  I don't work in the garage as a mechanic.

Q    How often is your vehicle calibrated by the garage?

A    I do not know.

MR. DUDDY:  Objection.

BY MS. REDDY:

Q    And what speed did your

Page 151

J. DAVIDSON

speedometer reflect?

A    Thirty miles per hour.

Q    Okay.  And so did you maintain a certain speed for a duration of time behind the vehicle that Mr. Suttles was in?

A    Yes.

Q    What was that?

A    Thirty miles per hour.

Q    For how long?

A    I don't recall.

Q    Was there other traffic present on that street?

A    I don't recall, but it's a -- it's a main thoroughfare in the city of Buffalo, so I would assume yes.

Q    And did that vehicle pull over right away after you turned on your lights?

A    I wouldn't say right away, but I wouldn't also say it turned into a pursuit of any kind.  I did have to turn on my horns.  I don't recall -- so there's a setting on our sirens, so to speak, where

Page 152

J. DAVIDSON
you have -- you can turn them on and they stay on indefinitely.

And then there's a -- there's a button where you can just go -- like, I'll just -- for lack of a better -- honk honk. Like, you can give a big, loud -- and I believe I did that. I don't think I had to, like, turn the lights on and chase or anything like that. So I guess it's a matter of semantics. He pulled -- she pulled over relatively quickly, but I would not say right away.

Q    Okay. And does the Buffalo Police Department have any written policies about stops of motor vehicles that are suspected of speeding?

A    I'm certain they do.

Q    Have you read them?

A    I have read the entire MOP twice in my career from cover to cover, once while in the academy and once two years ago while studying for a promotional. But I -- I can't recall page and verse or anything like that.

Page 153

J. DAVIDSON

Q   And what is a promotional?

A   To take a -- so similar to how you take a written test and then all the tests we discussed earlier to become a police officer.  It's a similar -- not the same, but it's a similar experience to become a detective or a lieutenant.  You have to take a written test, prove residency, things of that nature.

Q   Okay.  And so what was that for for you?

A   Detective.

Q   Okay.  And what was the outcome of that?

A   I passed.  I'm on the list.

Q   Okay.  To become a detective?

A   Someday, if they get to my name on the list before the list expires.

Q   Oh, when does the list expire?

A   It's kind of a fluid thing.  I don't know the exact parameters.  I believe the list has to stay in effect for two or three years, and can exceed four or five years.

Page 154

J. DAVIDSON

Q    Okay.  And then that would make you a detective in your district?

A    So that would be the hope, but I -- it necessarily wouldn't go to my district.  Everything in our department's based on seniority.  So the longer you've been in a position, the -- you get the perks of that.

So as now I've gotten to a district that takes a little seniority to get to, 'cause I have nine years, if I were to become a detective tomorrow, I'd have one day seniority, and it would be unlikely that I'd be able to get back to the station house I'm at for some time.

Q    Okay.  And are you required to write any reports specific to the circumstances of stopping a vehicle?

A    Not in and of itself.  Not just for stopping.  If you stop a vehicle and then just advise someone -- now, there is a stop receipt you can give someone if you choose not to give them a ticket.  So when you pull someone over, it's at your

Page 155

J. DAVIDSON

discretion as an officer to either advise or give a ticket.

If you advise rather than give a ticket, there is a stop receipt you give them.  But at the time, we were not using that.  That was not a regular -- I don't know the exact phrasing, I guess.  It wasn't regular used in the course of business as a Buffalo police officer. That's something that's newer.  I wouldn't say brand new, but newer, that you give a stop receipt if you just advise.

So when I -- when I stop a car, I'm almost always trying to find a way just to advise and not write a ticket.  I prefer to just let people know what they've done wrong and let them go.  The overwhelming majority of my traffic stops end with advising and not a ticket.

Q    And let's say they do end with a ticket or an arrest.  Is there a requirement that you report on the reason for the stop itself?

A    It would be -- not on its own,

Page 156

J. DAVIDSON

no. But in the course of arrest paperwork, you would put in there the reason for it. Or if you wrote a ticket, you'd have to put in there the reason for it. But if you were to just advise, then no. It would be on the stop receipt, but it wouldn't be, like, a separate report.

We're kind of in the transition process. We're kind of behind the times, it seems, where we're going digital more than paper. So that report would just be done at your in-car computer.

Q Okay. So in relation to this specific incident with Mr. Suttles, were you required to provide written details that explained the basis of your stop of that vehicle?

A So yeah, that would be in the police report and the arrest paperwork. It would be -- it would be documented as to why I made the traffic stop.

Q Where you indicated that the vehicle was speeding?

A Again, I don't know if I would

Page 157

J. DAVIDSON

have used the word "speeding."  I may --
may have, but I would think I'd more
likely use "imprudent speed."

Q    Okay.  And are you required to
explain the basis of the determination in
writing that the vehicle was driving
imprudently?

A    If you write the -- if you write
a ticket, you would -- you would do it on
a supplemental to the ticket.  And then
when you go to traffic court, that would
be discussed.

So yes is the answer, but
there's nothing that would technically
stop you from not -- from just not doing
that portion of the vehicle and traffic
ticket.  And then you'd have to be more
diligent in your explanation when you go
to traffic court.

Q    Okay.

A    Can I just pause or mute this
for 30 seconds?  It's going a little later
than I thought.  I'm going to ask my
mother to pick up my kids from their --

Page 158

J. DAVIDSON

their summer activities.

Q    Yeah.  And just so you know, I'm wrapping up, if you need to let her know that also.

A    Oh.  So I'm about 20 minutes from where I need to be, and I need to be there in about 35 minutes.  Should I not -- should I -- can I still do that, you think?

Q    Yeah, why don't --

A    You think this is more than 15 minutes?  Okay, cool.

Q    No, I don't think so.

A    Then I'll just hold off.

Q    -- want to try to make that.

A    Okay.  Then I'll just wait and keep going.  Thank you.

Q    Thank you for that.  So what did you estimate the speed of the vehicle that Mr. Suttles was in when you --

THE REPORTER:  I'm sorry, when you what?

BY MS. REDDY:

Q    I'm sorry.  I just wanted to

Page 159

J. DAVIDSON

clarify the timeframe.  When you first saw the vehicle pass the intersection, did you make an estimation --

A    I did not make an estimation. When I first saw it go by, I believe the exact phrase I used to Russ Sullivan was, "Wow, that car was moving."  And then as I paced it, it was over the speed limit.

Q    But did you put a numerical value to it at any point in time?

A    I did not.

Q    Did Officer Sullivan make an estimation of the speed it was traveling at any point in time?

A    Not to my knowledge.

Q    And were you aware that Mr. Suttles appealed his conviction and won --

MR. DUDDY:  Objection.

BY MS. REDDY:

Q    -- his appeal on the basis of the stop that you and Officer Sullivan effectuated and was thereafter -- from incarceration?

Page 160

J. DAVIDSON

THE REPORTER:  I didn't hear the end of that because there was an objection. Can you repeat the end of that?

MS. REDDY:  Yeah, let me -- yeah, I think, if I finish my question then the objection could be lodged.  What part did you get to, Talya?

THE REPORTER:  "His appeal on the basis of the stop that you and Mr. Sullivan -- Officer Sullivan effectuated."

BY MS. REDDY:

Q    And was released from incarceration?

A    So I am aware that he'd been released from incarceration.  I did not know the circumstances around it.  I was under the impression that when you plead guilty, you forego the appeal process.

So no, I had no idea that he'd gotten out on an appeal based on our traffic stop, especially since I've never been -- I would think that if you were appealing on the traffic stop, I would

Page 161

J. DAVIDSON

have been called into court to discuss the traffic stop. So news to me, and very confusing.

Q   Well, Officer Davidson, I entered your transcript as an exhibit to this proceeding where you did testify before the court in relation to his traffic stop.

MR. DUDDY:  Objection.

BY MS. REDDY:

Q   Is that correct?

A   Yes, during a suppression hearing, but not after he was incarcerated. So I just -- whatever -- I don't understand the whole court system. No -- I mean, I'm not trying to portray that I do. I just -- I just find it strange that someone could say I didn't know what I was doing on a traffic stop without me there and then have it overturned, so --

Q   Yeah, I'm sure you can talk to your attorney about how you can make a plea deal and reserve your right to appeal

Page 162

J. DAVIDSON

a conviction, and thereafter have a suppression hearing where the officer testifies, and then prevail because a court of law determines that the stop itself was a bad stop.

A    Sure.  I just am surprised that I wouldn't be involved --

MR. DUDDY:  Hang on, hang on. Objection.  The trial testimony that he had shown as an exhibit was in 2020.  It was my understanding that that was done at the very beginning of this process.  When was the suppression hearing?  It's not -- years later.

THE REPORTER:  Wait --

MS. REDDY:  I -- no.

THE REPORTER:  I just didn't hear that, Mr. Duddy.

MS. REDDY:  Yeah, I don't know what you're saying, Mr. Duddy.

MR. DUDDY:  You're trying to equate -- the suppression hearing, the Ingle hearing that Mr. Davidson appeared at was right at the beginning of this

Page 163

J. DAVIDSON

process.  I feel like we're getting the three things inflated here.

MS. REDDY:  No, we're not.

MR. DUDDY:  We are, obviously.

MS. REDDY:  No, we're not.  Officer Davidson claimed that he never testified for any -- that he doesn't recall testifying.  And I just clarified to him that I submitted the transcript as an exhibit of testimony that he provided as an officer involved in this stop.

THE WITNESS:  Sure.  I didn't say that, though.  I didn't say that I never remembered testifying.

BY MS. REDDY:

Q    No.  I asked you if you -- you did say that, Officer Davidson, and then I clarified to you that I entered your transcript --

MR. DUDDY:  Objection.

BY MS. REDDY:

Q    -- from your testimony at a hearing.  And then you went on to say that you didn't understand how the appeal

Page 164

J. DAVIDSON

process works, and that's fine.  But I'm just clarifying to you that I did enter your prior testimony as an exhibit, and you confirmed that transcript.

A   Yeah.  At no time did I ever say -- I never said that I didn't testify. I said in -- in the follow-up to the -- after he'd been incarcerated, I didn't testify in anything.

Q   Right.  And so I would just clarify -- well, I didn't make a distinction about incarceration or not.  I asked you about the appeal decision regarding his incarceration.

A   Sure.  And I --

Q   Oh, we are on the same chronology of events.  There was a hearing that you testified in in relation to his criminal case.

A   Correct.

Q   I'm not reflecting on his incarceration.  I was just letting you know he was released from incarceration.

MR. DUDDY:  Objection.  Testifying.

J. DAVIDSON

MS. REDDY: Yeah. I'm just trying to answer Officer Davidson's --

BY MS. REDDY:

Q And actually, Officer, you can obviously have that discussion with counsel if you want any clarity about the legal proceedings. But I wanted to clarify that we did enter your transcript into evidence today.

A That's fine. No, I don't have any questions about that.

Q So during that hearing that you testified, did you explain to the court how you paced the vehicle that Mr. Suttles was traveling in?

A I do not recall.

Q So are you required to undergo any training on bias as a Buffalo police officer on a yearly basis or any kind of consistent basis?

MR. DUDDY: Objection.

THE WITNESS: Bias to what?

BY MS. REDDY:

Q Just generally.

Page 166

J. DAVIDSON

MR. DUDDY:  Objection.

BY MS. REDDY:

Q    Have you heard of bias training?

A    We do -- like, they call it verbal judo, like deescalation tactics.

Q    What's that?

A    Trying to -- and I do believe in it personally.  Like, if you can talk someone into the back of your car rather than grabbing them and throwing them, it's always going to be better for everyone involved.  Just -- that's, like, one example.  I mean, it's really just being able to use your words to deescalate situations.

Q    Okay.  How about any training to ensure that police officers aren't profiling citizens in stops?

MR. DUDDY:  Objection.

THE WITNESS:  I can't think of, like, a specific training to that.  I don't -- no, I can't think of specific training to that.  I just try and enforce the law regardless of who is not following it.

Page 167

J. DAVIDSON

BY MS. REDDY:

Q    Right.  I understand that's what you do.  I'm just trying to get --

A    Yeah.

Q    -- Buffalo Police Department's policies are or requirements on training.

A    Yeah.  And -- and like I said, I'm not trying to just pass the buck to the -- and I don't mean the -- when I say the Academy -- I apologize for not being clear.  I don't mean the academy that I went to nine years ago.  We have a unit that's called the Academy Unit within our department, and they keep records of all that kind of stuff.

So -- and that would be their expertise, and they would know if we've got ongoing specific training, or if that training's embedded within another training, or if that training doesn't exist.  But I don't know.

Q    And did you make -- oh, so what's the policy if you're riding with a police officer and you see a vehicle that

J. DAVIDSON

you want to stop?  Does there need to be an agreement amongst the officers to stop that vehicle, or is it typically the driver of the patrol unit who makes that determination?

A    So you wouldn't be able to do that.  You're not allowed to just want to stop a car and then stop it.  There's got to be a vehicle and traffic infraction in New York State.

Q    Right.  But amongst, let's say you and Officer Sullivan, for example, on the day in question, which is September 8th --

THE REPORTER:  Wait, wait.  Sorry, you broke up there.  Just try not to say "mm-hmm" or "uh-huh" during the question because then I'll lose words of it; okay?  Can you repeat the question?

MS. REDDY:  Where did you stop?  Sorry.

THE REPORTER:  "Right, but among" --

BY MS. REDDY:

Q    Oh, right.  Among you and

Page 169

J. DAVIDSON

Officer Sullivan, for example, on September 8th, 2019, does there need to be -- did there need to be a consensus to stop the vehicle that Mr. Suttles was traveling in?

MR. DUDDY: Objection.

THE WITNESS: Well, there's a relationship between two people in a car, any two people in a car, not just patrol car. So I don't know if there'd have to be a verbal consent, like, "Are you okay with us stopping this vehicle right now?"

But between body language and comfortability and somebody just piping up and being like, "I don't think so" -- but no, there's no -- like, we don't have any forms or formal policy on working together to determine that. It's just kind of naturally ebb and flow of a conversation within a car.

BY MS. REDDY:

Q So on this day, did you make the decision to pull over the vehicle that Mr. Suttles was in?

J. DAVIDSON

MR. DUDDY:  Objection.

BY MS. REDDY:

Q    Or was it --

THE REPORTER:  I'm sorry, I didn't -- didn't hear the end of the question.

BY MS. REDDY:

Q    Or was it Officer Sullivan?

A    Yeah, I -- I don't really have a whole lot to add to that.  I believe I did already answer that.  Really just -- I was the officer driving, so ultimately I was the one that put the -- you know, put the lights on the vehicle.  So I pulled over the car.  But we as a car crew made the traffic stop, if that makes sense.

Q    And by that point in time, how many vehicles had you pulled over in a vehicle stop as a Buffalo police officer?

A    I think that is the one and only traffic stop Russ Sullivan and I have ever done together, before or since.

Q    Okay.  And thank you for that. But I'm just trying to clarify.  You came off --

Page 171

J. DAVIDSON

A    Oh.

Q    You came off probation in July of 2018 and became a Buffalo police officer.  This stop occurred on September 8th, 2019.  I'm just asking -- to you as a Buffalo police officer, by that date, how many vehicles had you pulled over in a traffic stop relating to the speed of the vehicle?

A    I do not know.

Q    Okay.  And would that information be contained anywhere?

A    Probably not.

Q    So there's no record of how many vehicles you've stopped per year or --

A    Nothing cumulative.  I suppose if someone took the time to comb through every transmission I've ever put out -- you put out over the air when you are doing a traffic stop.  So there would -- there would be a way, I suppose, if you found every radio transmission transcript and then went through them to see how many times I called out on a traffic stop.

Page 172

J. DAVIDSON

But I don't believe there's going to be any kind of comprehensive number system anywhere.  But again, that would be a question maybe for our dispatchers.  But I -- I do not know of a -- of a way to find that information easily.

Q    Okay.  But by that date, you had been a Buffalo police officer for about a year, a little bit more than a year; is that correct?

A    No, probably be closer to --

Q    And I'm using your July 2018 date that you gave me earlier.

A    Well, I was a police officer on January 20, 2017.

Q    Right.  I'm referring to when you came off probation.  You gave me a June 2018 date.

A    Sure.  So I would have done traffic stops on probation as well during the FTO process, that 16-week field training officer process.

Q    Right.  But you indicated to me

J. DAVIDSON

that you became a Buffalo police officer, non-probationary, at the end of July 2018. So I'm just --

A    Yes, that would have been when I came off probation.

Q    And then this stop occurred September 9, 2019, so a year and a few months.

A    I agree.

MS. REDDY:  I'm just going to -- we can stay on the record.  I'm just going to go off video for one minute to look at my notes, and then I might just be done, Officer Davidson.  I just want to make sure.  And I think that'll still get you on --

THE WITNESS:  Okay.

MS. REDDY:  Okay.  I think I'm all set.

THE REPORTER:  Okay.

THE WITNESS:  Okay.  Thank you.

THE REPORTER:  One moment.

//

//

J. DAVIDSON

EXAMINATION

BY MR. DUDDY:

Q    I just have one -- I have one follow-up question.

A    Yes, sir.

Q    Just to clarify.

A    Yeah.

Q    The handgun that was found at the traffic stop, do you have any other information about that handgun that we haven't shared here today?

A    Yes.  I was told by a --

MS. REDDY:  Hold on a second.  Hold on.

THE WITNESS:  Yep.

MS. REDDY:  Officer Davidson, hold on one second.  I just want to lodge my objection.

Object to form.

And you can answer.

THE WITNESS:  Sure.  So I was told by a GVU, which stands for Gun Violence Unit detective, that that gun was being sought because it was used in the shooting of a

J. DAVIDSON

young lady, I believe an 11-year-old girl who was waiting at home for her mother to return from the Erie County Fair with snacks, and a stray bullet hit that young lady in the foot.

And then I was told subsequently, later to that, by a Safe Streets detective, that that gun was ballistically matched to that shooting of the young lady waiting for her mother from the fair.

MR. DUDDY:  That's great.  Thanks.

THE WITNESS:  Yes, sir.

THE REPORTER:  Okay.  And before we go off the record, Mr. Duddy, you're ordering a copy of this transcript?

MR. DUDDY:  That's fine.  Yep.

THE REPORTER:  Okay.  It's 4:27. We're off the record.

(Whereupon, at 4:27 p.m., the proceeding was concluded.)

Page 176

CERTIFICATE OF DEPOSITION OFFICER

I, TALYA BROTT, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

*Talya Brott*

TALYA BROTT

Notary Public in and for the

State of New York

CERTIFICATE OF TRANSCRIBER

I, AMANDA WELLS, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

*Amanda Wells*

AMANDA WELLS

Page 178

Suttles. Quentin v. City Of Buffalo

John Davidson (#7458284)

E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____    _____

John Davidson                               Date

Suttles. Quentin v. City Of Buffalo

John Davidson (#7458284)

ACKNOWLEDGEMENT OF DEPONENT

I, John Davidson, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____    _____

John Davidson                                          Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

_____ DAY OF _____, 20____.

_____

NOTARY PUBLIC

**[0001 - 6]**    Page 1

**0**

**0001** 47:22
**00098** 1:7
**0304** 79:20
**0318** 79:20
**0600** 48:2

**1**

**1** 78:11,14 87:5
88:9 89:21,25
89:25 93:5
94:20 96:4,14
97:2,6 98:2
101:7,15 102:2
**10** 22:12,13
**101** 3:9
**11** 22:13 175:2
**11th** 1:19 2:14
**12** 27:15
**12:25** 1:15 4:6
**14** 26:12 80:8
80:13
**14202** 1:20
2:15
**14209** 2:6
**15** 26:12 97:17
98:2 125:14
158:12
**16** 14:25 15:6
26:8 172:23
**17** 17:2 24:23
**174** 3:4
**18** 47:7,15,19
48:4 49:8

**18th** 47:22
**19** 63:8,12
**19th** 25:8,10,16
47:23 65:15
**1:16** 57:8
**1:51** 57:11

**2**

**2** 1:14 4:10
17:15 54:7
82:24 87:4
88:8 89:21,23
90:13,17 93:5
**20** 158:6
172:17 179:15
**2002** 20:11,20
27:6
**2006** 21:13,16
21:24,25
**2009** 22:11
**2010** 22:8
91:12,21
**2011** 21:25
22:21
**2016** 24:21
25:3 26:11
**2017** 10:14
16:23 24:25
25:7,8 30:19
66:24 172:17
**2018** 16:22,23
18:10 40:7
47:18 48:5
171:4 172:14

172:20 173:3
**2019** 40:24
41:2,14 58:16
63:8,13 65:15
79:15 80:19
81:3,7,19,20
86:12 91:8,15
92:3,19 94:7
97:10 100:3
102:20 136:10
144:4 145:15
146:16 169:3
171:6 173:8
**2020** 101:7
102:3 162:11
**2025** 1:14 4:10
54:4,5,7
**20th** 25:7 31:10
47:15,20 102:2
**2357** 80:19
81:16
**2359** 47:23
**24** 1:7
**25** 104:8
**265.03** 82:25
83:2
**27982** 176:16
**2:41** 99:12
111:23
**2:54** 99:15

**3**

**3** 82:25 83:2
96:4 102:19

103:19 105:11
**30** 110:25
111:12,19
120:15 121:13
157:23
**30014** 177:13
**35** 51:17,19
158:8
**3:18** 110:2
**3:32** 116:10
**3:33** 134:21
**3:45** 134:24
**3:56** 146:6
**3:57** 146:9

**4**

**4** 96:13
**40** 111:13,15
115:11,14,15
**455** 2:5
**47** 118:20
**4:27** 175:18,21

**5**

**5** 18:16,18
96:25
**53** 101:15
**5:13** 121:16,21
**5:17** 132:21
**5:21** 125:21
**5:23** 130:20

**6**

**6** 3:3,8 101:3,8
102:9

**[601 - agree]** Page 2

**601** 20:7
**65** 1:19 2:14

**7**

**7** 97:5,14
**716** 2:8,17
**725-0139** 2:8
**7458284** 1:22
  178:2 179:2

**8**

**8** 80:19 81:3,7
  81:19 91:15
  92:3,19 94:7
  97:6,14 100:3
  144:4 145:15
  146:16
**851-4203** 2:17
**8th** 81:16 82:2
  91:7 102:20
  168:15 169:3
  171:6

**9**

**9** 7:8 59:8,23
  75:6,7,20 76:6
  79:15 81:20
  86:12 97:9
  136:10 173:8
**9/1/2020** 3:9
**9th** 82:3 91:8

**a**

**ability** 39:22
  86:18 176:9
  177:6

**able** 30:17 40:2
  48:10 78:7
  103:21 138:10
  141:4 154:15
  166:15 168:7
**above** 66:15,21
  89:14 115:12
  115:16 179:7
**absent** 4:16
**absolutely**
  28:14
**academy** 10:17
  10:19,21,23
  11:6,7,12,24
  12:3,8,15,17,20
  15:8 16:3,8
  19:7 24:24
  27:24 28:4,18
  28:20,21 29:11
  30:18,24 32:25
  33:3,6,24,25
  34:4,5,11
  46:16,19 48:9
  49:7,13,16,24
  50:15 51:24
  52:2,9 53:10
  54:2,15 55:18
  55:23 66:6,8
  67:4,5 72:10
  143:14 144:15
  144:23 145:5
  152:22 167:11
  167:12,14

**acceptance**
  30:18,23
**accepted** 31:8
**access** 58:5
**accreditation**
  53:14
**accredited**
  53:15
**accrued** 27:24
**accumulated**
  24:10
**accurate** 81:21
  176:8 177:5
**accurately**
  90:14 91:5
  96:5,14 97:2,8
**acknowledge...**
  179:3
**acknowledge...**
  4:13
**acronym** 51:4,4
  54:20 56:9
**action** 176:11
  176:15 177:8
  177:11
**actively** 84:16
**activities** 158:2
**actual** 12:3
  65:9
**actually** 10:20
  22:18 25:16
  27:14,16 31:14
  55:8 56:5 76:4
  81:2 83:13

87:3 92:7
  122:2 149:10
  165:5
**add** 170:10
**added** 27:13,17
**addition** 73:8
**additional** 84:6
  126:3
**additionally**
  4:16
**additions** 179:6
**administer**
  4:13
**admitted** 71:8
**aduddy** 2:16
**adversarial**
  141:24
**advise** 154:22
  155:2,4,13,16
  156:6
**advising**
  155:20
**afternoon** 4:2
  5:8,12,13 6:15
  64:5
**afternoons**
  18:23 40:17
  41:10
**agility** 29:15
**ago** 52:19
  138:14,23
  152:23 167:13
**agree** 4:14,19
  173:10

**[agreement - asked]**

**agreement** 168:3
**ahead** 36:18 93:16 116:9
**air** 112:11 119:21 120:7 126:4 171:20
**al** 1:10 4:9
**alcohol** 71:12
**allow** 73:10,25 144:18
**allowable** 72:19 73:9,24 147:22
**allowed** 112:14 168:8
**allows** 72:15
**aloud** 90:22
**amanda** 177:2 177:14
**amount** 40:13 56:22
**andrew** 46:11
**anesthesia** 36:24
**annual** 53:22 53:23
**annually** 52:11 53:11
**answer** 8:9,11 10:5 14:18 18:20 19:14 36:12,13,18 37:6 39:8,22

40:2 41:15 45:2 48:10 55:17,21 86:15 93:25 95:23,25 96:16 106:19 108:12 112:19 120:3 128:5 129:16 130:16 130:18 131:4 138:16,18 139:2 140:15 141:12 142:19 143:2,8,22 144:21 145:24 157:14 165:3 170:11 174:21
**answered** 45:14 93:21 98:8 108:15 129:10 131:2
**answering** 57:17 98:13
**answers** 8:5
**anthony** 2:12 5:13
**antibiotics** 36:23
**anybody** 123:3
**anybody's** 114:18
**anymore** 50:24
**anyway** 134:9
**apologize** 33:16 89:7 93:17

95:22 108:14 130:25 167:11
**apparatus** 102:22 103:4
**appeal** 86:10 86:19 159:22 160:9,20,22 161:25 163:25 164:14
**appealed** 159:18
**appealing** 160:25
**appear** 110:12 110:17
**appeared** 63:19 74:17 162:24
**appearing** 34:13
**appears** 88:16 105:15,25 110:14
**appended** 179:7
**applicable** 4:23
**apply** 26:3
**appreciate** 55:22
**apprehend** 123:6
**approached** 70:16
**approaching** 69:5,14

**appropriate** 10:8
**approximately** 12:4 19:6 22:24
**approximatio...** 10:6 11:21
**area** 16:15 90:7 147:22
**arm** 123:22,24
**armed** 42:12
**arms** 75:2 84:13
**arrest** 77:23,25 78:4,24 79:7 80:17,24 81:24 83:25 84:7 85:4,10 100:7 100:16 102:21 155:22 156:2 156:20
**arrested** 7:8 78:3,4
**arresting** 82:10 82:15,16
**arrived** 80:11
**article** 51:17,19
**asked** 37:6 41:16 71:22,24 95:22 106:24 106:25 107:3 108:15 119:4 127:7,14 128:17 129:9

131:9 132:13 132:17 141:11 145:3 149:11 163:17 164:14

**asking** 18:7 57:17 73:7 87:10 88:11,13 95:25 103:25 105:10 107:7 107:19 108:21 109:4,7 113:4 116:13 117:23 125:7 129:21 130:18 131:8,8 135:5 140:22 143:9 145:6 171:6

**asp** 123:22 124:8,9

**asps** 124:20

**assigned** 4:4 9:5,22 10:17 10:23 11:11,24 12:8,14,17 13:8 15:7,25 16:2 17:11,14 41:14,17,19,22 46:20

**assignment** 15:22 16:9,11 23:5

**assignments** 43:24

**assistant** 2:20

**assume** 47:20 83:24 92:5,22 151:17

**assumed** 130:22

**attempt** 40:6

**attempted** 57:24 130:16

**attempting** 81:14 119:12

**attend** 14:12 62:10

**attendance** 5:6

**attention** 80:16 101:2

**attorney** 5:9,13 37:12 38:18 39:5 93:20 161:24 176:13 177:9

**attorneys** 35:13 35:19

**audio** 113:24 120:17 176:7 177:3

**authority** 29:2

**authorized** 4:12

**available** 16:7

**avenue** 2:5

**aware** 7:4,5 37:21 48:13,18 49:2,6 88:4

159:17 160:16

**b**

**b** 3:6 14:8,10 85:2

**back** 19:19 22:22 23:17 27:17 34:19 40:5,17 46:15 57:15 59:25 62:4 69:11 77:22 86:6 93:2 98:22 99:20,23 106:15 110:24 111:20 113:13 117:15 120:2 122:4 124:5 129:3,6,22,25 131:6 135:3,9 138:15 139:7 146:13 148:15 154:15 166:10

**background** 11:15 77:12

**bad** 29:8 162:6

**bail** 100:17

**ballistically** 175:9

**ballpark** 11:22 11:23 58:19

**bank** 23:4,7,10

**banker** 22:23 22:25

**banking** 23:8

**barely** 104:21 104:22 121:17 121:18

**based** 14:19 47:20 48:4 64:20 83:24 135:15 145:7 145:11 154:7 160:22

**basic** 31:3

**basically** 9:15 29:21

**basis** 34:7 70:2 73:20 116:5 127:3,6,8,13 140:8 156:17 157:6 159:22 160:10 165:20 165:21

**bathroom** 134:15

**baton** 124:2,6 124:11,11,19

**bear** 86:25

**becerril** 13:10 13:24,25 14:13

**beep** 55:4

**began** 60:25 68:3,5 149:23 149:24

**beginning** 5:7 97:13 101:19 162:13,25

**[begins - buffalo]**                                                                Page 5

**begins** 46:3 47:25

**behalf** 2:2,10

**beholden** 29:23

**belief** 95:11,13

**believe** 6:23 7:6 10:22 14:14 28:25 34:22 48:5 51:13 53:23 56:19 62:7 65:17 71:14 74:12 76:11 82:24 84:22 87:15 92:24 101:24 102:23 103:2,5 103:12 108:4 110:18,22 112:8 115:2 123:10 124:10 124:20 125:6 137:25 149:11 152:8 153:23 159:6 166:8 170:10 172:2 175:2

**belong** 75:20

**belonged** 76:6

**best** 14:2,5,19 33:13 39:11 48:10 72:25 91:16 106:23 176:9 177:5

**bet** 51:4

**better** 152:6 166:12

**beyond** 60:23 73:13

**bi** 53:11

**bias** 165:19,23 166:4

**big** 29:18 50:6 50:12 51:17 54:19 152:7

**biggest** 114:24

**bimonthly** 53:12

**bishop** 20:3,10 20:11,13,14,15 20:16

**bit** 19:19 24:4 28:8 69:13 172:11

**black** 89:14,17

**blast** 114:18

**blasted** 104:15

**block** 80:4,12 80:14 89:19 90:4,4,24

**bloodborne** 51:16 54:12

**board** 27:23

**body** 34:23 102:22,24 103:4,10 105:15,16,18 110:20 116:24

117:3 120:19 169:14

**boller** 3:8 101:12

**bonaventure** 21:2,10

**booking** 78:25 79:8,24,24 80:7,10 87:16 89:16

**bottom** 88:20 88:23 96:8,21

**bounced** 18:22

**box** 94:4

**bracelet** 112:12

**brain** 52:23 53:4

**brand** 124:10 124:18,21 155:12

**break** 57:23 98:25 99:2,7 134:15 139:7

**breaks** 21:9

**brief** 18:13 40:13 55:10

**briefing** 15:13 16:5

**briefly** 18:14

**bring** 24:18

**brings** 24:16 58:13

**broadway** 61:2 61:4,10 62:17

63:11 64:7 67:9,12 83:6 83:23 147:12 147:15,17 149:25

**broke** 168:17

**broken** 120:18

**brott** 1:21 4:3 176:2,17

**brunt** 54:14

**buck** 167:9

**budgetary** 56:23

**buffalo** 1:7,17 1:20 2:6,10,13 2:15 4:9,10 5:14 8:18,19 8:24 14:21 15:22 20:7,16 22:22 23:16,22 23:23 24:14 25:4,9 26:3,8,9 27:23 28:4,17 28:20,21 31:7 31:9 42:17,20 42:22 48:15 51:9 53:6 54:8 59:13 60:14 61:3,4 63:12 67:15 68:9 70:6 73:3 79:2 94:17 115:17 138:20 139:9 139:19 140:3

**[buffalo - certainly]**                                                     Page 6

140:14,24 143:13,17 144:9,13 145:8 151:17 152:14 155:10 165:19 167:6 170:19 171:4,7 172:10 173:2 178:1 179:1

**buffalony.gov** 2:16

**buffer** 69:13

**buffers** 104:10

**bullet** 175:5

**bulletin** 56:13

**bunch** 7:2

**bus** 94:23

**business** 155:10

**button** 152:5

**c**

**c** 2:1,12 14:10 14:10 17:11,12 18:9,15,24 19:5,8 31:23 31:25 32:4,9 40:12,14,19,21 41:3 43:10,12 43:15,22 44:3 46:20,23 51:2 56:18

**cadence** 142:25

**calibrate** 150:14,18

**calibrated** 150:12,21

**call** 14:25 15:24 16:5 17:15 31:6,14 45:12 110:16 138:4 166:5

**called** 6:4 9:14 18:16 49:16 53:20 56:8 65:8,11 101:21 124:20 137:10 137:12,23 138:6 139:2,4 148:11,13 150:16 161:2 167:14 171:25

**calling** 110:22 124:13 126:3 130:11

**calls** 14:20,20 14:23 15:3 44:16,23 45:9 45:14

**cam** 102:22,25 103:4,10 105:18

**camera** 34:23 105:15,16 116:24 117:3

**camera's** 110:21

**cameras** 120:19

**capacity** 7:16 42:21 43:25 54:8 87:13 88:7

**capitals** 90:21

**captain** 16:6 33:7,22 34:2,5 110:9,9

**captains** 32:14 49:17

**car** 44:10 45:16 45:17,18,23 46:4,12 50:11 55:2 56:20 61:19 67:11 69:12 95:4 136:18 139:20 147:19 155:14 156:13 159:8 166:10 168:9 169:9,10,11,21 170:15,15

**career** 152:21

**careers** 52:10

**carolina** 21:19

**carpooled** 62:9

**cars** 44:9 55:6 94:24 110:22 125:8 126:3 130:11 133:19 137:19 148:15 150:16

**case** 6:19 8:2 34:16 35:8,14 35:18,23 40:23 58:2 103:20 146:18 164:20

**cases** 7:3 36:5

**catch** 20:18 132:2 135:23

**caught** 38:9

**cause** 55:17 154:12

**cazenovia** 42:5

**cell** 80:4,11,14 89:19 90:4,4

**center** 69:4,12

**ceremony** 22:10

**certain** 7:3 10:2 16:24 17:3 22:8 29:2 34:18 47:22 49:12 51:6 54:12 62:8 65:17 69:19 76:13,19,23 80:9 81:5 84:2 85:2 105:20 106:3 112:13 117:13 123:13 129:20 132:17 137:13 138:10 151:5 152:18

**certainly** 14:4 41:3

**certificate** 176:1 177:1
**certification** 27:20
**certifications** 27:14
**certified** 4:19 27:14
**certify** 176:3 177:2
**cetera** 46:18
**chance** 119:16
**change** 178:4,7 178:10,13,16 178:19
**changed** 47:10 100:16 142:25
**changes** 179:6
**charges** 82:19 82:21,23 84:6 85:5,8,11 100:2
**charlie** 17:12
**charlotte** 21:19 21:20,21 22:3 22:5
**chase** 152:9
**chatter** 133:16
**check** 144:23
**chest** 123:23
**chevy** 91:12,21 91:25 136:14 136:15

**chewing** 126:15
**chiefs** 32:14
**choices** 28:13
**choose** 154:24
**chronology** 30:12 31:3 164:18
**circumstances** 64:21 136:25 154:19 160:18
**cit** 51:12
**citizens** 166:19
**city** 1:7,17 2:10 2:13 4:9 5:14 8:19 15:21 59:13 60:14,14 61:3,4 63:12 67:15 68:9 70:6 78:25 87:20 89:15 94:17 115:16 143:17 147:22 151:16 178:1 179:1
**civil** 1:6
**claim** 127:13
**claimed** 163:7
**clarified** 163:9 163:19
**clarify** 10:9 64:5 108:19 135:10,24 140:17 159:2 164:12 165:9

170:24 174:7
**clarifying** 82:4 131:5 164:3
**clarity** 142:21 142:22 165:7
**classes** 21:8
**classroom** 31:15
**classrooms** 12:21
**clear** 8:15 25:13 38:17 94:4 114:6 139:18 167:12
**client** 38:20
**close** 11:9 17:7 34:10 45:20 81:15
**closer** 113:8 172:13
**closing** 23:3
**clothing** 76:18
**coach** 26:21
**coached** 26:22
**coaching** 26:20
**coca** 124:15
**coke** 124:13
**cola** 124:15,16
**colas** 124:13
**collapsible** 123:25 124:6 124:11,19
**college** 20:23 20:24 21:7,8

27:7
**colleges** 21:9
**color** 91:12
**comb** 171:18
**come** 58:21 59:10
**comfortability** 169:15
**coming** 71:11 71:16
**community** 21:7,7,9
**complaint** 88:8
**complete** 50:17 53:8 179:8
**completed** 17:10
**complying** 122:23
**comprehensive** 172:3
**computer** 156:13
**concluded** 175:22
**conclusion** 102:6
**concrete** 18:25
**conference** 9:16
**confirmed** 164:5
**conflicting** 35:2

**[confusing - dates]**                                        Page 8

**confusing**
  161:4
**consensus**
  169:4
**consent**   169:12
**consider**   40:13
  80:6
**consistent**
  165:21
**constantly**
  94:24
**constitute**   5:3
**contact**   58:22
**contained**
  171:13
**context**   40:7
**contingency**
  25:25
**continue**   57:16
  106:4 120:11
  124:23 135:4
**contract**   84:3
**conversation**
  33:11 70:20
  169:20
**conversations**
  71:24
**conviction**
  86:11 159:18
  162:2
**cool**   31:18
  158:13
**copy**   175:16

**corporation**
  1:18
**correct**   16:22
  62:12 63:4,15
  63:25 64:9,10
  64:13 70:4
  72:11,12,16,17
  81:4,12,13
  85:6 116:7,8
  117:9 136:8,11
  138:7,9 139:5
  144:6,11
  146:22 147:13
  147:23 149:9
  161:12 164:21
  172:12 179:8
**corrections**
  179:6
**counsel**   1:18
  35:7,10 103:17
  165:7 176:10
  176:13 177:6,9
**count**   11:9 80:9
**counter**   36:20
**county**   10:21
  11:4,6 12:20
  66:2,6 75:22
  175:4
**couple**   6:25
  15:9 16:18
  17:18,19 18:8
  18:12,12 40:8
  43:17 58:25

**course**   34:16
  36:4 57:25
  74:23 78:12
  101:5 103:18
  103:20 155:9
  156:2
**court**   1:1 6:20
  8:4 9:13,14,14
  9:17,21,21
  35:25 38:2
  87:21 89:16
  92:16 100:21
  100:22 157:12
  157:20 161:2,8
  161:16 162:5
  165:14
**cover**   152:21
  152:21
**crack**   122:2
**create**   40:6
  69:5,13 97:23
**credit**   29:20
  30:3
**credits**   21:4,6
  27:18,19
**crest**   117:6
**crew**   170:15
**crime**   75:21
  84:20 118:3
**crimes**   85:20
**criminal**   34:20
  35:11 99:25
  164:20

**crisis**   51:14
**criteria**   48:11
  49:19
**cross**   43:23
**crossed**   147:12
**cubes**   89:19
  90:4
**cubicles**   90:6
**cumulative**
  171:17
**current**   8:16
  37:3
**currently**   6:19
  9:4
**curtin**   33:2
**cut**   55:11 56:21
**cv**   1:7

**d**

**d**   3:1
**daily**   50:16
**dark**   110:5
**date**   1:14 7:12
  11:9 42:6 43:9
  47:12 58:17,20
  79:11,14 80:16
  80:17 81:2,12
  97:9 101:14
  102:20 171:8
  172:9,15,20
  178:24 179:12
**dates**   24:8
  79:21

| davidson 1:8 | 89:1 90:1 91:1 | 156:1 157:1 | death 119:17 |
|---|---|---|---|
| 1:13 2:11 4:1,8 | 92:1 93:1 94:1 | 158:1 159:1 | debriefing |
| 5:1,15,16,18,18 | 95:1 96:1 97:1 | 160:1 161:1,5 | 15:17 |
| 5:20 6:1,3,13 | 98:1 99:1,19 | 162:1,24 163:1 | debt 29:22 |
| 7:1 8:1 9:1 | 100:1 101:1,21 | 163:7,18 164:1 | decide 26:15 |
| 10:1 11:1 12:1 | 102:1 103:1 | 165:1 166:1 | decided 28:15 |
| 13:1 14:1 15:1 | 104:1 105:1 | 167:1 168:1 | decision 92:6 |
| 16:1 17:1 18:1 | 106:1 107:1 | 169:1 170:1 | 164:14 169:24 |
| 19:1 20:1 21:1 | 108:1 109:1 | 171:1 172:1 | declare 179:4 |
| 22:1 23:1 24:1 | 110:1 111:1 | 173:1,15 174:1 | decriminalized |
| 25:1 26:1 27:1 | 112:1 113:1 | 174:17 175:1 | 84:22 |
| 28:1,8 29:1 | 114:1 115:1 | 178:2,24 179:2 | deemed 179:6 |
| 30:1 31:1 32:1 | 116:1 117:1 | 179:4,12 | deescalate |
| 33:1 34:1 35:1 | 118:1 119:1 | davidson's | 166:15 |
| 36:1 37:1,10 | 120:1 121:1 | 165:3 | deescalation |
| 38:1 39:1,4 | 122:1 123:1 | day 9:20 12:9,9 | 166:6 |
| 40:1 41:1 42:1 | 124:1 125:1 | 13:2 15:22 | defendant |
| 43:1 44:1 45:1 | 126:1 127:1 | 16:4,9,10,14 | 80:23 |
| 46:1 47:1 48:1 | 128:1 129:1,16 | 17:15,16 18:9 | defendants |
| 48:23,25 49:1 | 130:1 131:1 | 25:13 26:20 | 1:11 2:10 |
| 50:1 51:1 52:1 | 132:1 133:1 | 34:7,7 40:8,11 | defense 78:13 |
| 53:1 54:1 55:1 | 134:1 135:1,4 | 44:14 47:25 | definitely 56:25 |
| 56:1 57:1,16 | 136:1 137:1 | 63:3 74:11 | 130:10 134:14 |
| 58:1,12 59:1 | 138:1 139:1,8 | 76:4,5 92:8,11 | degree 21:12 |
| 60:1 61:1 62:1 | 139:18,23 | 92:12,13 100:7 | 21:14,17 22:4 |
| 63:1 64:1 65:1 | 140:1 141:1,12 | 103:4 143:24 | delay 55:9 |
| 66:1 67:1 68:1 | 141:20 142:1,5 | 144:4 154:14 | department |
| 69:1 70:1 71:1 | 143:1 144:1 | 168:14 169:23 | 1:17 2:13 8:18 |
| 72:1 73:1 74:1 | 145:1,4,22 | 179:15 | 8:25 23:3 26:4 |
| 75:1 76:1 77:1 | 146:1 147:1 | days 100:15 | 28:17,24 31:7 |
| 78:1 79:1 80:1 | 148:1 149:1 | deal 161:25 | 31:9 42:18,20 |
| 81:1 82:1,10 | 150:1 151:1 | dealing 51:14 | 42:22 48:16,20 |
| 83:1 84:1 85:1 | 152:1 153:1 | dealt 59:6 | 53:15 138:21 |
| 86:1 87:1 88:1 | 154:1 155:1 | | 139:10,19 |

140:3,14,24
144:10,14
152:15 167:15
**department's**
154:6 167:6
**depending** 16:7
**deponent** 179:3
**deposed** 7:22
**deposition** 1:13
4:7,25 7:14
9:16 34:22
101:18 102:6
128:3 145:23
176:1
**depositions**
58:2,7 78:12
103:20
**depth** 49:6
53:22
**describe** 78:22
**described**
95:14
**description** 3:7
**designated**
82:15
**detail** 9:13 15:8
15:11 17:10
**details** 55:20
156:16
**detective** 153:8
153:13,17
154:3,13
174:24 175:9

**determination**
91:24 94:6
148:2,5 157:6
168:6
**determine**
60:15 64:18
95:4 122:13
136:3 140:4,12
143:16 144:16
148:9 169:19
**determined**
64:11 67:13
75:19 76:6
147:20
**determines**
162:5
**determining**
136:6,22
139:20
**dialogue** 37:15
**different** 7:2,2
19:21 43:21
87:19 95:20
136:21 137:3
140:15 142:3
**differently**
140:19
**difficult** 27:10
50:10
**digital** 156:11
176:7 177:3
**diligent** 118:9
157:19

**diploma** 22:12
22:13,19
**direct** 39:15
80:15 95:10
100:25
**direction**
149:15
**directly** 39:4
102:12
**disbanded**
52:19
**disbelieve**
91:20
**discovery**
101:5 103:18
**discretion**
155:2
**discuss** 58:13
161:2
**discussed** 35:8
35:18 81:9
92:8 99:24
135:19 153:5
157:13
**discussing** 63:8
**discussion**
37:15 39:5
70:23 71:3,4,7
74:15 81:17
111:2 165:6
**discussions**
35:13 80:25
**dishonesty**
59:18

**dispatched**
14:24 15:4
45:11
**dispatchers**
172:6
**distinct** 135:17
**distinction** 57:2
164:13
**distorted**
120:18
**distractions**
50:11 118:12
**district** 1:1,2
9:3,5,9,23,25
10:15 12:16
15:23 16:2,12
17:5,12,12
18:9,15,24
19:5,8,12,14
22:3 23:23
25:5 26:10
31:23 32:2,4
32:10 40:12,14
40:19,21 41:4
43:10,12,15,22
44:4 46:21,24
154:3,6,11
**divided** 74:22
**division** 23:10
**dms** 56:8
**dna** 75:21,23
**document**
78:14,16,23
79:4,10,14

81:6 82:7 87:8 87:11,14,18 88:3,6,15 89:3 93:4 96:5,22 96:24 97:2,6 97:14,18,23 101:4,24

**documentation** 71:25

**documented** 68:22 156:21

**documents** 34:13 78:19

**doe** 1:10

**doing** 7:19 12:9 13:5 14:22 35:24 36:4 92:9 123:5 140:21 157:16 161:20 171:21

**double** 89:14

**dozens** 32:13

**dragged** 119:16

**drive** 50:8 66:16 67:11 137:20

**driver** 59:16 70:21 74:10,15 75:3 83:15 84:14 92:5 109:7 111:2,14 118:7,9,10 119:8 168:5

**driver's** 61:17 70:16,17 75:12 117:4 119:9,20 120:6

**driving** 55:2 60:7 61:15 71:8 108:2 141:2 144:17 145:11 157:7 170:12

**dropped** 15:16

**drove** 62:2

**drug** 29:16 46:18

**duddy** 2:12 3:4 5:11,12,13 17:24 18:3 36:16 37:2,16 37:24 38:3,7 38:11,15,20,23 39:9,17 58:3 58:10 74:4 75:25 77:2 86:14 93:15 98:11,14,20,23 103:7 106:13 108:7 123:12 125:5,22 126:21,23,24 127:5,14,19,24 128:4,7,13,15 128:18,21,25 129:2,9,14,18 131:12,21

132:2,5,10,12 140:7 141:6 143:20 144:19 145:17 147:24 149:2 150:23 159:20 161:10 162:9,19,21,22 163:5,21 164:25 165:22 166:2,20 169:7 170:2 174:3 175:12,15,17

**due** 35:2 56:23

**duly** 6:5 176:5

**duration** 75:15 151:5

**duties** 63:3

**duty** 62:12,14

**e**

**e** 2:1,1 3:1,6 14:8,10,10 51:2 178:3,3,3

**ear** 113:19

**earlier** 72:8 73:16 81:23 83:4 93:3,9 95:21 99:24 113:3 131:9 135:9 146:19 147:18 149:5 153:5 172:15

**early** 16:21,23 16:25 22:15

41:10

**ears** 104:15 114:18

**easier** 21:5

**easily** 172:8

**east** 62:24

**eastbound** 67:12,24 147:16 149:11 149:14,16,25

**easy** 131:22

**ebb** 169:20

**education** 21:15,23 27:19

**effect** 48:3 153:23

**effectuate** 145:10

**effectuated** 159:24 160:12

**effectuating** 140:25

**eight** 45:20

**either** 16:23 27:18 107:3 128:9 155:2

**elementary** 21:15

**elevated** 130:10

**embedded** 167:20

**emergency** 52:15

**employed** 8:24 9:4 176:10,13 177:7,9

**employee** 176:12 177:9

**employment** 8:17

**ends** 35:3 46:3

**enforce** 166:24

**enforcement** 10:21 11:6 12:20 66:6

**engaged** 70:20

**ensure** 166:18

**entail** 12:24

**enter** 164:3 165:9

**entered** 57:25 97:7 161:6 163:19

**entering** 46:19

**entertain** 37:22

**entire** 13:3 15:21 32:9 40:20 50:14 75:15 139:9 152:20

**episodes** 51:16

**equate** 162:23

**equipped** 65:18

**erie** 10:20 11:3 11:4,5 12:20 21:6 66:2,5 75:22 175:4

**ert** 52:18

**es** 176:4

**especially** 160:23

**esquire** 2:3,12

**essentially** 13:5

**estimate** 11:11 158:20

**estimated** 10:25

**estimation** 11:2 11:18 60:12 95:19 135:16 159:4,5,14

**estimations** 95:6

**et** 1:10 4:9 46:18

**evaluation** 29:16

**evasive** 51:5

**evening** 81:25

**event** 16:14

**events** 30:16 164:18

**eventually** 122:11

**everybody** 27:7 127:2

**evidence** 165:10

**evidentiary** 4:24

**evoc** 50:7,20 51:2 54:19,24

**exact** 11:8 24:8 40:10 43:17 44:7 47:12,24 71:23 91:18 153:22 155:8 159:7

**exactly** 29:10 29:12 30:2 47:16 55:13 88:22 107:17

**examination** 3:2 6:11 174:2

**examined** 6:7

**example** 95:2 124:14 166:14 168:13 169:2

**exams** 28:16

**exceed** 153:24

**exceeding** 67:14 70:5,18

**except** 89:12

**excess** 73:6 136:4

**excessive** 83:19

**exhibit** 3:8 58:4 78:11,14 83:7 87:5 88:9 90:14 93:5 96:4,14 97:2,6 97:18 98:2 101:3,8,16 102:9,18,19,19

103:19 105:11 134:8 161:6 162:11 163:11 164:4

**exhibiting** 59:17

**exhibits** 57:24 77:6 99:4 102:9 134:18

**exist** 167:22

**exit** 59:20

**exited** 70:15

**experience** 8:3 21:23 27:10 64:21 153:7

**expertise** 167:18

**expire** 153:20

**expires** 153:19

**explain** 15:10 45:8 65:21 143:10 157:6 165:14

**explained** 156:17

**explaining** 137:18

**explanation** 157:19

**extensive** 51:25 137:2

**extensively** 52:9

**[extra - formal]**                                                          Page 13

**extra** 52:12
**eye** 64:15,20
  137:6
**eyes** 137:17
  148:10

**f**

**facing** 62:20
  147:5,12,14,15
  149:16
**fact** 31:12
**fair** 175:4,11
**fairly** 22:8
**fall** 40:24 41:2
  55:15
**familiar** 6:21
  6:23,24 87:22
  89:12 96:11,21
  97:20
**far** 7:20,24
  15:15 67:17
  68:23 118:11
**farmer's** 42:8
**fashion** 146:25
**fast** 60:13,13
  60:16 63:20
  71:9 108:2
  112:2 114:24
  115:22,25
  116:5 137:5
**faster** 66:19
  68:15 137:8,21
  148:7

**federal** 6:20
**feel** 99:8 130:25
  163:2
**felony** 88:8
  92:21,23
  100:14
**felt** 44:13
**female** 60:8
  72:4 83:14
  86:5
**field** 12:5,13,23
  13:4 14:12
  21:23 34:6
  49:10,20 55:18
  172:23
**fight** 59:22
**files** 49:17
**final** 92:6
**finally** 17:5
  27:25 29:4
**financially**
  176:14 177:10
**find** 57:24
  155:15 161:18
  172:7
**fine** 10:4 11:2
  11:20 14:6
  30:7 58:10
  89:11 90:23
  134:6 164:2
  165:11 175:17
**finish** 37:25
  49:10 139:22
  141:21 160:6

**finished** 22:9
  22:14,17
**fire** 28:21
**firearm** 54:14
  54:23 59:9
  82:24 83:3
  122:24,25
**firearms** 50:11
  51:11 54:20,23
  123:6
**fired** 49:8
**firm** 2:4,20
**first** 6:4 19:24
  20:5,15 23:2
  23:11 32:21,23
  33:7 42:2,4,23
  46:8,23 55:11
  61:5,8 87:17
  88:18 104:7
  115:24 141:17
  148:16 159:2,6
**fist** 123:20
**fists** 122:21
**five** 10:22 11:7
  11:9 12:4,21
  18:21 19:6,7
  24:7 31:23,25
  40:15 44:2
  99:7 100:15
  120:2 125:17
  134:12,18
  153:25
**floor** 1:19 2:14

**flow** 169:20
**fluid** 153:21
**focus** 74:22
  118:8,9
**folder** 58:4
**follow** 67:22
  68:3,19 135:13
  139:17 148:25
  164:8 174:5
**following**
  108:14 166:25
**follows** 6:7
**foot** 15:14
  175:6
**footage** 102:25
  103:11 104:20
  105:16,19
  110:2,5
**force** 15:2
  51:21 52:8
  62:7 122:5
**forces** 42:12
**forefront** 53:3
**forego** 86:18
  160:20
**foregoing**
  176:3,4 177:4
  179:5
**forgetting**
  52:25
**form** 96:9
  136:17 174:20
**formal** 169:18

**[format - going]**                                                    Page 14

**format** 87:19 87:23 88:3 90:11 96:23
**forms** 169:18
**forth** 40:18 86:6
**forward** 10:8
**found** 25:19 26:24 75:5 118:2 171:23 174:9
**four** 40:15 85:4 85:8 118:25 120:14 121:13 143:3 153:24
**fourth** 132:13
**frantic** 119:15
**frantically** 125:7 126:3 130:9
**free** 99:8
**freshener** 112:11
**freudian** 30:7
**front** 52:18 72:5,24 75:3 76:12 84:13 119:6
**frontier** 28:25
**fto** 41:18 49:10 172:23
**full** 26:18 27:5 130:19

**fumbling** 55:21
**functions** 50:9
**funny** 26:25
**further** 60:21 176:12 177:8

**g**

**gaining** 21:22
**games** 26:22
**garage** 150:15 150:15,19,21
**garry** 46:9
**gather** 94:3
**gauge** 55:6
**general** 7:7 12:25
**generally** 13:12 37:20 120:18 124:19 165:25
**generate** 102:24
**gentleman** 7:7
**gestures** 8:13
**getting** 27:5 78:6 117:6 163:2
**girl** 175:2
**girls** 86:6
**gist** 71:7 107:6
**give** 8:7 10:24 11:10 14:2,17 16:8 69:21,23 69:23 74:10 77:7 106:25

107:4 109:21 113:23 119:15 127:9 129:6 152:7 154:23 154:24 155:3,4 155:5,12
**given** 36:25 179:9
**go** 13:14,17 14:23 15:3 19:16,18,19 20:24 23:12,17 36:17 55:5 61:25 91:3 93:2,16 106:15 110:24 111:12 111:20 120:2 122:4 128:15 128:23 129:25 134:3 135:8 136:24 143:2 146:4,13 148:14 152:5 154:5 155:18 157:12,19 159:6 173:13 175:15
**going** 14:9 16:14 19:18 33:9 34:18 36:17 37:15,22 40:5 44:25 45:4 46:15 55:5 57:6,16

59:25 60:13,21 63:6 66:15,19 68:15 69:22 71:10,17 77:22 78:5,13 80:15 86:23 87:4 89:20 91:10 93:15 94:20,22 96:9,12,22 97:12 98:24,25 99:2,6,23 100:24 101:19 102:6,17 103:16,24 105:2 106:4,15 107:9,22 109:13,25 110:24 111:13 111:15,20 112:2 114:10 114:18,24 115:14,22,25 116:5,9,18 118:5,6,19 120:2,11 124:23 125:14 126:7 127:9 131:6,18,21,23 132:20,21 133:9 134:7,9 134:13,14 135:4 136:19 137:5,7,8,20 141:4 142:13

**[going - hear]**

147:16 148:6 156:11 157:23 157:24 158:18 166:12 172:3 173:11,12

**good** 4:2 5:8,12 5:13 6:13,14 6:15,15 11:21 28:12 29:6,20 30:3 99:22 114:12 127:12 127:12 134:17

**gotten** 25:20 29:4 154:10 160:22

**grabbing** 166:11

**graduate** 20:10 41:20 49:7

**graduated** 20:2 20:6,18,19 22:11,12 27:7 27:7

**graduating** 27:5

**graduation** 22:10

**grandy** 46:14

**gray** 91:12,21 136:14

**great** 6:10 8:16 13:18 19:13 99:17 102:11 135:8 175:12

**guess** 7:7 10:6 10:12,25 14:2 14:5,9 28:12 65:7 80:5 88:17 90:5 112:20 152:10 155:8

**guidelines** 53:16

**guilty** 85:12 86:2,18 160:20

**gum** 126:14,15 130:22

**gun** 65:8,21,23 76:23 94:11 121:25 122:4,6 122:8,10,14,16 125:4,12,21 126:16 130:23 131:11 174:23 174:24 175:9

**gvu** 174:23

**h**

**h** 3:6 178:3

**hail** 94:21

**half** 10:22 11:7 11:10 12:4,22 40:15,16 96:20 96:21

**hand** 5:23 8:13 68:2 120:24 124:3,4

**handcuff** 120:24 123:8

**handcuffed** 84:17

**handcuffs** 122:7

**handgun** 7:8 59:23,24 75:6 174:9,11

**handle** 14:20

**hands** 119:20 119:24 120:6 122:3 123:11 123:14

**handwriting** 97:25

**hang** 36:16 162:9,9

**hanging** 108:3 112:9,13,14,20

**happen** 43:8

**happened** 17:20 18:8 67:7 68:25 70:11 71:18,24 74:14 81:22 85:15

**happening** 118:24 120:16 120:23 121:15 121:22

**happens** 15:5

**happy** 10:10

**hard** 14:17 29:12 41:15 50:13 55:16 131:22

**head** 8:13 24:2 47:14

**heading** 88:17 89:13,13

**heads** 109:21 113:23

**health** 51:16

**hear** 30:24 38:4 38:14 44:21 77:13,14,17,18 104:5,6,21,22 104:24 107:25 110:21 111:9 111:10 113:16 114:3 116:15 121:5,17,18 122:2 125:13 125:20,23,25 126:2,13,17,18 126:19,23 127:11,14 128:9,10 130:7 130:8 131:10 131:15,17,19 132:7,9,15,16 132:23 133:2,5 133:7,11,13,15 133:15,16,18 133:25 160:2 162:18 170:6

**heard** 86:4,21 90:3 114:10 125:11 126:12 127:18 130:4 130:16,19 132:17 135:22 138:13 139:8 140:19 166:4
**hearing** 3:8 5:21 92:21,23 92:25 100:6,9 100:12,14,19 101:11 109:16 111:5 113:9 161:14 162:3 162:14,23,24 163:24 164:18 165:13
**heffron** 17:22
**help** 128:13
**helped** 41:23 78:3
**hereto** 176:13 177:10 179:7
**herkimer** 21:7
**high** 19:20,21 19:24,25 20:2 20:19,21 64:16
**higher** 16:6 64:15,24 65:2 147:21
**highlight** 81:15
**hip** 45:13,13

**hire** 25:24
**hired** 16:25 47:6
**hiring** 26:12
**hit** 113:23 123:19 175:5
**hmm** 50:21 168:18
**hold** 25:10 37:9 37:9 77:5 115:24 142:2 143:25 158:15 174:14,14,17
**home** 9:22 17:5 175:3
**honest** 71:21 91:18
**honestly** 30:13 40:3
**honk** 152:6,6
**hoodie** 76:12 76:17
**hope** 41:23 154:4
**hoping** 74:18 128:5
**horn** 55:4
**horns** 151:24
**hour** 68:18 70:8 111:15 115:11,15 150:11 151:3 151:10

**hours** 143:3
**house** 154:16
**huh** 168:18
**hurting** 27:4
**hust** 132:6
**hypothetical** 95:24
**hypothetically** 137:20

**i**

**ibuprofen** 36:21
**ice** 94:22
**idea** 42:15 160:21
**identification** 101:9
**identified** 106:17
**identify** 5:6
**ignition** 119:11 119:19
**immediately** 27:6 148:20
**impair** 39:22
**important** 8:6
**impression** 76:22 86:17 160:19
**imprudent** 59:14 60:3,11 157:4

**imprudently** 141:3 144:17 157:8
**impudently** 145:11
**incarcerated** 161:15 164:9
**incarceration** 85:13 159:25 160:15,17 164:13,15,23 164:24
**incident** 58:13 63:7 81:18,22 81:25 86:11 92:17 156:15
**incidents** 81:8 91:6
**indefinitely** 152:3
**indicate** 82:17 93:5 101:20
**indicated** 112:2 115:22 156:23 172:25
**indicates** 88:6
**indicating** 60:22 115:25 125:4
**indication** 66:18
**individual** 131:10

**inflated** 163:3
**informant** 85:20 86:3
**information** 89:16 95:11,13 171:13 172:7 174:11
**infraction** 95:2 168:10
**infractions** 137:4
**ingle** 100:6 162:24
**initial** 67:4
**initially** 17:14
**initiate** 69:15 72:16,19
**initiated** 67:16
**injury** 119:17
**inspector** 31:6
**instance** 9:12 73:19 94:19
**instruction** 12:10
**instrument** 87:25 90:8
**insurance** 71:21
**intended** 4:22 69:20,24
**intensive** 51:12 52:7
**intentionally** 150:5

**interaction** 7:10
**interested** 176:14 177:11
**internally** 80:8
**interpret** 45:7
**interpretation** 29:25 85:21
**interrupt** 17:25 39:6
**interrupted** 44:22
**intersection** 63:17 64:7 67:17 146:21 146:22 147:2,6 147:20 148:8 149:7 159:3
**intervention** 51:14
**interviewed** 118:5
**intoxicated** 74:17 118:7
**intoxication** 59:17
**investigate** 69:25
**invitation** 28:21
**involved** 7:18 59:11 83:17 162:8 163:12 166:13

**involvement** 88:7,14
**involves** 40:24 95:5
**involving** 6:20 58:2,14 91:7 92:17 99:25
**irony** 27:21
**ish** 43:18,19
**isolate** 126:19
**it'd** 16:14 65:7 68:23 84:6 85:18
**it'll** 56:13
**itemize** 140:22

**j**

**j** 1:7 4:1 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1

55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1

138:1 139:1
140:1 141:1
142:1 143:1
144:1 145:1
146:1 147:1
148:1 149:1
150:1 151:1
152:1 153:1
154:1 155:1
156:1 157:1
158:1 159:1
160:1 161:1
162:1 163:1
164:1 165:1
166:1 167:1
168:1 169:1
170:1 171:1
172:1 173:1
174:1 175:1
**jail** 85:18
**james** 33:2
**jamestown**
86:7
**jane** 1:9
**january** 10:14
16:25 24:22,25
25:7,8,10
30:19 47:15
48:5 66:24
172:17
**jason** 110:10
**jm** 1:8
**job** 1:22 8:20
13:6 14:23

23:20 25:20
26:18 27:11
29:4 35:16,18
36:4 50:10
**jobs** 27:5
**john** 1:7,9,13
2:11 4:7 5:15
5:18 6:3 17:22
20:15 48:23,24
82:11 101:21
178:2,24 179:2
179:4,12
**joined** 42:17
**joining** 42:20
**joking** 30:14,15
**jude** 20:3,10,11
**judge** 3:8
101:11
**judo** 166:6
**july** 1:14 4:10
47:20 48:5
54:7 171:3
172:14 173:3
**jump** 44:14
52:5 53:2
**june** 172:20
**justification**
51:20

### k

**k** 27:14 46:3
**keep** 49:17
53:13 109:14
131:6 158:18

167:15
**keeping** 31:16
**keeps** 52:2
**kept** 25:22
52:17
**keys** 119:10,18
**kids** 94:23
157:25
**kind** 7:19 15:3
18:22 19:16
29:3,24 40:6
40:17 42:12
53:2 55:20
79:8 94:11
107:5,6 124:13
124:16 130:9
138:2 151:23
153:21 156:9
156:10 165:20
167:16 169:19
172:3
**kinds** 137:3
**knew** 19:17
31:16 42:16
**know** 6:25 7:12
7:17,20 10:5,9
11:8,17 13:19
14:3 16:19
18:19 23:8,9
24:2,7 25:15
25:21 26:11,13
27:2,13 29:6
29:20,25 31:5
31:8,13 32:12

32:15 34:8,9
35:4,22 36:3
38:8,23 40:10
40:11 41:4,9
42:6,25 43:9
43:23 45:4
47:12,16,21,23
47:23 48:2
49:7,9,11,14,18
50:2,4,7,10,23
50:23 51:25
52:4,6,13 53:9
53:10,12,17,23
55:5,13 56:8
56:17 58:17,20
61:7,14 62:21
65:3,10 66:11
66:14,25 68:24
70:10 71:10
72:5 75:9,24
76:13,14,22
77:13 78:2
79:12 80:3,5
81:5 82:23
83:10 84:2
85:22,23,25
86:17,19 91:17
95:24 103:8,13
104:4 105:22
106:2 107:16
107:21 109:6
110:5,14 113:2
113:19 114:12
117:13,15,16

119:14,22,24
120:20 122:9
123:18 124:3
124:12,18
133:4,17,22
135:20 137:15
137:18 138:8
146:2 148:12
150:22 153:22
155:8,17
156:25 158:3,4
160:18 161:20
162:20 164:24
167:18,22
169:11 170:13
171:11 172:6
**knowledge** 7:9
48:17 59:6
65:16 87:17
103:10 110:13
145:7 159:16
176:9 177:6

**l**

**l** 14:10
**lab** 75:22
**lack** 152:6
**lacrosse** 26:22
**lady** 128:7
175:2,6,10
**laid** 24:11
**landmarks**
150:3,4,5

**language** 44:19
45:5 139:11
169:14
**late** 16:23
41:11
**law** 1:17 2:4,13
2:20 10:21
11:6 12:20
66:6 72:23
82:25 84:22,23
162:5 166:24
**lawful** 119:5
**laws** 4:24
**lawyers** 35:10
**learn** 54:23,24
55:3,6,7,7
**learned** 66:5
141:8
**learning** 50:7
**leave** 23:11
109:18
**left** 24:19 25:4
25:23 67:21
69:13 80:12
149:12
**legal** 66:15
165:8
**letter** 27:22
31:12
**letting** 31:7
117:16 164:23
**leverage**
123:25

**liable** 29:23
**license** 71:20
106:24
**lieutenant** 16:6
32:25 110:11
153:8
**lieutenants**
32:13 49:17
**light** 62:19,20
62:23 64:12
147:13
**lights** 69:17,19
149:20 151:20
152:9 170:14
**likely** 25:24
78:20 157:4
**limit** 60:20,23
66:16,17,20,22
67:15 68:9,10
68:16,17 70:6
70:18 73:6,14
94:21 111:18
115:12,16
136:4 159:9
**limits** 147:22
**line** 89:14,17
178:4,7,10,13
178:16,19
**linwood** 2:5
**list** 153:16,19
153:19,20,23
**listed** 79:23
88:17

**listen** 127:7
**listing** 37:4,17
**literacy** 27:15
**little** 19:19 28:8
33:10 52:6
54:21 55:3,8
104:13 109:14
111:5 112:12
154:11 157:23
172:11
**lived** 19:15
**ljv** 1:7
**loaded** 59:8,24
75:6 83:2
**located** 61:11
**location** 1:16
**lodge** 37:12
174:18
**lodged** 93:22
160:7
**lodging** 38:8
**long** 8:23 9:24
10:18 12:2
14:11 16:16
17:16,18 18:18
19:4 23:6,10
24:5 46:7,10
47:4 53:21
68:19 148:14
149:18 151:11
**longer** 11:11
41:21,22 46:13
48:14 80:7,13
84:23 134:14

**[longer - method]**                                    Page 20

154:7
**look** 78:19
  89:12 90:8
  173:13
**looking** 83:10
  84:12 90:16
  131:3 137:7,14
  137:16 140:20
**looks** 79:7,17
  87:24 98:3
**lose** 168:19
**lot** 12:25 52:24
  56:15 140:18
  170:10
**loud** 113:12,19
  114:3,14 152:7
**loudly** 114:4
**love** 26:20,20
**low** 116:18
**lying** 58:18

**m**

**m** 20:14 82:11
**m&t** 23:4,6,12
  23:14
**ma'am** 7:25 9:9
  11:5 19:10
  25:2 26:6 28:9
  32:2 51:3
  61:18 62:15
  64:3 73:22
  87:6 115:2
  144:7

**made** 19:11
  23:17 26:15
  48:13,17 49:8
  67:24 91:24
  92:6 94:6
  108:6,19
  156:22 170:15
  179:5
**main** 151:16
**maintain** 151:4
**maintenance**
  150:16,17
**majority**
  155:19
**make** 8:7 29:23
  67:21 89:9
  90:3 91:18
  102:13 108:23
  109:12 126:15
  129:11,12
  139:10 154:2
  158:16 159:4,5
  159:13 161:24
  164:12 167:23
  169:23 173:15
**makes** 168:5
  170:16
**making** 129:14
**mandatory**
  57:2,3
**mann** 33:7,22
  34:3
**manner** 4:25
  95:14 97:4

**map** 83:10
**marijuana** 84:8
  84:19,21 118:2
**mark** 110:2
  111:23
**marked** 58:6
  61:20 62:10
  78:12 97:7
  101:2,8 102:10
  102:19 103:19
**markedly**
  148:6
**market** 42:8
**master's** 21:17
  21:22 22:4,7
**match** 91:17
  93:9
**matched**
  175:10
**math** 47:14,21
**matter** 4:8 6:22
  40:23 59:4
  63:24 99:25
  100:20 152:11
**matthew** 82:13
**mckinley** 20:7
**mean** 11:8
  19:14 32:15
  35:9 45:10,13
  50:2,15 54:10
  60:10 68:13
  76:17 80:2
  81:6 83:17
  92:4 106:23

107:5 108:17
  108:24 112:19
  124:15 125:10
  136:24 137:25
  146:24 161:17
  166:14 167:10
  167:12
**means** 5:2
**mechanic**
  150:19
**mecklenburg**
  22:3
**medication**
  36:8,10 39:21
**medications**
  37:3
**meet** 42:2,23
  49:3 58:16
**men's** 36:21
**mental** 51:16
**mentioned**
  46:16 65:20
  72:9 127:11
  135:14,16
**mess** 11:19
**message** 18:2
**met** 35:5 42:4
  42:19
**method** 72:14
  73:24 95:3
  136:6,9 137:13
  137:23 138:6
  138:25 139:4
  140:23 144:8

145:9

**methods** 72:18 73:9 135:18 140:11 143:15 144:12

**mic** 113:8

**mid** 22:17 47:19

**middle** 24:19 47:17 128:16 128:25

**midnight** 18:23 81:16,20

**midnights** 18:15 40:16

**mile** 94:20

**miles** 68:18 70:8 111:15 115:11,15 150:11 151:3 151:10

**millimeter** 7:8 59:8,23 75:6,8 75:20 76:6

**mind** 129:21

**mine** 120:21

**mine's** 111:11

**minute** 86:24 90:20 99:7 132:6 138:23 142:11 173:13

**minutes** 80:8 80:13 115:6 118:20,25

120:15 121:13 125:17 138:13 142:25 158:6,8 158:13

**mirror** 112:9

**misdemeanor** 85:2

**misunderstood** 135:12

**mm** 50:21 168:18

**moffett** 46:11

**moment** 19:2 31:18 85:3 112:7 119:15 120:8 122:12 123:14 129:5,6 129:24 138:22 139:12 147:8 147:25 148:5 148:16 173:23

**month** 52:17 66:25

**months** 10:22 11:7,10,23 12:5,22 15:9 16:18,19 17:19 18:12 27:24 28:3 40:8 46:23 47:8,15 48:4 49:9 173:9

**moore** 83:11,16

**mop** 152:20

**morning** 6:13 6:14,15 15:13 41:10,12 57:18 82:2

**mortgage** 23:3

**mortgages** 23:5

**mother** 157:25 175:3,11

**motor** 152:16

**motrin** 36:21

**move** 19:9,11 21:20 102:18 113:8 117:3

**moved** 21:21 22:22 24:4 27:8 34:21 35:4 75:17

**moving** 10:8 40:18 96:25 97:5,17 116:22 128:19 132:20 143:19 159:8

**mp** 17:15 18:16 18:18

**muffled** 126:13

**multi** 51:12

**multiple** 32:14 127:6

**multivitamin** 36:21,22

**mute** 113:20 157:22

**muted** 133:5

**n**

**n** 2:1 3:1 20:14

**nair** 2:20

**naked** 137:6

**name** 4:3 5:17 13:13,20,23 32:6 33:8 45:25 55:15 60:9 61:14 62:21 65:9 72:6 82:6 86:8 87:7,11 88:16 90:14,17 96:5 96:7,15,19 97:3,8,15 124:10,12,18 138:2 141:17 141:18 145:8 153:18

**named** 20:15

**names** 87:9 141:19

**naming** 32:16

**narrative** 91:11

**naturally** 169:20

**nature** 70:22 70:23 71:2 153:10

**navy** 42:12

**near** 81:19

**[nearing - occurred]** Page 22

**nearing** 81:19
**necessarily**
14:24 69:22
124:14 154:5
**necessary**
179:6
**need** 8:11 10:9
14:7 39:8
48:19 56:14
74:19 99:3,8
108:23 132:9
142:10 143:8
158:4,7,7
168:2 169:3,4
**neighborhood**
15:14 16:13
19:16
**neither** 176:10
177:6
**never** 44:10
160:23 163:7
163:14 164:7
**new** 1:2 4:10,14
15:22,23,24
16:10 17:4,7
20:6,7 22:22
23:16 24:12
27:3,20 28:2
47:25,25 51:21
53:14 73:5,13
84:20,23 86:7
95:8 118:3
155:12 168:11
176:19

**newer** 155:11
155:12
**news** 161:3
**nfta** 28:23
**niagara** 1:19
2:14 23:2,11
28:25
**nice** 19:15
31:20
**nick** 45:25
**night** 26:22
41:8,11 77:24
81:3 91:22
94:7 136:16
**nights** 41:11
**nine** 10:12
125:18 154:12
167:13
**ninth** 9:2
**nods** 8:13
**noise** 77:12
**non** 173:3
**nope** 133:8
**normal** 33:11
101:4 103:18
**north** 21:19
62:20
**northbound**
147:14
**notary** 4:12
176:18 179:13
179:19
**noted** 179:7

**notes** 23:5
173:14
**number** 172:4
**numerical**
159:10
**ny** 1:20 2:6,15

**o**

**o** 14:8,8 20:14
51:2
**oath** 57:21
99:21 135:6
**oaths** 4:13
**object** 37:23
93:15,21
131:23 174:20
**objected** 129:9
**objection** 4:16
5:21 36:17
37:13,16 38:9
38:15,18,19
39:6,9,13,17
74:4 75:25
86:14 93:22
103:7 106:13
108:7 123:12
125:5,22
126:21,25
127:4,8,15
128:18,22
129:12,18
130:17 131:12
131:12 132:8
132:12 140:7

141:6 143:20
144:19 145:17
147:24 149:2
150:23 159:20
160:3,7 161:10
162:10 163:21
164:25 165:22
166:2,20 169:7
170:2 174:19
**objections**
37:14,23
**observation**
95:10
**observe** 148:16
**observed** 63:14
63:16 64:4,6
**obstructed**
112:3
**obstructing**
84:11 112:21
**obstruction**
59:15 84:7,10
112:5
**obstructions**
108:3
**obviously** 8:3
163:5 165:6
**oc** 53:19,20
**occasionally**
36:20 44:10,15
**occupants**
59:20 74:24
**occurred** 34:9
83:13 91:6

**[occurred - okay]**                                                    Page 23

171:5 173:7
**offers** 29:5
**office** 1:18
102:7
**officer** 1:7,8,9
2:10,11 5:15
6:13 8:22 12:6
12:13,14 13:3
13:5,6,7,9
14:21 16:14
24:20 25:8,15
37:10 39:4
41:21 42:2,5
42:16,23 46:25
47:3,5,11,11
48:7,8,15
49:11,22 51:10
53:6 54:9 56:3
57:16 58:12
61:22,25 64:22
73:3 78:8
82:10,16 99:19
116:25 118:8
121:24 122:15
125:7 126:2
129:16 130:4,8
133:18 135:4
136:22 139:8
139:18,23
141:9,12,19
142:5 143:13
143:15 144:16
145:4,8,22
146:15 153:6

155:2,10
159:13,23
160:11 161:5
162:3 163:6,12
163:18 165:3,5
165:20 167:25
168:13 169:2
170:8,12,19
171:5,7 172:10
172:16,24
173:2,15
174:17 176:1,2
**officers** 35:23
36:5 59:22
65:23 75:4
76:15 110:17
131:7 166:18
168:3
**official** 30:18
30:23 31:12
**officially** 80:23
**oh** 15:23 20:12
28:5 31:20
42:9,11 53:19
77:19 82:14,25
87:10 104:22
107:11 108:21
109:6 121:21
129:5 130:24
133:7 139:22
145:25 153:20
158:6 164:17
167:23 168:25
171:2

**okay** 7:5,11,13
7:16,22 8:2,2
8:20 9:10,18
9:24 10:4,6,11
12:2,23 13:8
13:22,25 14:11
15:5,10,19
16:16,21 17:9
17:13,20 18:2
18:4,7 19:4,18
20:9,17 21:11
22:20 23:13
24:5,24 25:3
26:7 30:4
31:20 32:3,6
33:3,12,19
34:12 35:7,12
35:17 36:7
38:17 39:20
40:19 41:6,13
42:9,13,13,21
43:11 44:8,20
45:23 46:4,15
47:2,9 48:6
50:25 51:7
53:5 55:22,24
57:4,13,15,19
58:9,12,21
59:10,25 62:14
63:5,18 65:12
65:20 66:8,23
68:25 69:15
70:11,19 71:18
72:2,13 74:14

76:3,17,25
77:4,19,22
78:5,7,10,15
79:3,10,13,21
80:15,18,25
81:8 82:4,14
82:20 83:4,22
86:10,23 87:2
87:3,10,13
88:5,22,22
89:11,20,24
90:13,19 91:4
91:5,10 92:15
93:2,13,24
94:4 95:3 96:3
96:25 97:12,17
97:25 98:6,14
98:16,24 99:5
99:12,17,19
100:24 102:5
102:11,13
103:16,24
104:3,16,19
105:2,9,9,17
106:4,10,18
107:11,16,18
107:18,23
109:7,13
110:12,24
111:6,20,22
113:2,6,10,18
113:22 114:12
114:18 115:4
116:17,21

117:18 118:19
118:22 124:25
125:16 126:9
126:20 127:7
129:24 131:17
133:10,20,24
134:6,6,19,21
135:3,7,8
136:5,21
137:16 138:5
138:12 139:12
139:16 140:11
142:15 143:7
143:11,12,23
143:25 145:25
146:11 147:18
148:4,11,14,19
148:24 149:5
149:13,18,22
150:2,9 151:4
152:14 153:11
153:14,17
154:2,17
156:14 157:5
157:21 158:13
158:17 166:17
168:19 169:12
170:23 171:12
172:9 173:18
173:19,21,22
175:14,18
**old**  175:2
**once**  12:12 29:3
  29:4 41:19

52:16 106:20
152:21,22
**one's**  14:9
  137:8
**ones**  50:6 52:5
  53:2,2,10,11
  54:19 137:9
  150:17
**ongoing**  50:2
  50:18 102:9
  167:19
**online**  56:10
**opportunity**
  135:24
**opposed**  8:13
**order**  32:7 46:8
  49:3 119:5
**ordering**
  175:16
**outcome**  85:10
  153:14 176:14
  177:11
**outside**  35:7,9
  35:9,12,15
  42:9 49:20
  51:7 118:10
**overhead**  69:17
  69:19
**overlap**  43:15
  93:13
**overlapped**
  43:20
**overlapping**
  30:23 44:2,6

**overnight**
  18:17
**overtime**  43:24
**overturned**
  161:22
**overview**  13:2
**overwhelming**
  155:19
**own**  55:14
  155:25
**oxford**  21:3

**p**

**p**  2:1,1 124:9
**p.m.**  1:15 4:6
  175:21
**pa**  86:7
**pace**  60:18
  65:25 66:9
  68:5,7 72:15
  149:23,24
  150:3
**paced**  60:17
  67:10,12 159:9
  165:15
**pacing**  60:25
  66:10 72:10
  73:8,17,24
  74:6,8 81:10
  94:14 95:16,20
  95:21 135:17
  136:2,20 138:6
  138:16 139:5
  143:23 144:3

145:13
**page**  3:2,7 87:4
  88:8,23 89:10
  89:21,23,25
  90:13,17 93:5
  96:4,13,25
  97:5,14,14,17
  98:2 101:15,15
  152:24 178:4,7
  178:10,13,16
  178:19
**panic**  130:10
**paper**  56:22
  156:12
**paperwork**
  35:25 48:18
  56:21 83:25
  84:12 85:7
  87:21 156:3,20
**parallel**  84:3
  146:25
**parameters**
  153:22
**pardon**  106:22
**park**  42:6
**parked**  63:10
  67:18 146:14
  147:3,11
**parkway**  20:8
**part**  12:7 48:22
  63:3 81:18
  87:15 116:17
  150:6 160:7

**[participate - played]**

| | | | |
|---|---|---|---|
| **participate** 50:19 | 91:14 92:2 94:8 117:7 119:6 146:19 148:22 | 128:24 129:3 | **physical** 29:15 56:16,22 |
| **participated** 7:14 | **passengers** 118:15 | **pennsylvania** 86:9 | **physically** 56:5 |
| **particular** 65:14 76:5 102:18 | **past** 94:22 | **people** 27:4 45:21 51:15 55:5 74:24 101:21 155:17 169:9,10 | **pick** 157:25 |
| **parties** 4:14,18 176:11,13 177:7,10 | **pathogens** 51:17 54:12 | | **picture** 121:9 |
| **partner** 41:14 41:19,22 43:3 44:12,12,14,18 45:16,17,19,24 46:5,9,10,12 92:8,10 103:3 110:16 | **paths** 43:23 | **pepper** 53:19 | **piping** 169:15 |
| | **patrick** 46:9 | **perfect** 114:7 | **pizzerias** 19:17 |
| | **patrol** 9:8,11 15:14 44:9 50:8,9 60:19 61:19,20 62:10 65:14,18 70:15 118:16 143:18 146:15 168:5 169:10 | **perfectly** 114:11 | **place** 8:17 38:18 74:20 122:6 |
| | | **perform** 74:21 118:6 | **placed** 17:4 24:12 26:17 80:23 81:24 124:4 |
| | | **period** 18:13 43:13,16 46:11 46:13 105:24 | **plaintiff** 1:5 2:2 5:10 58:23 59:4 63:24 146:18 |
| **partners** 41:17 44:11 46:7 | | **perks** 154:9 | **plan** 25:25 |
| **parts** 114:13 | **pause** 104:2 109:25 132:23 141:20 142:10 143:2 147:8 157:22 | **permanent** 26:24 | **play** 103:24 105:6 106:15 107:10,22 113:23 116:10 116:18 120:11 124:23 131:18 132:20 |
| **partying** 71:15 | | **permitted** 4:22 | |
| **pass** 50:17 63:13,14 64:6 67:9 146:24,24 148:22 159:3 167:9 | | **perpendicular** 83:23 | |
| | | **person** 59:7 | |
| | **paused** 115:5 117:5 130:20 | **personally** 166:9 | |
| **passed** 63:17 146:20,21 147:16,19 148:8 153:16 | **pausing** 120:14 121:16,21 141:25 | **perspective** 117:3 | **played** 104:11 104:17 106:7 107:12,24 109:23 111:7 111:24 114:21 115:9,19 116:12,20 117:19 118:23 |
| | | **ph** 17:23 | |
| | **penal** 82:25 84:23 | **phone** 31:6,14 | |
| **passenger** 63:24 64:2 67:23 72:4,5,7 81:11 84:14 | **pending** 33:21 77:3,11 94:3 98:10,18 | **phrase** 135:21 159:7 | |
| | | **phrasing** 155:8 | |

120:5,13
121:14 125:2
125:19 126:10
132:25 133:3
133:12,21
**playing** 77:6,13
106:5 109:14
109:22 113:20
114:9,19
115:18 118:20
121:12 125:17
127:17
**plea** 161:25
**plead** 86:18
160:19
**pleading**
121:25 122:3
**please** 5:6,23
37:25 96:18
108:19 129:16
141:12,14
142:2,8 145:4
**pled** 85:12,24
86:2
**pmi** 150:17
**po** 48:23
**point** 16:3
19:15 28:15
30:6,11,17
36:3 68:6
71:14 109:9
116:21 118:2
123:9 129:19
145:21 159:11

159:15 170:17
**police** 5:14 8:18
8:22,24 12:13
13:6 14:21
24:20 25:7,15
26:3,9,16 28:4
28:17,20,24
31:7,9 41:21
42:18,20,22
46:25 47:3,5
47:11,11 48:7
48:8,14,15
49:22 51:9
53:6 54:9 56:2
64:22 73:3
138:20 139:9
139:19 140:3
140:14,24
141:8 143:13
143:14 144:9
144:13,15
145:8 150:15
152:15 153:6
155:10 156:20
165:19 166:18
167:6,25
170:19 171:4,7
172:10,16
173:2
**policies** 24:15
152:16 167:7
**policy** 167:24
169:18

**polish** 45:25
**polygraph**
29:17
**pops** 13:13
**portion** 12:6,24
27:8 64:19
70:12 80:9
82:2,3 90:20
133:3,14 134:3
157:17
**portions** 34:23
**portray** 161:17
**pos** 49:16
**position** 25:4
26:24 154:8
**possession** 59:8
59:23 75:5,7
76:8,9,24
82:23 84:8,18
87:16
**possible** 22:16
89:2 118:13
**possibly** 109:18
**post** 23:3
**posted** 66:21
67:14 68:8,15
70:6 73:14
111:18 136:4
**pouch** 76:12
**ppo** 41:18
48:24
**prathima** 2:3
5:9

**preddy** 2:7
**prefer** 155:17
**preparation**
34:13,24
**prepared** 72:21
177:3
**prescribed**
36:22
**presence** 16:15
**present** 2:19
56:6,17 151:13
**pretty** 31:17,18
53:16
**prevail** 162:4
**previous** 88:3
138:18
**previously**
57:25 58:6
78:11 97:7,24
102:19 103:19
142:4
**pried** 123:21
**prilosec** 36:19
**principal** 25:20
**prior** 42:19
46:19 48:24
58:7 131:6
140:4 164:4
176:4
**prison** 85:18
**probably** 26:19
26:23 43:19,20
45:19 89:15
134:16 148:12

**[probably - questioning]**

171:14 172:13

**probation** 143:14 144:14 171:3 172:19 172:22 173:6

**probationary** 12:12 41:21 46:25 47:4,7 47:10 48:8,14 48:22 49:4 173:3

**problem** 29:6,8 114:25

**procedural** 4:23

**proceed** 6:9

**proceeded** 149:8

**proceeding** 1:16 4:5,21 161:7 175:22 177:4

**proceedings** 35:11,25 165:8 176:3,4,5,8 177:5

**process** 25:23 26:12 35:24 41:18 49:10 75:18 78:3 87:16 156:10 160:20 162:13 163:2 164:2 172:23,24

**produced** 4:20 78:13 101:4 103:17

**profiling** 166:19

**promotion** 45:18

**promotional** 152:23 153:2

**pronounce** 46:2

**proof** 29:17,19 30:3 71:20

**prove** 153:9

**provide** 8:8 29:19 30:2 93:25 156:16

**provided** 163:11

**prudent** 93:7 94:5,15,16 95:5

**prying** 123:22 123:24

**psychological** 29:16 46:18

**public** 21:18 22:2 23:15,23 24:14 25:4 176:18 179:19

**pull** 73:4,14 75:3 84:15 86:24 91:25 119:8,12,23,23

119:23 144:4 148:19 151:18 154:25 169:24

**pulled** 59:12 60:2 63:22 67:20 69:2,3,8 69:9,10 70:13 83:14 109:8 136:19 152:11 152:12 170:14 170:18 171:9

**pulling** 66:17 68:11,13 70:3 124:2

**pumped** 31:17

**purposes** 47:24

**pursuit** 151:22

**put** 36:17 39:6 39:12 67:11 122:3 156:3,5 159:10 170:13 170:13 171:19 171:20

**putting** 39:3 48:22

**q**

**qualified** 54:13 176:7

**qualify** 37:18

**queens** 22:4

**quentin** 1:4 2:2 4:8 6:21 7:4 58:14 79:9

117:21 146:17 178:1 179:1

**question** 8:6,8 10:10 18:5 33:17,21 37:19 39:8,14,15,19 40:21 41:16 44:21 58:25 60:21 70:25 73:23 76:3,4 77:2,11 88:11 93:16,18 94:2 95:17,23,25 96:13 98:10,18 106:20 109:3,4 115:7 120:3 128:4,17,24 129:3,17,20 130:13,14 131:2 136:12 139:22 141:13 141:15 142:14 142:17 147:9 160:6 168:14 168:18,20 170:6 172:5 174:5

**question's** 143:5

**questioned** 118:5

**questioning** 77:23 128:25

**[questions - recorded]** Page 28

questions 6:19 8:5 36:14 40:2 57:17 99:3 103:25 113:4 135:5,13 138:25 142:16 142:20,24 143:9 145:23 165:12

queue 55:10 99:4

quickly 22:16 25:23 152:12

quiet 134:3

quite 17:3 24:4 24:13 48:11 71:9,10 88:2

quoted 71:6

**r**

r 2:1 14:8,8,10 14:10 56:18 178:3,3

rack 52:23

radar 65:4,5,6 65:7,8,8,22,23 94:11

radio 55:2,9 110:19 126:4 133:16,17 171:23

raise 5:23

rajitha 2:20

ran 119:23

rarely 45:15

rate 64:16

rather 119:15 155:4 166:10

reaching 68:8

reaction 107:15

read 56:14,15 90:25 129:3,22 138:15 152:19 152:20 179:5

reading 27:15

ready 78:7 117:6

really 14:22 15:2 45:2 46:2 52:20 105:3 114:3,14,17 166:14 170:9 170:11

rear 64:2,2 72:7 81:11 117:4,11 118:15 146:18

rearview 108:4 112:8

reason 39:25 58:18 91:20 101:24 102:4 112:23,24 155:23 156:4,5 178:6,9,12,15 178:18,21

reasonable 93:6 94:5,14 95:5

reasons 56:24 72:22 86:20 118:17

recall 31:13 32:17,24 33:7 33:23 34:2 47:9 49:25 50:24 51:5,8 54:11,19 60:5 60:8 67:19 68:21 71:19,22 71:23 74:9 78:18 100:18 100:18 112:10 148:18 149:3 149:21 151:12 151:15,24 152:24 163:8 165:17

receipt 154:23 155:5,13 156:7

receive 21:12 22:6 53:22

received 14:20 20:25 22:4,12 22:13,19 24:8 27:22 28:20 31:6,14 71:19

recent 46:12

recently 34:15

recognize 79:5 97:18 104:19 105:10,13 106:8 110:8

recognized 108:10

recollection 29:14 73:2 91:16 113:3

record 4:4,5,17 4:20 5:7,17 8:12,14 37:13 38:19 39:3,7 39:13 47:13 57:7,9,10,12,15 58:3 77:9 93:23 96:18 98:20,21 99:13 99:14,16,20 115:5 127:20 127:22,24 128:6,12,14,15 128:19,23 129:8 130:3 132:11 134:22 134:23,25 135:3 139:14 140:20 142:21 146:4,7,8,10 171:15 173:12 175:15,19 176:9 177:5

recorded 4:25 176:6

**recording** 8:4
105:23 176:8
177:3
**records** 49:13
49:18,24 52:3
52:17 167:15
**recruit** 12:11
**red** 62:23
**reddy** 2:3,4,20
3:3 5:7,8,9
6:10,12 11:13
13:11,21 18:6
28:11 30:10,25
31:2,19 33:20
37:8,20,25
38:4,7,12,16,22
39:2,10,18
44:24 57:6,13
57:14,23 58:11
59:2 66:7 74:7
76:2 77:4,10
77:17,19,21
86:22 89:5
90:12 93:14,19
98:6,9,17,24
99:6,11,17,18
100:10 102:5
102:13,16
103:9 104:14
104:18 106:14
108:8,24 109:2
109:24 111:4,6
111:8 113:7,10
113:18 114:2

114:12,17,22
115:4,10,18,20
121:6,19,20
123:15 124:22
125:9 126:6,23
127:3,12,17,22
128:3,6,14,23
129:11,15,22
130:12 131:13
131:16 132:3,8
132:19 133:24
134:5,16,20
135:2 138:15
138:19,23
139:6,15
140:10 141:10
142:7 143:21
144:20 145:18
146:4,11,12
147:10 148:3
149:4 150:24
158:24 159:21
160:5,13
161:11 162:17
162:20 163:4,6
163:16,22
165:2,4,24
166:3 167:2
168:21,24
169:22 170:3,7
173:11,19
174:14,17
**reduced** 176:6

**refer** 78:14
81:2 84:9
145:5
**reference** 41:6
**references**
91:12
**referred** 102:8
**referring** 60:4
65:13 66:23
67:3 76:18
79:3 112:6
115:13 137:13
172:18
**reflect** 81:11,18
83:8 90:14
91:6 96:5,14
97:3,8 101:25
105:17 107:8
115:5 136:14
139:8 150:10
151:2
**reflected** 79:16
79:18 82:6
87:7,11 88:14
98:2 101:14
105:10 113:5
**reflecting**
164:22
**reform** 100:17
**refuse** 59:21
74:25
**refusing** 122:5
**regarding** 35:6
35:14 100:20

164:15
**regardless**
166:25
**registration**
71:20 107:4
**regular** 150:16
155:7,9
**related** 176:10
177:7
**relating** 171:9
**relation** 72:20
73:10 74:2
86:11 92:17
94:7 96:13
100:6 102:3
144:17 156:14
161:8 164:19
**relationship**
169:9
**relative** 76:4
176:12 177:9
**relatively**
152:12
**released** 85:17
86:20 160:14
160:17 164:24
**relevant** 63:18
130:14
**remained** 75:14
**remember**
22:18 28:22
32:7,21,22
50:13 71:5,6
74:13 82:22

86:8 92:20 106:12 112:13 113:12

**remembered** 163:15

**remind** 57:20

**remote** 1:16

**remotely** 4:15

**remove** 49:4 74:19 119:10

**removed** 119:18 121:7 121:10,11

**removing** 74:23

**repeat** 13:22 69:7 96:17 132:4,11 147:9 160:4 168:20

**repeated** 129:7 130:2 139:13

**repeating** 138:12

**rephrase** 39:19 141:15

**replay** 106:20

**report** 78:25,25 79:7,8 89:18 90:9 97:22 98:4 155:23 156:8,12,20

**reported** 1:21

**reporter** 4:2,3 5:11,16,19,21

6:8 8:4 11:3 13:16 28:7,10 30:9,22 33:9 33:15,18 38:2 38:14 44:20 57:8,11 58:24 66:3 77:8,16 77:18 88:25 90:2 93:12 98:22 99:12,15 100:8 102:11 104:12,16 108:22 109:19 109:20 111:3 113:7,14,22 121:3,5,18 124:7 126:22 127:25 128:9 129:5,7,24 130:2 131:25 132:4,6,9 134:2,21,24 138:17,22,24 139:12,13 142:6 146:6,9 147:7 158:22 160:2,9 162:16 162:18 168:16 168:23 170:5 173:21,23 175:14,18

**reports** 154:18

**represent** 40:22 63:6

89:21 91:11 101:5 103:16

**requested** 129:8 130:3 139:14

**require** 48:6

**required** 51:9 53:7,8 154:17 156:16 157:5 165:18 179:13

**requirement** 155:23

**requirements** 49:3 167:7

**requires** 118:8

**reserve** 161:25

**residency** 29:17 153:10

**resisting** 84:7 84:16,17

**respond** 39:4 45:9

**responding** 109:3

**response** 52:16 108:13 109:11

**restroom** 99:8 134:12

**resulting** 119:17

**retention** 24:15

**retired** 34:3,10

**retitled** 48:7

**return** 15:17 175:4

**returned** 119:9

**reverse** 55:5

**review** 79:6 88:5 90:20

**reviewed** 34:12 34:17

**rewind** 125:14 126:7

**ride** 44:8 45:20

**riding** 167:24

**right** 5:23 9:24 13:12 18:25 24:16 25:16 26:25 29:8 40:22 44:19 45:5 47:14 57:22 63:9 67:22 68:2 69:9 82:25 83:10 90:17 91:3,23 93:18 101:10,13,17 101:22 102:15 106:6 107:7,19 108:17 112:10 114:20 116:3 116:11 118:24 123:23 127:7 130:13 137:19 139:7,11 141:9 145:25 147:2 149:7,12,12,13

149:14,16,16 151:19,21 152:13 161:25 162:25 164:11 167:3 168:12 168:23,25 169:13 172:18 172:25

**road** 69:10,14 94:25 118:14 140:6

**roadway** 60:14 73:12

**robert** 46:14

**roberto** 13:10 13:24 14:12

**rode** 46:10

**roll** 16:5 107:2

**roughly** 11:8 11:24 12:18 17:3 19:8 23:9 31:25 44:2

**rule** 11:17

**rules** 4:24

**run** 74:18

**running** 86:5

**russ** 159:7 170:21

**russell** 1:8 2:11 42:3,16,23 61:22 92:13 126:2

**s**

**s** 1:10 2:1 3:6 56:19 124:9 178:3

**safe** 141:3 175:8

**safety** 54:24 69:5,13 74:21

**sat** 56:11

**saw** 63:13 67:7 83:18 107:6 117:17 148:16 148:20 159:2,6

**saying** 20:13 50:25 98:11 111:12 117:20 131:24 162:21

**says** 80:17 89:25 114:23 115:14 121:24 128:16 133:17

**scenarios** 118:12

**scene** 110:13,15

**schedules** 35:3

**scheme** 18:13

**school** 19:20,24 19:25 20:2,19 20:22 21:18 22:2,3,17 23:15,23,24 24:19 25:5,9 25:21 26:10

27:23

**schools** 19:22 23:25 24:3,13 24:14

**scope** 35:16,17

**screen** 18:2 58:8 78:6,8,10 90:25 98:25 100:25 134:9

**screenshot** 103:21

**scroll** 79:5 97:13 101:19 116:9

**scrolled** 84:5

**scrolling** 89:22 96:4

**seamless** 25:6

**season** 15:6

**seasoned** 13:3

**seat** 61:17 64:2 72:5 75:3 119:7

**second** 20:2,12 34:5 37:9 55:11 77:5,7 115:6 119:2 131:20 134:10 141:21 142:11 142:18 143:25 174:14,18

**seconds** 104:7 110:25 118:21 120:3,15

121:13 125:10 125:15,18 126:8 148:24 157:23

**sector** 16:12

**see** 14:25 59:15 61:5,8 78:8 80:20 82:6,9 87:9,9 89:3,22 103:21 104:4,9 110:2,4 116:25 117:2,2 120:24 122:10,25 167:25 171:24

**seeing** 68:10 78:18 87:22 90:11 96:10,24 140:5

**seemed** 134:3

**seems** 120:17 156:11

**seen** 78:16,19 78:20 87:18,19 88:2 136:13

**semantics** 152:11

**semester** 21:3

**send** 102:7,12

**seneca** 19:25 20:5

**senior** 21:5

**seniority** 154:7 154:11,14

**[sense - soon]**

| | | | |
|---|---|---|---|
| **sense** 109:12 126:16 170:16 | 75:18 78:19 123:18 137:7 | **sic** 14:10 | **sit** 53:5 56:10 73:2 91:19 101:23 145:6 |
| **sentence** 88:18 141:21 | **sex** 86:6 | **side** 61:13,24 62:17,18 63:11 64:8 70:16,17 72:7 75:10,12 76:10,15,20 83:7,8,11,12 116:22 117:4,7 117:10 119:9 147:5,11,15 | **sitting** 12:9 |
| **sentenced** 85:12 | **sfsts** 74:18,21 118:7 | | **situated** 118:15 |
| **sentences** 38:2 | **share** 58:4,8 100:25 | | **situation** 150:6 |
| **sentiment** 85:19 | **shared** 174:12 | | **situations** 166:16 |
| **separate** 156:8 | **sharing** 78:6,10 86:24 99:2 102:17 134:9 | **sign** 48:19,19 48:20,23 56:11 56:14 82:18 | **six** 11:23 27:18 |
| **september** 58:15 63:8,12 65:14 79:15 80:19 81:3,7 81:16,19,20 86:12 91:7,15 92:3,19 94:7 97:9 100:3 101:7 102:2,2 102:20 136:10 144:4 145:15 146:16 168:15 169:3 171:6 173:8 | **shift** 13:3 15:16 15:18 17:13,15 17:17 18:9,17 18:23 19:2 40:8,12 41:4,8 43:6,12,17 44:7 63:3 | | **sixteen** 14:14 |
| | | | **ski** 46:3 |
| | | **signature** 88:21 90:18 96:6,8 96:15,20 97:3 97:9,15 176:16 177:13 | **skills** 176:9 177:6 |
| | | | **slang** 90:6 |
| | | | **sleet** 94:22 |
| | | | **slid** 117:15 |
| | | | **sliding** 94:24 |
| | | | **slight** 55:9 |
| | | **signatures** 90:15 98:5 | **slightly** 69:4,11 69:11 |
| | **shifts** 40:17 43:14,19,22 | **signed** 48:24 | **slow** 28:7 33:10 93:12 |
| | | **significantly** 64:15 | |
| | **shoot** 123:4 | **signify** 79:22 80:21 82:12 | **slower** 33:10 |
| | **shooting** 174:25 175:10 | | **small** 89:10 |
| **sequence** 30:16 55:23 71:23 | **shot** 123:5 125:24 130:5,6 | **signs** 59:17 | **smelled** 71:12 |
| **series** 142:16 | **shoulder** 126:5 | **silence** 105:24 | **snacks** 175:5 |
| **serve** 85:25 | **show** 16:4 58:8 87:4 | **similar** 7:23,24 153:3,6,7 | **somebody** 169:15 |
| **set** 173:20 | **showed** 97:23 | **single** 133:5 | **someday** 153:18 |
| **setting** 151:25 | **shown** 162:11 | **sir** 174:6 175:13 | **something's** 137:5 |
| **several** 24:3 26:5 32:5,13 50:3 53:25 63:16 64:6 | **shows** 81:7 | | |
| | **shy** 11:25 12:18 27:19 | **sirens** 69:18 151:25 | **soon** 25:19 |

**sorry** 11:4 17:25 18:4 20:17 26:9 30:5,9,22 37:2 38:12 41:25 44:20 45:3 51:22 55:20 58:24 62:19 66:3,4 69:7 70:24 77:10,19 88:25 90:2,5 98:6,12,18 100:8 102:2 104:14 105:8 108:17 113:10 121:3,4,21 124:7 126:22 130:24 131:25 137:11,18 139:24 158:22 158:25 168:16 168:22 170:5

**sort** 42:8,8

**sought** 52:12 174:24

**sound** 120:19

**sounds** 99:22 126:13,14

**southern** 27:8

**space** 69:5

**span** 81:25

**speak** 8:9 25:25 36:5 39:11 72:21 105:5 111:4 113:8,13 128:11 151:25

**speaking** 13:11 37:14,20,22 139:25 142:25 143:4

**special** 27:19

**specific** 6:25 7:3 16:2,11 36:2 48:11 49:19 53:16 55:15 59:3 60:5 80:16 81:23 87:20 94:12 124:10 124:21 138:4 142:13,16 154:18 156:15 166:22,23 167:19

**specifically** 50:4 79:4 85:24 92:21

**specifics** 50:2

**specify** 88:14

**speed** 59:14 60:3,11,12,20 60:23 64:15,17 64:24 65:25 66:9,11,11,13 66:16,16,20,22 67:14 68:8,10 68:16,17 70:6 70:18 72:15,20

73:6,11,14 74:3 83:20 93:3,6 94:5,12 94:21 95:5 111:18 115:12 115:16 136:4 144:18 145:12 147:21 150:25 151:5 157:4 158:20 159:9 159:14 171:10

**speeding** 64:13 66:15 69:21,25 74:11 94:17 136:7,18,19,23 139:20 140:4 140:13 141:2 143:17 152:17 156:24 157:2

**speedometer** 150:7,10,13 151:2

**speeds** 55:7

**spell** 13:14,16 13:17,20 14:3 46:2

**spend** 13:2 21:3

**spent** 12:19 28:3

**sports** 26:21,21

**spot** 112:18

**spray** 53:19,20

**square** 1:19 2:14

**st** 20:3,10,11 21:2

**stages** 51:15

**stand** 28:24 50:22

**standards** 53:13

**stands** 51:13 174:23

**start** 10:13 28:16,17 30:19 32:16 78:5 79:24 103:25 114:19 143:4

**started** 10:14 24:24 114:8

**starting** 111:23 115:7

**state** 4:14 5:17 27:20 28:2 51:21 53:14 73:5,13 84:21 84:24 95:9 118:4 128:18 168:11 176:19

**statement** 8:12 60:2 73:15 107:8,13,14,19 108:5,18,19 109:10 126:11 130:15,19 131:8 132:15

132:16,18
**statements** 131:6
**states** 1:1 27:9 111:14
**station** 154:16
**stationary** 61:16,24 62:16 63:6,11 64:8 67:21 83:18 143:18 146:14 148:20
**status** 47:7 49:4
**statute** 100:15
**stay** 19:4 77:8 152:3 153:23 173:12
**stayed** 40:14
**staying** 68:10 127:23
**steady** 45:17
**stemming** 100:2
**stenographic** 5:2
**step** 74:25 116:14 117:21 117:24 118:17 119:7
**stepping** 119:3
**stipulation** 5:4
**stop** 59:14 62:19,19 67:16

68:22,23 69:16 72:16,19 73:10 73:20 74:2 75:16 83:13,21 83:21 84:3,15 86:23 93:6 94:23 98:25 102:17 112:22 116:6 127:19 127:19,19,19 127:20,20 134:9 140:5,9 140:13,25 142:2,8 144:18 145:2,10 154:21,23 155:5,13,14,24 156:7,17,22 157:16 159:23 160:10,23,25 161:3,9,20 162:5,6 163:12 168:2,3,9,9,21 169:5 170:16 170:19,21 171:5,9,21,25 173:7 174:10
**stopped** 48:22 92:18 112:24 118:25 135:15 139:24 171:16
**stopping** 70:2 154:19,21 169:13

**stops** 152:16 155:19 166:19 172:22
**strange** 161:19
**stray** 175:5
**street** 61:3,13 61:24 62:17,18 62:21 63:11 64:8 83:7,8,11 83:12,22 119:17 147:5 147:11,15 151:14
**streets** 84:4 175:8
**strike** 122:17 123:16
**strong** 18:20
**struck** 122:19 124:5
**struggle** 75:4
**students** 31:15
**studying** 152:23
**stuff** 34:21 167:16
**sub** 82:25 83:2
**subject** 40:23
**submitted** 58:7 97:7 101:3 102:10 163:10
**subscribed** 179:14

**subsequent** 59:14
**subsequently** 175:7
**subset** 54:21
**succinct** 14:18
**sudden** 146:3
**sullivan** 1:9 2:11 42:3,5,17 42:24 61:22,25 92:13 125:7 126:2 130:8 133:18 146:15 159:7,13,23 160:11,11 168:13 169:2 170:8,21
**summer** 21:3 158:2
**summers** 24:12
**super** 29:22
**supervisor** 32:4 32:8,22,23 33:5,6,23
**supervisors** 34:2
**supplemental** 157:11
**suppose** 29:7 29:24 43:25 95:7,12,15 112:19 171:17 171:22

**supposed** 98:13
**suppression**
  92:24 100:19
  161:13 162:3
  162:14,23
**sure** 5:8 8:7
  11:14 14:8
  15:12 18:11
  24:13 31:4,5
  35:22 36:23,24
  37:21 47:13
  48:11 49:5
  52:24 53:15
  55:19 56:4
  57:5,8 65:9
  69:8,17 73:4
  79:12 83:16
  85:17 88:2,10
  90:3 92:7
  94:10 96:19
  99:10 100:17
  102:13 106:21
  107:9,11
  108:24 109:20
  111:6 114:16
  119:3 120:4
  121:24 131:3
  134:7 135:11
  136:2 138:2
  139:10 141:17
  141:23 142:22
  146:6,23
  161:23 162:7
  163:13 164:16

172:21 173:16
  174:22
**surgeries** 36:24
**surprised**
  162:7
**suspect** 141:2
  145:11
**suspected**
  152:17
**suttle's** 125:3
**suttles** 1:4 2:2
  4:9 6:21 7:4
  58:14,16,22
  59:3,6,21
  63:23 67:8,23
  72:6 73:21
  74:25 75:20
  76:7 77:23,25
  79:9 81:10
  83:5 85:5 91:7
  91:14 92:2,18
  94:8 99:25
  102:3,21
  116:14 117:8
  117:10,24
  118:18 119:5,5
  121:7 122:17
  144:5 146:17
  146:17 148:17
  148:21 151:6
  156:15 158:21
  159:18 165:15
  169:5,25 178:1
  179:1

**swear** 4:15
  5:22
**sworn** 4:17 6:5
  25:17 31:10
  176:5 179:14
**synonymous**
  79:9
**synopsis** 91:9
**system** 56:20
  58:5 161:16
  172:4

**t**

**t** 3:6 14:8 20:14
  56:18 178:3,3
**tactics** 166:6
**take** 4:4,12
  21:8 26:2
  29:13,14 36:7
  36:19,20 44:16
  44:22 45:8
  90:20 98:25
  99:2,6,7
  134:15,18
  142:11,18
  150:16 153:3,4
  153:9
**taken** 4:8 17:2
  36:22 37:4,18
  39:21 80:7
  176:3,11 177:8
**takes** 26:13
  154:11

**talk** 161:23
  166:9
**talked** 35:23
**talking** 37:2
  126:25 132:3
  142:8
**talya** 1:21 4:3
  13:15 38:12
  57:7 102:5
  113:18 128:21
  129:4,22
  133:24 138:15
  140:20 146:5
  160:8 176:2,17
**taser** 52:10
**taught** 65:25
  66:9 72:15
  138:6 139:4
**teach** 23:21
**teacher** 22:2
  23:15,19 25:9
  25:14 26:9,10
  26:19,23 28:2
**teachers** 27:4
**teaching** 21:18
  23:18 25:17
  26:16,18,20
**team** 52:16,19
**technically**
  33:5 46:24
  78:2 146:24
  157:15
**technician**
  89:18 90:10

97:22 98:4
**techniques**
  51:14
**technology**
  105:22
**tell** 6:5 38:20
  38:23 71:9,15
  115:15 120:15
  120:22 121:9
  121:15,22
  133:11 137:5,6
  137:8,21 141:7
  144:24
**telling** 111:11
  127:15
**ten** 134:12
**tenure** 24:8
  143:12
**tenured** 27:25
  28:2
**term** 46:7,10
  136:5
**terms** 33:22
**test** 26:3,6,14
  29:15,15,16
  46:17,18 50:17
  64:20 153:4,9
**testified** 6:7
  73:16 92:16,24
  100:5,14 113:2
  145:13 163:7
  164:19 165:14
**testifies** 162:4

**testify** 132:22
  138:10 161:7
  164:7,10
**testifying** 9:15
  9:16 95:18
  100:19 127:9
  127:13,21
  129:10 132:14
  163:9,15
  164:25 176:5
**testimony** 64:5
  72:8 81:9 83:5
  92:23 93:3
  99:24 101:20
  101:25 135:9
  135:25 140:18
  146:14,19
  147:19 149:5
  162:10 163:11
  163:23 164:4
  179:8
**testing** 75:21
  75:23
**tests** 26:5 30:21
  50:14 153:5
**tether** 32:18
**thank** 5:19 6:8
  6:10 28:10
  33:15 57:4,13
  82:4 91:4
  93:14 94:2
  97:5 99:11,17
  99:23 113:14
  120:9 127:18

129:23 134:18
  134:20 145:19
  146:11 158:18
  158:19 170:23
  173:22
**thanks** 87:3
  175:12
**that'd** 13:17
**thereddylaw....**
  2:7
**thing** 27:22
  32:17 49:23
  138:3,4 153:21
**things** 29:18
  47:25 48:23
  55:4,8 100:16
  153:10 163:3
**think** 14:5 31:2
  33:22 34:24
  35:20 37:7,18
  42:11 44:22
  48:9 52:4
  54:11 58:18
  77:5 80:3,13
  84:11 93:20
  100:15 104:6,8
  104:23 110:19
  114:2,13
  124:16 142:18
  142:23 152:8
  157:3 158:10
  158:12,14
  160:6,24
  166:21,23

169:16 170:20
  173:16,19
**thinking** 52:23
**third** 127:10
**thirty** 68:18
  70:8 150:11
  151:3,10
**thoroughfare**
  151:16
**thought** 52:21
  77:14 98:8,10
  138:13 139:8
  139:25 140:18
  157:24
**thoughts** 94:4
**thousand** 24:17
**three** 10:3,7
  16:19 24:9
  27:18,23 28:3
  46:7 115:5
  118:20 126:8
  132:17 137:19
  153:24 163:3
**throwing**
  166:11
**ticket** 69:21,23
  74:11 94:19
  95:8,9,11,13
  154:24 155:3,5
  155:16,20,22
  156:4 157:10
  157:11,18
**tickets** 69:24

**[time - training]** Page 37

**time** 1:15 5:5
8:7 9:14,21
10:16 12:19
18:13 19:3
22:10 23:20
24:10 26:13,18
27:5,11,25
32:9 33:4 34:4
34:11 35:5
37:21 40:13
42:4,19 43:2,5
43:13,16 44:3
46:13,16,22
47:6 48:2
50:18,24 56:7
58:15 59:7
61:7,12,16
69:20,24 75:10
79:16,24,25
80:11,12,16,17
80:22 81:23,24
84:19,24 85:13
86:2 87:17
89:4 92:15
100:5,13
105:18,24
108:23 110:11
118:3,17 120:7
123:9 127:10
127:25 128:2
128:11 132:13
134:17 145:16
151:5 154:16
155:6 159:11

159:15 164:6
170:17 171:18
**timeframe**
14:15 32:19
40:11,24 45:22
48:21 58:20
159:2
**times** 35:4 36:2
50:3 53:25
75:18 79:18,22
123:16 132:17
156:10 171:25
**timing** 27:12
**timon** 20:3,11
20:14,15
**title** 8:21 46:21
47:10 48:20
**titled** 46:25
**titles** 52:14
**today** 7:23 8:4
9:12,19 34:14
36:14 39:23
40:3 53:5
58:14 73:2
88:3 91:19
101:23 145:7
165:10 174:12
**together** 43:6
44:9,15,16,25
45:9,11 62:3,9
92:14 169:18
170:22
**told** 15:13 75:3
76:15 77:11

84:14 94:13
119:8 174:13
174:22 175:7
**tomorrow**
154:13
**ton** 34:20
**took** 26:13
46:17,19
123:21 171:18
**top** 24:2 96:8
96:20
**totaled** 24:9
**totality** 64:20
136:25 150:6
**totally** 30:14,15
105:21
**towards** 39:16
47:17
**town** 86:9
**tracs** 56:18
**traffic** 62:20
67:16 68:21,23
69:16 72:16,19
72:23 73:10
74:2 75:15
83:13,21 84:3
84:15 95:2
137:3 140:5,9
140:13,25
144:18,25
151:13 155:19
156:22 157:12
157:17,20
160:23,25

161:3,9,20
168:10 170:16
170:21 171:9
171:21,25
172:22 174:10
**trafficking**
86:6
**train** 14:16
**trained** 13:4
14:18 53:25
65:6,24 72:9
73:9,17,25
74:5 137:4
139:19 140:2
140:12,23
143:16 144:9
144:13,25
145:9,12,14
**training** 12:3,6
12:13,24 13:4
14:12 15:6
34:7 49:10,11
49:20,21,25
50:3 51:11,12
51:13,18,23,25
52:8,10,12
53:21 54:13,14
54:17 55:16,16
56:18,25 57:3
62:2,3,4,6,10
63:2 66:24
67:4,6 92:14
136:17 137:2
138:5,20 139:3

**[training - undergo]**

139:9 165:19 166:4,17,22,23 167:7,19,21,21 172:24

**training's** 57:2 167:20

**trainings** 43:25 50:19 51:8,9 52:16,23,25 53:7,7,17,22 54:3,8,21,22 55:14 56:2,4,6 56:10,17

**transcriber** 177:1

**transcript** 3:9 4:19 101:6 161:6 163:10 163:20 164:5 165:9 171:23 175:16 177:3,4 179:5,8

**transcriptionist** 176:7

**transfer** 21:4,6 21:10 47:24

**transferred** 31:23

**transition** 26:16 156:9

**transitioning** 117:14 134:17

**transmission** 171:19,23

**transmissions** 110:20

**transportation** 28:25

**travel** 66:12

**traveling** 59:13 60:3,13,16,20 60:22 62:23,24 62:24 63:20 64:14 66:20,21 67:8 70:9 73:5 73:13,21 83:6 83:19 91:21 95:4 136:3 144:5 147:21 159:14 165:16 169:6

**trees** 112:11

**trial** 34:20 162:10

**trick** 142:19,23

**tried** 22:15 95:23

**trouble** 109:16 111:5 113:9 141:16

**true** 176:8 177:4 179:8

**truth** 6:5,6,6

**truthfully** 39:23

**try** 8:9 27:9 28:7 39:11 47:14 93:12

113:12 133:9 158:16 166:24 168:17

**trying** 11:14 30:12 31:3 37:7 40:6 52:4 52:22 55:25 56:21 59:19 94:3 113:10 126:24 132:5 141:24 142:4 142:20,23 143:5,10 146:2 155:15 161:17 162:22 165:2 166:8 167:4,9 170:24

**tucked** 123:23

**tune** 14:6

**turn** 67:22,25 68:2 104:12,13 105:5,6,23 109:13,17,19 113:11,13,15 113:24,24 114:8 116:19 132:21 139:25 149:14,17 151:23 152:2,9

**turned** 56:24 67:11 104:23 105:18,25 149:7,10,19,25 151:19,22

**twice** 152:20

**two** 10:2,7 16:19 19:21 22:24 23:9 24:17 26:22 34:2 43:18,19 45:19 79:17 87:9,9 118:17 135:14,14,17 137:21 152:22 153:24 169:9 169:10

**twofold** 117:25

**type** 32:17 36:10 75:23

**typed** 97:22

**typewriting** 176:6

**typically** 9:6 168:4

**u**

**uh** 168:18

**ultimately** 170:12

**under** 4:23 55:15 57:21 76:21 80:23 81:24 86:17 94:21 99:20 123:23 124:5 135:6 160:19

**undergo** 49:22 56:2 165:18

**undergrad**
  20:25
**understand**
  4:18 8:8 24:14
  39:14 41:24
  55:23,25 73:7
  95:17 143:7,8
  161:16 163:25
  167:3
**understanding**
  18:25 72:14
  85:9,14,16
  105:21 141:16
  141:22 162:12
**unit** 11:24 48:9
  49:15,16 55:19
  61:20 62:11
  65:14 143:18
  146:15 167:13
  167:14 168:5
  174:23
**united** 1:1 27:9
**university** 21:2
  21:4 22:5
**unlawful** 84:8
  84:18
**unreasonable**
  94:16
**unreasonably**
  141:3
**unsafe** 118:12
**updated** 25:22
  56:2

**upset** 145:20
  146:3
**use** 51:20 52:8
  56:20 62:7
  69:18 85:19
  87:21 94:13,14
  95:7 99:8
  134:11 135:24
  139:11 140:12
  150:2 157:4
  166:15
**used** 90:11
  95:21 96:10,24
  135:20 136:2
  136:10 139:11
  143:24 144:3
  145:14 155:9
  157:2 159:7
  174:25
**uses** 4:22 89:16
**using** 95:23
  122:5 123:6
  138:9 150:5,7
  155:6 172:14

---
**v**

**v** 1:6 51:2,5
  178:1 179:1
**value** 159:11
**various** 51:15
**vary** 95:16
**vehicle** 50:8,9
  51:5,6 59:12
  59:20,20,22

60:2,4,6,7,16
60:17,18,19,20
60:24,25 61:6
61:9 62:5
63:13,14,19,21
64:14,22 65:5
65:19 66:10,12
66:13,18,21
67:8,13,22
68:4,5,7,11,20
69:2,3 70:3,4,9
70:14,15,17,21
71:12 72:3,7
72:10,20,23
73:4,11,12,17
73:20 74:2,11
74:16,20,25
75:2,10,13,17
76:11,16,20
81:10 83:6,19
83:20 84:14
91:13,13,17,25
92:18 93:4
94:8 112:15
116:6,14,23
117:5,11,24
118:2,4,18
119:4,7,10
121:2,8,10,11
135:15 136:3,6
136:12,14,23
140:4,6,13,25
143:16 144:5
144:16 145:10

146:16,20
147:12,16
148:17,21,25
149:6,8,19,23
149:24 150:3,8
150:18,20
151:6,18
154:19,21
156:18,24
157:7,17
158:20 159:3
165:15 167:25
168:4,10 169:5
169:13,24
170:14,19
171:10
**vehicle's**
  119:18
**vehicles** 62:22
  63:16 64:6,12
  64:16,23,25
  65:18 69:6,14
  118:16 137:7
  148:7 152:16
  170:18 171:8
  171:16
**verbal** 166:6
  169:12
**verbally** 8:11
**veritext** 4:4
**verse** 152:24
**video** 77:13
  102:25 103:22
  104:11,17

105:6 106:5,7 106:20 107:12 107:24 108:18 108:25 109:5 109:14,23 111:7,24 113:5 113:11,16,21 114:9,14,19,21 115:7,9,18,19 116:10,12,17 116:20 117:19 118:20,23 120:5,12,13,14 121:12,14,16 121:23 124:24 125:2,19 126:10 127:17 130:20 132:21 132:24,25 133:3,7,12,14 133:21,25 134:8 136:13 173:13

**videoconfere...** 2:3,12,21

**videos** 114:9

**view** 59:16 112:3,5,21

**violation** 84:20 84:25

**violence** 174:23

**visual** 95:6,19 135:16,21,23

**visually** 120:22 136:22 137:16 140:5 148:15

**voice** 106:8,9 106:10,17 108:9 111:9,12 111:25 114:23 115:21,23,24 116:13,15 117:20 122:2 125:3,11,25 130:7,10

**voices** 111:10 116:16

**volume** 104:24 105:7 109:15 109:17,18,19 114:4,9 132:22 133:23

**volume's** 114:7

**vs** 4:9

**w**

**wait** 30:22 55:10 108:22 108:22,22,23 127:25 132:6,9 134:12 142:6 147:7,7,7 158:17 162:16 168:16,16

**waiting** 33:17 175:3,11

**waived** 92:22 100:17

**walk** 15:14,15

**walked** 22:18

**walking** 15:8 15:11 17:6,10

**want** 11:16,18 11:19 32:16 37:23 57:20 58:12 66:11 71:5,9,15 77:8 79:6 85:19 89:9 90:3 93:2 106:25 107:2,4 112:10 113:20 114:17 115:4 118:10,11 123:3,4 127:11 128:11 130:9 139:2 146:13 158:16 165:7 168:2,8 173:15 174:18

**wanted** 23:19 66:14 93:21 135:8 139:10 158:25 165:8

**watched** 34:23

**watching** 62:22

**way** 25:24 34:19 41:16 45:17 62:4 80:6 87:21 89:15 94:13

95:25 96:10 105:21 109:15 131:22,22 140:15 144:24 155:15 171:22 172:7

**we've** 81:2 96:22 102:10 136:13 167:18

**weapon** 82:24

**weapons** 87:16

**wearing** 102:22 103:3

**wednesday** 1:14 4:10

**week** 15:6 51:12 172:23

**weekend** 25:11

**weekly** 50:16

**weeks** 14:14,25 17:18 18:9,12

**welcome** 5:20 39:15 82:5 120:10

**wells** 177:2,14

**went** 18:15 19:21 20:23 27:17 40:14 48:3 64:12,23 149:6 163:24 167:13 171:24

**west** 19:24,25 20:5 62:25

**[western - years]**                                                        Page 41

| | | | |
|---|---|---|---|
| **western** 1:2 | **won** 159:19 | **wrapping** | 105:8 106:21 |
| **whitenight** | **word** 20:12 | 158:4 | 107:11 108:2,5 |
| 110:9,10 | 29:21 33:12 | **write** 95:8,9,10 | 114:2 124:9 |
| **window** 107:2 | 55:11 71:6 | 95:12 154:18 | 126:7,20 |
| **windshield** | 85:19 95:20 | 155:16 157:9,9 | 133:15 134:4 |
| 59:16 | 126:14,16,17 | **writing** 31:5 | 138:19 141:23 |
| **witness** 4:15,17 | 130:23 131:19 | 98:4 157:7 | 156:19 158:3 |
| 4:18 5:22 6:4 | 133:6 135:17 | **written** 5:3 | 158:11 160:5,5 |
| 11:5 13:19 | 138:9 157:2 | 26:2,6,14 | 161:23 162:20 |
| 17:22,25 18:4 | **wording** 7:17 | 28:16 29:14 | 164:6 165:2 |
| 28:9 31:4 | 7:20 | 30:21 46:17,17 | 167:5,8 170:9 |
| 33:13,16,19 | **words** 58:25 | 94:18 152:15 | 174:8 |
| 36:19 37:5 | 91:2 126:18 | 153:4,9 156:16 | **year** 9:2 10:13 |
| 38:6 66:4 74:5 | 135:14 166:15 | **wrong** 155:18 | 11:25,25 12:18 |
| 86:16 89:2 | 168:19 | **wrote** 156:4 | 12:18 16:25 |
| 90:5 93:17 | **work** 9:7,8,8,10 | **x** | 17:3,5,7 18:21 |
| 98:8,12,16 | 26:16 42:10 | | 19:7 20:9,18 |
| 99:5,10 102:15 | 43:6,11 55:18 | **x** 3:1,6 | 21:5,11 22:6 |
| 103:8 113:15 | 90:7,9 97:20 | **y** | 22:17 24:3,19 |
| 114:6,16,20 | 150:18 | | 42:6,14 43:21 |
| 115:6 121:4 | **worked** 21:17 | **yah** 130:24 | 50:4 54:6,11 |
| 123:13 124:9 | 22:23 23:2,4,8 | **yeah** 5:12 6:17 | 54:13 56:16 |
| 125:6,23 | 44:2 | 11:2,16,20,22 | 91:18 171:16 |
| 128:17 129:19 | **working** 12:15 | 14:5 18:11 | 172:11,11 |
| 130:4 131:14 | 21:22 25:13,14 | 27:12 28:6 | 173:8 175:2 |
| 133:22 134:4 | 25:21 41:5 | 29:9 31:21 | **yearly** 53:7,10 |
| 134:11,19 | 169:18 | 37:5,16 38:11 | 165:20 |
| 140:8 141:7 | **works** 105:22 | 41:25 42:11 | **years** 10:3,7,13 |
| 147:25 149:3 | 164:2 | 45:3,6 51:3 | 18:14 19:6,8 |
| 163:13 165:23 | **worry** 98:15 | 58:10 77:10 | 22:24 23:9 |
| 166:21 169:8 | **wow** 28:5 159:8 | 79:13 83:2 | 24:7,10 31:24 |
| 173:18,22 | **wrapped** 75:2 | 86:16 89:7,11 | 31:25 40:16 |
| 174:16,22 | 84:13 119:6 | 90:5 97:19 | 43:17 44:2 |
| 175:13 176:4 | | 98:23 100:24 | 45:20 52:19 |
| | | 104:8,10,14 | |

**[years - zoom]**                                        Page 42

152:22 153:24
153:25 154:12
162:15 167:13
**yep**   37:11 44:5
  79:13 105:4
  142:9 174:16
  175:17
**york**   1:2 4:11
  4:14 20:6,7
  22:23 23:16
  27:3,20 28:2
  51:21 53:14
  73:5,13 84:20
  84:23 86:7
  95:9 118:4
  168:11 176:19
**young**   175:2,5
  175:10
**youth**   26:21

**z**

**zoom**   88:24
  89:3,6,7

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.